**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**March 21, 2023**

**Christopher M. Wolpert**
**Clerk of Court**

BRENDA EVERS ANDREW,

    Petitioner - Appellant,

v.

TAMIKA WHITE, Acting Warden, Mabel
Bassett Correctional Center,*

    Respondent - Appellee.

No. 15-6190

_____

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:08-CV-00832-R)**
_____

John T. Carlson, Assistant Federal Public Defender (Virginia Grady, Federal Public
Defender, and Mark Henricksen of Henricksen & Henricksen, Oklahoma City,
Oklahoma, with him on the briefs), Denver, Colorado, for Petitioner-Appellant.

Joshua Lockett, Assistant Attorney General (Mike Hunter, former Attorney General of
Oklahoma, with him on the briefs), Oklahoma City, Oklahoma, for Respondent-Appellee.
_____

Before **HARTZ**, **BACHARACH**, and **PHILLIPS**, Circuit Judges.
_____

**PHILLIPS**, Circuit Judge.
_____

* Pursuant to Fed. R. App. P. 43(c)(2), Aboutanaa El Habti is replaced by
Tamika White as Acting Warden of the Mabel Bassett Correctional Facility.

Petitioner Brenda Evers Andrew, an Oklahoma state prisoner convicted of first-degree murder and sentenced to death, appeals the district court's denial of her habeas petition seeking a new trial or resentencing under 28 U.S.C. § 2254. We granted Ms. Andrew a Certificate of Appealability ("COA") on ten issues. Exercising jurisdiction under 28 U.S.C. §§ 1291 and 2253, we affirm.

## BACKGROUND

### I.    Factual Background

We begin with the Oklahoma Court of Criminal Appeals' ("OCCA") recitation of some orienting facts, as contained in its order affirming on direct appeal:

> [Ms. Andrew]'s husband Robert ("Rob") Andrew was shot to death at their Oklahoma City home sometime around 7:00 p.m. on November 20, 2001. [Ms. Andrew] was also shot in the arm during this incident.
>
> The Andrews were separated at the time and Rob Andrew was at the home to pickup [sic] the two minor children for visitation over the Thanksgiving holiday. The custom was that [Ms. Andrew] would bring the children out to the car and Rob would take them from there. However, on this night, [Ms. Andrew] asked Rob Andrew to come into the garage to light the pilot light on the furnace because it had gone out.
>
> [Ms. Andrew]'s version of the events from that point on was that as Rob was trying to light the furnace, two masked men entered the garage. Rob turned to face the men and was shot in the abdomen. He grabbed a bag of aluminum cans to defend himself and was shot again. [Ms. Andrew] was hit during this second shot.
>
> Undisputed facts showed that after that, [Ms. Andrew] called 911 and reported that her husband had been shot. Emergency personnel arrived and found Rob Andrew's body on the floor of the garage; he had suffered extensive blood loss and they were unable to revive him. [Ms. Andrew] had also suffered a superficial gunshot wound to her arm. The Andrew children were found in a bedroom, watching television with the volume turned up very high, oblivious to what had happened in the garage.

[Ms. Andrew] was taken to a local hospital for treatment. Her behavior was described by several witnesses, experienced in dealing with people in traumatic situations, as uncharacteristically calm for a woman whose husband had just been gunned down.

Rob Andrew was shot twice with a shotgun. A spent 16–gauge shotgun shell was found in the garage on top of the family van. Rob Andrew owned a 16–gauge shotgun, but had told several friends that [Ms. Andrew] refused to let him take it when they separated. Rob Andrew's shotgun was missing from the home. One witness testified to seeing [Ms. Andrew] at an area used for firearm target practice near her family's rural Garfield County home eight days before the murder and he later found several 16–gauge shotgun shells at the site.

[Ms. Andrew]'s superficial wound was caused by a .22 caliber bullet, apparently fired at close range, which was inconsistent with her claim that she was shot at some distance. About a week before the murder, [James] Pavatt purchased a .22 caliber handgun from a local gun shop. Janna Larson, Pavatt's daughter testified that, on the day of the murder, Pavatt borrowed her car and claimed he was going to have it serviced for her. When he returned it the morning after the murder, the car had not been serviced, but Larson found one round of .22 caliber rimfire ammunition on the floorboard. In a conversation later that day, Pavatt told Larson never to repeat that [Ms. Andrew] had asked him to kill Rob Andrew, and he threatened to kill Larson if she did. He also told her to throw away the .22 round she found in her car.

Police searched the home of Dean Gigstad, the Andrews' next-door neighbor, after the Gigstads reported finding suspicious things in their home. Police found evidence that someone had entered the Gigstads' attic through an opening in a bedroom closet. A spent 16 gauge shotgun shell was found on the bedroom floor, and several .22 caliber rounds were found in the attic itself. There were no signs of forced entry into the Gigstad home. Gigstad and his wife were out of town when the murder took place, but [Ms. Andrew] had a key to their home. The .22 caliber round found in Janna Larson's car was of the same brand as the three .22 caliber rounds found in the Gigstads' attic; the .22 caliber bullet fired at [Ms. Andrew] and retrieved from the Andrews' garage appeared consistent with bullets in these unfired rounds. These rounds were capable of being fired from the firearm that Pavatt purchased a few weeks before the murder; further testing was not possible because that gun was never found. The 16 gauge shotgun shell found in the Gigstads' home was of the same brand as the 16 gauge shell found in the Andrews' garage. Ballistics comparison showed similar markings, indicating that they could have been fired from the same weapon. Whether these shells were fired from the 16–gauge shotgun Rob Andrew had left at the home was

3

impossible to confirm because, as noted, that gun remains missing.

Within days after the shooting, before Rob Andrew's funeral, [Ms. Andrew], James Pavatt and the two minor children left the State and crossed the border into Mexico. They were apprehended while attempting to re-enter the United States in late February 2002.

[Ms. Andrew] and Pavatt met while attending the same church. At some point they began teaching a Sunday school class together. [Ms. Andrew] and Pavatt began having a sexual relationship. Around the same time, Pavatt, a life insurance agent, assisted Rob Andrew in setting up a life insurance policy through Prudential worth approximately $800,000. In late September 2001, Rob Andrew moved out of the family home, and [Ms. Andrew] initiated divorce proceedings a short time later.

Janna Larson, Pavatt's adult daughter, testified that in late October, Pavatt told her that [Ms. Andrew] had asked him to murder Rob Andrew. On the night of October 25–26, 2001, someone cut the brake lines on Rob Andrew's automobile. The next morning, Pavatt persuaded his daughter to call Rob Andrew from an untraceable phone and claim that [Ms. Andrew] was at a hospital in Norman, Oklahoma, and needed him immediately. An unknown male also called Rob that morning and made the same plea. Rob Andrew's cell phone records showed that one call came from a pay phone in Norman (near Larson's workplace), and the other from a pay phone in south Oklahoma City. Rob Andrew discovered the tampering to his car before placing himself in any danger. He then notified the police. The next day, [Ms. Andrew] told Rob that she read in the newspaper that someone cut his brakes, but no media coverage of this event had occurred.

One contentious issue in the Andrews' relationship was control over the insurance policy on Rob Andrew's life. After his brake lines were cut, Rob Andrew inquired about removing [Ms. Andrew] as beneficiary of his life insurance policy. Rob Andrew spoke with Pavatt's supervisor about changing the beneficiary. He also related his suspicions that Pavatt and [Ms. Andrew] were trying to kill him. At trial, the State presented evidence that in the months preceding the murder, [Ms. Andrew] and Pavatt actually attempted to transfer ownership of the insurance policy to [Ms. Andrew] without Rob Andrew's knowledge, by forging his signature to a change-of-ownership form and backdating it to March 2001.

In the days following the murder, Pavatt obtained information over the Internet about Argentina, because he had heard that country had no extradition agreement with the United States. Larson also testified that after

4

the murder, [Ms. Andrew] and Pavatt asked her to help them create a document, with the forged signature of Rob Andrew, granting permission for his children to travel with [Ms. Andrew] out of the country. [Ms. Andrew] also asked Larson to transfer funds from her bank account to Larson's own account, so that Larson might wire them money after they left town.

[Ms. Andrew] did not attend her husband's funeral, choosing instead, to go to Mexico with Pavatt and the children. Pavatt called his daughter several times from Mexico and asked her to send them money. Larson cooperated with the FBI and local authorities in trying to track down the pair.

After her apprehension, [Ms. Andrew] came into contact with Teresa Sullivan, who was a federal inmate at the Oklahoma County jail. Sullivan testified that [Ms. Andrew] told her that she and Pavatt killed her husband for the money, the kids, and each other. [Ms. Andrew] also told her that Pavatt shot her in the arm to make it look as if she was a victim.

Expert testimony opined that the wound to [Ms. Andrew]'s arm was not self-inflicted, but was part of a scheme to stage the scene to make it look like she was a victim, just like her husband.

*Andrew v. State* (*Andrew I*), 164 P.3d 176, 184–85 (Okla. Crim. App. 2007) (paragraph numbers and footnotes omitted), *as corrected* (July 9, 2007), *opinion corrected on denial of reh'g*, 168 P.3d 1150.[1]

## II.     Procedural Background

In November 2001, the State of Oklahoma charged Ms. Andrew with the first-degree murder of Rob Andrew and with conspiracy to commit that murder.[2] A jury convicted her on both counts.

---

[1] Ms. Andrew does not challenge these factual findings, and without clear and convincing evidence to the contrary, we presume them to be correct. *Lockett v. Trammel*, 711 F.3d 1218, 1222 (10th Cir. 2013); *see also* 28 U.S.C. § 2254(e)(1).

[2] Ms. Andrew was charged jointly with Pavatt, but their cases were severed for trial. A jury convicted Pavatt on both counts, and he received the death penalty. The

(continued)

At the close of the ensuing penalty-stage proceedings, the jury found, beyond a reasonable doubt, two aggravating factors that warranted the death penalty: (1) Ms. Andrew committed the murder for remuneration or the promise of remuneration ("remuneration aggravator"), and (2) the murder was especially heinous, atrocious, or cruel ("HAC aggravator").[3] After weighing those factors against mitigating evidence, the jury recommended a sentence of death. The court adopted that recommendation and sentenced Ms. Andrew to death.[4]

The OCCA affirmed Ms. Andrew's convictions and sentence on direct appeal and denied her petition for rehearing. *See Andrew I*, 164 P.3d at 206.[5] The OCCA also denied her application for post-conviction relief. *Andrew v. State* (*Andrew II*), No. PCD-2005-176 (Okla. Crim. App. Jun. 17, 2008) (unpublished).

---

OCCA affirmed his convictions and sentence, *Pavatt v. State*, 159 P.3d 272, 297 (Okla. Crim. App. 2007), and a federal district court denied his habeas petition, *Pavatt v. Trammell*, No. CIV-08-470-R, 2014 WL 1745019, at *57 (W.D. Okla. May 1, 2014). Pavatt appealed to this court. The original hearing panel affirmed Pavatt's convictions but reversed and remanded for further sentencing proceedings. *Pavatt v. Royal* (*Pavatt I*), 894 F.3d 1115, 1134 (10th Cir. 2017). After an en banc hearing, we vacated our prior panel opinion and affirmed the district court. *Pavatt v. Carpenter* (*Pavatt II*), 928 F.3d 906, 935 (2019) (en banc), *cert denied*, 140 S. Ct. 958 (2020). Pavatt now awaits execution.

[3] The jury rejected a third aggravating factor proposed by the government: that Ms. Andrew was a continuing threat to society.

[4] The court also sentenced Ms. Andrew to ten years' imprisonment and a fine for the conspiracy conviction.

[5] The OCCA corrected its earlier opinion in its order denying Ms. Andrew's petition for rehearing. *Andrew v. State*, 168 P.3d 1150, 1151–52 (Okla. Crim. App. 2007). That change is reflected in the recitation of the facts.

Having exhausted her state-court remedies, Ms. Andrew filed the 28 U.S.C.

§ 2254 petition underlying this appeal. The district court denied the petition and declined

to issue a COA. *Andrew v. Moham* (*Andrew III*), No. CIV-08-832-R, 2015 WL 5254525,

at *58 (W.D. Okla. Sept. 9, 2015).

Ms. Andrew then appealed to this court. We ultimately granted her a COA on

these ten issues:

1. Whether the admission and use of evidence about Ms. Andrew's sex life rendered the guilt and penalty phases of the trial fundamentally unfair.

2. Whether the exclusion of the six defense witnesses during the trial's guilt phase violated Ms. Andrew's Sixth Amendment right to present a defense.

3. Whether the government, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), suppressed material evidence during the guilt phase by failing to disclose evidence that Teresa Sullivan, a jailhouse informant, received a benefit after testifying against Ms. Andrew and whether an evidentiary hearing is warranted.

4. Whether the admission of a video-recorded, pre-*Miranda* interview Ms. Andrew gave to law enforcement violated the Fifth Amendment, affecting the guilt phase.

5. Whether the admission of Rob Andrew's statements in a police report during the guilt phase violated Ms. Andrew's rights under the Sixth Amendment's Confrontation Clause.

6. Whether four instances of penalty-phase prosecutorial misconduct violated Ms. Andrew's due-process rights.

7. Whether Ms. Andrew received ineffective assistance of counsel on the handling of bloodstain evidence, affecting both the guilt phase and penalty phase of the trial.

8. Whether Ms. Andrew received ineffective assistance of counsel because of her trial counsel's ignorance of the extradition treaty between Mexico and the United States and her appellate counsel's failure to bring her

7

ineffective-assistance-of-counsel claim on direct appeal.

9.  Whether there was sufficient evidence to support the HAC aggravator.

10. Whether accumulation of error in the guilt and penalty phases offends due process.

Case Mgmt. Order at 1–2 (Sept. 29, 2016); Order Granting Motion to Expand COA at 1 (Mar. 30, 2017) (expanding the COA to include Claim 8 and to include two other defense witnesses in Claim 2); Order Granting Combined Motion for Expanded COA at 1 (July 3, 2017) (expanding the COA to include Claim 10).[6]

## STANDARD OF REVIEW

This appeal is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under AEDPA, when a state court has "adjudicated" a claim "on the merits," we may grant habeas relief only if the petitioner establishes that the adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)–(2).[7]

Our application of § 2254(d)(1) requires two steps. First, as a "threshold matter," we must determine "what constitutes 'clearly established Federal law, as determined by

---

[6] We have altered the order of Ms. Andrew's claims in light of our orders granting her motions to expand the COA.

[7] Here, the OCCA adjudicated all claims on the merits. When a state court has not done so, we are "not constrained by the deference principles in § 2254(d)." *Cargle v. Mullin*, 317 F.3d 1196, 1212 (10th Cir. 2003).

the Supreme Court of the United States.'" *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003) (quoting § 2254(d)(1)). In this context, clearly established federal law refers to holdings of the Supreme Court, not dicta. *Terry Williams v. Taylor*, 529 U.S. 362, 412 (2000). Those holdings "must be construed narrowly" and "on-point." *Fairchild v. Trammell*, 784 F.3d 702, 710 (10th Cir. 2015) (citation omitted). It isn't necessary for the holding to "have had its genesis in [a] closely-related or similar factual context" to the case at issue, but "the Supreme Court must have expressly extended the legal rule to that context." *House v. Hatch*, 527 F.3d 1010, 1016 (10th Cir. 2008).

If—and only if—the principle of federal law was clearly established, do we then move to the second step. *See id.* at 1017–18 ("The absence of clearly established federal law is dispositive under § 2254(d)(1)."). In step two, we "consider whether the state court decision was 'contrary to' or an 'unreasonable application of' that clearly established federal law." *Bland v. Sirmons*, 459 F.3d 999, 1009 (10th Cir. 2006).

A state-court decision is "contrary to" clearly established law under § 2254(d)(1) if it "applies a rule different from the governing law set forth in Supreme Court cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts." *Lockett*, 711 F.3d at 1231 (brackets and citation omitted).

And a state court decision involves an "'unreasonable application' of clearly established federal law if it 'identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of [the] petitioner's case.'" *Id.* (citation omitted). Whether an application of a rule is unreasonable depends in part on the rule's specificity. *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). "The more general the

9

rule, the more leeway courts have in reaching outcomes in case-by-case determinations."
*Id.*

Crucially, an "*unreasonable* application of federal law is different from an
*incorrect* application of federal law." *Terry Williams*, 529 U.S. at 410. A state court's
application of federal law is unreasonable only if "*every* fairminded jurist" would "reach
a different conclusion." *Brown v. Davenport*, 142 S. Ct. 1510, 1530 (2022). In other
words, the state-court determination must have been "so lacking in justification that there
was an error well understood and comprehended in existing law beyond any possibility
for fairminded disagreement." *Davis v. Ayala*, 576 U.S. 257, 269–70 (2015) (citation
omitted).

Our application of § 2254(d)(2) is similarly constrained. We cannot conclude that
a state court's determination of the facts was unreasonable "merely because we would
have reached a different conclusion in the first instance." *Brumfield v. Cain*, 576 U.S.
305, 313–14 (2015) (cleaned up). Instead, we must defer to the state court's factual
determinations if "reasonable minds reviewing the record might disagree about the
finding in question." *Id.* (cleaned up). Thus, a state court's factual findings are presumed
correct, and a petitioner bears the burden of rebutting that presumption by "clear and
convincing evidence." 28 U.S.C. § 2254(e)(1).

"Recognizing the duty and ability of our state-court colleagues to adjudicate
claims of constitutional wrong, AEDPA erects a formidable barrier to federal habeas
relief for prisoners whose claims have been adjudicated in state court." *Burt v. Titlow*,
571 U.S. 12, 19 (2013). The standard stops short only of a "complete bar on federal-court

10

relitigation of claims already rejected in state proceedings." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). So if the standard appears "difficult to meet, that is because it was meant to be." *Id.*

We also briefly review how harmless error applies for alleged constitutional violations at different stages of a criminal proceeding. On direct appeal, the *Chapman* harmless-error standard applies. *Ayala*, 576 U.S. at 267 (citing *Chapman v. California*, 386 U.S. 18, 24 (1967)). Under that standard, the government bears the burden of showing that the federal constitutional error was harmless beyond a reasonable doubt. *Chapman*, 386 U.S. at 24; *see also Deck v. Missouri*, 544 U.S. 622, 635 (2005) ("The State must prove 'beyond a reasonable doubt that the [constitutional] error complained of did not contribute to the verdict obtained.'" (citation omitted)).

But after a case is decided on a direct appeal and presents itself on federal habeas review, we apply the harmless-error standard from *Brecht v. Abrahamson*, 507 U.S. 619 (1993). Under the *Brecht* standard, "relief is proper only if the federal court has grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict." *Ayala*, 576 U.S. at 267–68 (quotations and citation omitted). This requires that the petitioner show "actual prejudice." *Brecht*, 506 U.S. at 637.

But *Brecht* doesn't "abrograte[] the limitation on federal habeas relief that § 2254(d) plainly sets out." *Ayala*, 576 U.S. at 268. Instead, when we review a state

11

court's *Chapman* decision under AEDPA,[8] the petitioner must show that the state court "applied *Chapman* in an objectively unreasonable manner." *Id.* at 269 (citation omitted). Put differently, the state's "*harmlessness determination itself*" must have been unreasonable. *Id.* (citation omitted). "And a state-court decision is not unreasonable if fairminded jurists could disagree on its correctness." *Id.* (cleaned up).

So "a federal court must *deny* relief to a state habeas petitioner who fails to satisfy either [*Brecht*] or AEDPA. But to *grant* relief, a court must find that the petitioner has cleared both tests." *Davenport*, 142 S. Ct. at 1524; *see also Malone v. Carpenter*, 911 F.3d 1022, 1030 (10th Cir. 2018) ("[S]atisfaction of the AEDPA/*Chapman* standard is a *necessary* condition for relief (that is, failure to satisfy the standard requires denial of relief), but satisfaction of the standard is not a *sufficient* condition because *Brecht* must also be satisfied.").

Further, we review the federal district court's conclusions of law de novo and its factual determinations for clear error. *Hanson v. Sherrod*, 797 F.3d 810, 825 (10th Cir. 2015).

## DISCUSSION

With the AEDPA standard firmly in mind, we address each of Ms. Andrew's claims in turn.

---

[8] A state court's determination that a federal error was harmless beyond a reasonable doubt under *Chapman* constitutes an adjudication "on the merits" for the purposes of § 2254(d). *See Ayala*, 576 U.S. at 269.

## I.    Right to a Fair Trial: Admission of Sexualization Evidence

Ms. Andrew argues that the admission of "bad acts" evidence, in her view all irrelevant to the charged crimes, rendered the guilt and penalty phases of her trial fundamentally unfair, in violation of due process.[9] The challenged evidence included:

- Testimony about Ms. Andrew's affairs with Rick Nunley and James Higgins.

- Testimony that Ms. Andrew dyed her hair red after learning that her husband's friend preferred that color.

- Testimony that while with her husband and another couple at a restaurant, someone called her a "hootchie" because she was dressed provocatively.

- Testimony that Ms. Andrew trained her children to be discreet about her affairs.

- Testimony that Ms. Andrew made sexual advances toward two college-aged males who were hired to fence her yard.

- Evidence that Ms. Andrew possessed a book entitled "203 Ways to Drive a Man Wild in Bed."

- Testimony that Pavatt's daughter doubted Ms. Andrew's claim to him that she had only had two sexual partners in her life—Rob Andrew and Pavatt.

- Testimony that Rob Andrew had expressed frustration with his and Ms. Andrew's lack of a sex life.

- Ms. Andrew's thong underwear that she took to Mexico.

*See* Opening Br. at 22–27.

---

[9] On direct appeal, Ms. Andrew challenged this evidence in two separate "Propositions." Proposition III.B and III.C challenged evidence of her affairs and other sexual and sexualizing facts unrelated to her relationship with Pavatt. Proposition VII.2 challenged evidence directly tied to her relationship with Pavatt. Because both Propositions were "anchored" in the Due Process Clause of the Fourteenth Amendment, she consolidated them for this appeal. Opening Br. at 44.

Ms. Andrew also challenged how the above evidence was used by the government in closing arguments. Specifically, she objected to the government doing these things:

- "Brandish[ing]"[10] Ms. Andrew's underwear and insinuating that no true grieving widow would pack such underwear and leave for Mexico with her boyfriend.

- Referring to her affairs with Nunley and Higgins.

- Referring to entries in Rob Andrew's journal about Ms. Andrew's two earlier affairs during their engagement.[11]

*See* Opening Br. at 28–31.

The OCCA concluded that the state court hadn't abused its discretion by admitting the majority of the challenged evidence because it was relevant to show Ms. Andrew's motive, intent, preparation, and "the schemes she used to enter into a conspiracy with Pavatt to kill Rob Andrew." *Andrew I*, 164 P.3d at 188–94. Though the OCCA "struggl[ed] to find any relevance" for some of the challenged evidence, the court still concluded that its admission "was harmless due to the overwhelming evidence in this case." *Id.* at 192.

---

[10] As Ms. Andrew concedes, nothing in the record indicates that the government ever "brandished" her underwear.

[11] The government argues that though all the challenged evidence was in the record, Ms. Andrew failed to identify it before the OCCA. So it requests that we ignore all newly presented evidence when evaluating this claim. But we need not decide this issue because Ms. Andrew cannot prevail even if we consider all the matters she raises in this claim.

Because the OCCA adjudicated this legal claim "on the merits," Ms. Andrew must overcome AEDPA's deferential standard of review set out at § 2254(d)(1).[12] Specifically, Ms. Andrew must show that the OCCA's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

We begin, as we must, with Ms. Andrew's first required showing under § 2254(d)(1): evaluating whether she has cited clearly established federal law governing her claim. *Sanders v. Miller*, 555 F. App'x 750, 752 (10th Cir. 2014) (Gorsuch, J.) ("[The petitioner] bears the burden of identifying [the] clearly established Supreme Court law."). The district court accepted Ms. Andrew's position that *Payne v. Tennessee*, 501 U.S. 808 (1991), met the clearly-established-law requirement. *See Andrew III*, 2015 WL 5254525, at *18–19. We disagree.

In *Holland v. Allbaugh*, 824 F.3d 1222, 1228 (10th Cir. 2016), we foreclosed reliance on *Payne* as an "on-point" Supreme Court holding for evidentiary claims. There, the petitioner sought habeas relief given the trial court's admission of what the petitioner

---

[12] On direct appeal to the OCCA, Ms. Andrew styled this claim as one arising under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and under the Oklahoma Constitution. In denying her claim, the OCCA referenced only state law. Nevertheless, we must presume that the OCCA adjudicated the merits of the federal claims as well. *See Johnson v. Williams*, 568 U.S. 289, 301 (2013) ("When a state court rejects a federal claim without expressly addressing that claim, a federal habeas court must presume that the federal claim was adjudicated on the merits[.]"). Though the "presumption that the federal claim was adjudicated on the merits may be rebutted," Ms. Andrew has made no effort to do so on appeal. *Id.* In fact, the parties treat this claim as requiring consideration of the OCCA's harmlessness determination subject to AEDPA's deferential standard of review.

alleged was irrelevant and prejudicial evidence. *Id.* Specifically, the petitioner challenged the admission of any testimony about his racial animus and Nazi tattoos. *Id.* The district court agreed with the petitioner and granted him relief after concluding that the OCCA had unreasonably applied *Payne* by not ruling that the challenged evidence violated the petitioner's right to a fair trial. *Id.*

We reversed. We viewed *Payne*'s central holding as more limited than the district court had viewed it, namely, that *Payne* had merely established that the Eighth Amendment did not erect a "*per se* bar" to the introduction of victim-impact statements in capital cases. *Id.* (quoting *Payne*, 501 U.S. at 827). We acknowledged *Payne*'s broad pronouncement that when "evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Id.* (quoting *Payne*, 501 U.S. at 825). But we viewed the broad statement as applying to scenarios in which "some victim impact statements will be so unfairly prejudicial, that their introduction will violate the Constitution notwithstanding the Eighth Amendment." *Id.*

Thus, we concluded that *Payne* didn't "clearly establish the applicable legal framework for wrongfully-admitted trial evidence." *Id.* at 1229. We treated *Payne* as setting a "general legal principle" involving the "factually distinct context" of victim-impact statements in a capital case. *Id.* at 1229. And because the petitioner hadn't identified clearly established law governing his evidentiary-rulings-based claim, we reversed the district court's grant of habeas relief. *Id.*; *see also Wyatt v. Crow*, 812 F. App'x 764, 767 (10th Cir. 2020) (relying on *Holland* to hold that no "Supreme

16

Court decision clearly establish[es] a standard for wrongfully admitted trial evidence"); *Stewart v. Winn*, 967 F.3d 534, 539–40 (6th Cir. 2020) (rejecting the petitioner's attempt to rely on the "general rule that the Due Process Clause prohibits 'fundamentally unfair' procedures—without a specific Supreme Court holding covering the type of due-process error he asserts"); *Holley v. Yarborough*, 568 F.3d 1091, 1101 (9th Cir. 2009) ("[The Supreme Court] has not yet made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ.").

Because Ms. Andrew raises a claim challenging a state court's evidentiary rulings, she faces the same problem as the petitioner faced in *Holland*: *Payne* is not "clearly established law" that establishes a due-process violation arising from ordinary evidentiary rulings at trial.

In pursuing a constitutional claim for the evidentiary rulings, Ms. Andrew also faces a roadblock in *Estelle v. McGuire*, 502 U.S. 62 (1991). There, the petitioner, convicted of the second-degree murder of his infant daughter, challenged his conviction on grounds that the district court had violated his due-process rights by admitting irrelevant battered-child-syndrome evidence. *Id.* at 67. The Ninth Circuit granted habeas relief, concluding that the evidence rendered the petitioner's trial arbitrary and fundamentally unfair in violation of due process. *Id.* at 66–67. But the Supreme Court reversed after concluding that the evidence was probative of intent. *Id.* at 69. With that decided, the Court observed that it "need not explore further the apparent assumption of the Court of Appeals that it is a violation of the due process guaranteed by the Fourteenth

17

Amendment for evidence that is not relevant to be received in a criminal trial." *Id.* at 70. So *Estelle* found no clearly established federal law that would entitle a petitioner to habeas relief based on the admission of irrelevant evidence. And no post-*Estelle* case has opted to "explore further" that rule. *Id.*

Though Ms. Andrew chiefly relies on *Payne* as her strongest case, we briefly explain why her other cited cases also fall short. Those cases include *Lisenba v. California*, 314 U.S. 219 (1941), *Chambers v. Mississippi*, 410 U.S. 284 (1973), and *Brown v. Sanders*, 546 U.S. 212 (2006).[13]

First, Ms. Andrew argues that *Lisenba* constitutes clearly established law given its statement that the "aim" of due process is "to prevent fundamental unfairness in the use of evidence whether true or false." 314 U.S. at 236. But *Lisenba* provides Ms. Andrew no help. The Court rejected a due-process claim contesting the admission of prejudicial evidence, noting that it didn't "sit to review state court action on questions of the propriety of the trial judge's action in the admission of evidence." *Id.* at 228; *see also Stewart*, 967 F.3d at 539 (holding that *Lisenba* did not serve as clearly established law for a due-process claim based on the admission of irrelevant and prejudicial evidence).

---

[13] In her Reply Brief, Ms. Andrew also urges us to consider *Kansas v. Carr*, 577 U.S. 108 (2016). She does so because *Carr* quotes *Payne* for the proposition that due process "wards off the introduction of 'unduly prejudicial' evidence that would 'rende[r] the trial fundamentally unfair.'" *Carr*, 577 U.S. at 123 (quoting *Payne*, 501 U.S. at 825). But as Ms. Andrew concedes, *Carr* post-dates the OCCA's direct appeal opinion by nearly a decade. *See Greene v. Fisher*, 565 U.S. 34, 38 (2011) (holding that "clearly established" requires that the precedent be in place at the time of the state court decision). Further, *Carr* does not persuade us that, contrary to our precedent, *Payne* serves as clearly established law entitling her to proceed with her due-process claim.

Next, Ms. Andrew relies on *Chambers* as clearly established law based on its rejection of two common-law evidentiary rules—(1) that a party may not impeach his own witness, and (2) that the declarations-against-interest hearsay exception applies only to declarations against pecuniary, not penal, interests, which the trial court relied on to exclude "critical evidence. . . [that] denied [the petitioner] a trial in accord with traditional and fundamental standards of due process." 410 U.S. at 302. But that holding dealt with exclusion, not admission, of evidence that was critical to the petitioner's defense. *Id.* at 294–303.

As for *Brown*, Ms. Andrew provides no analysis. She merely fashions a sentence from interspersed quotes from *Brown* to argue that "'due process would mandate reversal' where 'an invalid sentencing factor allowed the sentencer to consider evidence that would not otherwise have been before it.'" Reply Br. at 2 (quoting *Brown*, 546 U.S. at 220–21). *Brown* doesn't apply here. That case involved the factually distinct context of capital sentencing and set forth a test for setting aside a death sentence if an aggravating sentencing factor is later invalidated. *Id.* at 220; *see also House*, 527 F.3d at 1016 (holding that while a Supreme Court holding need not "have had its genesis in [a] closely-related or similar factual context" to the case at issue, "the Supreme Court must have expressly extended the legal rule to that context"). It did not involve the admission of prejudicial evidence at the guilt phase.[14]

---

[14] Ms. Andrew also cites four Tenth Circuit cases to meet the clearly-established-law requirement: *Spears v. Mullin*, 343 F.3d 1215 (10th Cir. 2003); *Duckett v. Mullin*, 306 F.3d 982 (10th Cir. 2002); *Revilla v. Gibson*, 283 F.3d 1203 (10th Cir. 2002); and

(continued)

In sum, Ms. Andrew has not identified clearly established federal law governing her claim. *See House*, 527 F.3d at 1018 ("The absence of clearly established federal law is dispositive under § 2254(d)(1)."). We thus affirm the district court's denial of Ms. Andrew's claim premised on the due-process right to a fair trial.[15]

## II.     Right to Present a Complete Defense: Exclusion of Witnesses and Testimony

In her second claim, Ms. Andrew argues that the trial court violated her right to present a complete defense by excluding all or part of the testimony of six defense witnesses during the guilt phase of her trial. Relying on a provision of the Oklahoma Discovery Code, the trial court excluded at least some of the testimony of five witnesses because Ms. Andrew hadn't furnished summaries of their anticipated testimony.[16] It excluded part of a sixth witness's testimony as hearsay.

---

*Williamson v. Ward*, 110 F.3d 1508 (10th Cir. 1997). But "circuit precedent does not constitute 'clearly established Federal law'" and therefore "cannot form the basis for habeas relief under AEDPA." *Parker v. Matthews*, 567 U.S. 37, 48–49 (2012) (per curiam) (quoting 28 U.S.C. § 2254(d)(1)).

[15] We share the OCCA's concerns about some of the "sexual and sexualizing" evidence admitted at trial, and the use to which it was put by the government. But Ms. Andrew must overcome AEDPA's deferential standard of review, and as explained in this opinion, she has not.

[16] The trial court excluded the witnesses under Okla. Stat. tit. 22, § 2002, which provides that "[i]f at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule, the court may order such party to permit the discovery or inspection, grant continuance, or prohibit the party from introducing evidence not disclosed, or it may enter such other order as it deems just under the circumstances."

The OCCA rejected Ms. Andrew's constitutional claim for all six witnesses, holding under *Chapman* that excluding the testimony was harmless beyond a reasonable doubt. Thus, we will assume constitutional error and move to whether Ms. Andrew can establish that the OCCA unreasonably applied *Chapman* under § 2254(d)(1). *See Ayala*, 576 U.S. at 269. Ms. Andrew cannot meet this stringent standard without showing that "*every* fairminded jurist" would "reach a different conclusion." *Davenport*, 142 S. Ct. at 1530.

After providing some brief legal background, we address Ms. Andrew's arguments and the OCCA's decision regarding each witness.

### A.      Legal Background

Defendants are guaranteed "a meaningful opportunity to present a complete defense" by the Due Process Clause of the Fourteenth Amendment and the Compulsory Process and Confrontation Clauses of the Sixth Amendment. *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (citation omitted). "This right is abridged by evidence rules that infringe upon a weighty interest of the accused and are arbitrary or disproportionate to the purposes they are designed to serve." *Id.* (cleaned up).

But the right to present testimony is not "free from the legitimate demands of the adversarial system." *United States v. Nobles*, 422 U.S. 225, 241 (1975). Defendants must "comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." *Chambers*, 410 U.S. at 302; *see also Taylor v. Illinois*, 484 U.S. 400, 413–15 (holding that the trial court's

exclusion of a witness whose name was untimely disclosed to the government didn't violate the defendant's right to a complete defense).

### B.    Sergeant Northcutt and Officer Frost

Ms. Andrew first challenges the exclusion of one portion of testimony from two Oklahoma City police officers—Sergeant Northcutt and Officer Frost—who provided off-duty patrols in Ms. Andrew's neighborhood. Ms. Andrew contends that Sergeant Northcutt would have testified that a few weeks before the shooting, she asked him to conduct extra off-duty patrols of her house because she feared Rob Andrew. She also contends that Officer Frost would have testified that Sergeant Northcutt had told him about Ms. Andrew's request and reported fear.

Ms. Andrew sought to admit the two officers' testimony because it "would have chipped away at the theory that Andrew planned and participated in her husband's murder." Opening Br. at 48. And, she says, it could have given the jury "an alternate, innocent explanation for Andrew's retention of the family shotgun after she and her husband separated, namely, her personal-security fears." *Id.* at 50.

Because Ms. Andrew failed to provide notice as required by Oklahoma's Discovery Code, the trial court barred Sergeant Northcutt from testifying that Ms. Andrew was the person who had requested the extra patrols. It limited his testimony to information about his work conducting off-duty patrols in her neighborhood.

Further, the trial court precluded as hearsay Officer Frost's proposed testimony that Ms. Andrew had asked Sergeant Northcutt to provide increased patrols. Even so, Officer Frost testified about his and other officers' off-duty patrols in Ms. Andrew's

neighborhood. He also testified that before Rob Andrew's murder, Sergeant Northcutt

received a request for extra security from someone in Ms. Andrew's neighborhood—he

just couldn't name the person requesting this.

On direct appeal, the OCCA rejected Ms. Andrew's claims:

[Ms. Andrew] claims that she was not allowed to present the testimony from Sergeant Larry Northcutt and Officer Roger Frost, both of whom worked during their off duty hours patrolling the Lansbrook neighborhood where the Andrews lived. Counsel asked Northcutt whether [Ms. Andrew] requested extra patrols around her house. Trial court ruled that the information had not been provided in discovery; therefore, Northcutt could not answer the question. Not until the day that Northcutt was to testify, did [Ms. Andrew] provide a summary of his testimony. No good reason existed for this other than to attempt to gain a tactical advantage; therefore, the trial court did not abuse its discretion in precluding this testimony.

Counsel asked Frost, in many different ways, whether Northcutt told him that [Ms. Andrew] requested extra patrols at her residence. The trial court sustained each objection based on hearsay. What was evident from the testimony was that the off-duty officers were providing extra patrol near the residence. On appeal, [Ms. Andrew] argues that the testimony is not hearsay, it is provided to show why the officers provided extra patrol. On the contrary, counsel wanted to elicit this testimony to show that [Ms. Andrew] requested extra patrols in order to show that she was not a calculating murderer. This testimony was hearsay and the trial court did not abuse its discretion.

Furthermore, the jury was well aware that extra patrols were requested. The only information that was kept from the jury was that [Ms. Andrew] had requested those patrols. The failure to give this information to the jury did not prejudice [Ms. Andrew]. The jury might have believed that her request for extra patrols took place during the planning stage of this murder, and the request was just another method of deflecting suspicion away from her.

*Andrew I*, 164 P.3d at 196–97 (paragraph numbers omitted).

So Ms. Andrew's claim depends on her showing that the OCCA unreasonably

applied *Chapman* in ruling that any (assumed) constitutional error in precluding the

proffered testimony (that Ms. Andrew requested the additional patrols) was harmless

beyond a reasonable doubt.[17] As did the OCCA, we must consider (1) the probative value of the precluded testimony and (2) the overall strength of the evidence against Ms. Andrew. *See United States v. Roach*, 896 F.3d 1185, 1195–96 (10th Cir. 2018).

Ms. Andrew disputes the OCCA's harmlessness determination in a single paragraph. She contends that we should grant relief because the precluded testimony "may have caused just one juror to pause, hesitant to convict Andrew of planning a murder in a location she knew would be the object of intensified surveillance." Opening Br. at 52.[18] But even if that were so, it would not address AEDPA's requirements. That same misunderstanding of her burden recurs throughout her briefing.

We reiterate that Ms. Andrew must establish that the OCCA unreasonably applied *Chapman*. To do so, she must demonstrate that "*every* fairminded jurist" would "reach a different conclusion"—not whether "*some* fairminded jurist" might. *Davenport*, 142 S. Ct. at 1530; *see also Ayala*, 562 U.S. at 101 (holding that a petitioner is not entitled to relief so long as "fairminded jurists could disagree" on the correctness of the

---

[17] In ruling that the excluded testimony didn't "prejudice" Ms. Andrew, the OCCA didn't refer to the "harmless beyond a reasonable doubt" standard or cite *Chapman*, as it did elsewhere in its opinion. But the parties agree that the finding of no "prejudice" substitutes for that. Further, we don't "impose mandatory opinion-writing standards on state courts." *Williams*, 568 U.S. at 300. And because Ms. Andrew presented this claim as a federal claim, we must presume that the OCCA adjudicated it as such and on its merits. *Id.* at 301. We therefore interpret the OCCA's no "prejudice" language as a *Chapman* application.

[18] Ms. Andrew doesn't dispute that she provided inadequate notice of the content of Sergeant Northcutt's testimony, or that Officer Frost's testimony about what Sergeant Northcutt told him was hearsay.

state court's decision) (quoting *Alvarado*, 541 U.S. at 664)). In advancing a "just one juror" argument, Ms. Andrew is in reality asking that we review her claim as though she were on direct appeal seeking de novo review. She neglects even to acknowledge—let alone meet—her much heavier burden under AEDPA/*Chapman*.

We have no difficulty concluding that a fairminded jurist could agree with the OCCA that any constitutional error in excluding these portions of the two witnesses' testimony was harmless beyond a reasonable doubt. As did the OCCA, a reasonable jurist would need look no further than the overwhelming evidence of Ms. Andrew's guilt. To supplement some of the earlier-provided evidence in support of her planning and carrying out the murder of Rob Andrew, we mention these additional facts:

- Ms. Andrew stated that she wished Rob Andrew was dead so she could go on with her life and get his life-insurance money; "she would see him dead" [Trial Vol. 3 at 136]; and she was going to kill Rob Andrew or have him killed.[19]

- Ms. Andrew told Higgins that she hated Rob "and wished that she didn't have to stay with him." Trial Vol. 2 at 88.

- Ms. Andrew asked Pavatt whether he would kill Rob Andrew or knew someone who would do it for her.

- Rob Andrew repeatedly expressed fear of Ms. Andrew and Pavatt and said he believed that they would murder him over his life-insurance policy.

- Ms. Andrew and Pavatt attempted to murder Rob Andrew by cutting his car's brake lines and luring him to the hospital.

- Ms. Andrew and Pavatt attempted to fraudulently change the ownership

---

[19] All record citations, unless otherwise noted, are to the digital version of the record, not the paper version. We cite the appropriate folder and PDF pagination.

of Rob Andrew's life-insurance policy from Rob Andrew to Ms. Andrew.

- Ms. Andrew had Pavatt tracking Rob Andrew in the month leading up to his murder.

- The night before Rob's murder, Ms. Andrew told her friend, referring to Rob: "I hate him. I hate him. I hate him." Trial Vol. 11 at 175–76.

- Ms. Andrew was unusually calm at the crime scene and in the hours after her husband's murder.

- Ms. Andrew and Pavatt were seen giggling together at the hospital the morning after the murder.

- At the time of the murder, the Andrew children were in a room far from the garage, where the murder took place, with the door closed and the television turned up loud even though they were supposed to be ready to leave with Rob Andrew to spend the Thanksgiving vacation with him and his parents.

- Testimony from each side's expert witness that Ms. Andrew's arm-shooting was staged to make it look like she was a victim.

- Expert testimony that Ms. Andrew was shot in the arm from two to four inches away, in contradiction of her testimony that she was shot from some distance.

- Pavatt purchased a .22 caliber handgun a week before the murder. On the day of the murder, Pavatt borrowed his daughter's car. The day after the murder, Pavatt's daughter found a .22 caliber round on the floorboard of her car and turned it over to the police.

- Ms. Andrew was shot with a .22 caliber handgun, the shell of which was recovered at the crime scene.

- Ms. Andrew kept and refused to return to Rob Andrew his 16-gauge shotgun, a variety of shotgun less common than a 12- or 20-gauge shotgun, after Rob moved out in September 2001. Rob told several friends that Ms. Andrew refused to let him take it when they separated. Ms. Andrew told the police she hadn't seen it since January 2001, and the shotgun was never found after the murder.

- Ms. Andrew was seen at a firearm target range near her family's Garfield County home eight days before the murder. Several 16-gauge shotgun shells were later found at the site.

- Rob was killed by two 16-gauge shotgun blasts.

- One spent 16-gauge shotgun shell was found on top of the Andrews' van in the garage and the other spent shell was found in the neighbors' spare bedroom.

- The police found three .22 caliber rounds in the attic and spare bedroom leading to the attic at the Andrews' neighbors' home. Ms. Andrew had a spare key to the home, and was watching the home for the neighbors, who were out of town on vacation at the time of the murder.

- Ballistics evidence showed that the same 16-gauge shotgun fired the spent shells found on the van in the garage and in the spare bedroom of the neighbors' home.

- The .22 caliber round found in Pavatt's daughter's car the day after the murder and the .22 caliber rounds found inside the neighbors' home were the same brand. And the .22 caliber bullet fired at Ms. Andrew and recovered from the crime scene was consistent with those unfired rounds.

- Ms. Andrew demonstrated no interest in planning her husband's funeral. When the funeral director asked her what she loved and would miss about Rob, she said "nothing." Trial Vol. 11 at 95. The funeral director said that her response was the most "bizarre" he had received in his twenty-five years of experience. Trial Vol. 11 at 95.

- Ms. Andrew fled to Mexico with Pavatt and her children in Ms. Pavatt's car before Rob Andrew's funeral.

- Though Ms. Andrew blamed two masked men for the shootings, Pavatt later claimed that he had shot Ms. Andrew and that another unidentified man had murdered Rob Andrew.

Ms. Andrew does not dispute that Officer Frost's and Sergeant Northcutt's testimony was cut short on just one point: that Ms. Andrew was the one who requested the extra neighborhood patrols. But based on the overwhelming evidence of Ms.

27

Andrew's guilt, as the OCCA concluded, the exclusion of this evidence was harmless.

Second and relatedly, Ms. Andrew overstates the value of the precluded testimony because, as the OCCA correctly noted, the jury "might have believed that her request for extra patrols took place during the planning stage of this murder, and the request was just another method of deflecting suspicion away from her." *Andrew I*, 164 P.3d at 197. Such a view would be bolstered by the undisputed fact that Ms. Andrew asked Rob Andrew to get out of his car and enter the garage with her, purportedly to reignite the pilot light.

Thus, we conclude that a fairminded jurist could easily conclude that the OCCA correctly determined that any constitutional error in excluding Sergeant Northcutt's and Officer Frost's testimony on this point was harmless beyond a reasonable doubt. Ms. Andrew has therefore failed to demonstrate that the OCCA unreasonably applied *Chapman* in evaluating the testimony of these two witnesses.[20]

### C.     Officer Warren

Next, Ms. Andrew challenges the exclusion of Officer Warren's testimony. Officer Warren was one of the first officers to arrive at the murder scene. Ms. Andrew claims that had Officer Warren been permitted to testify, he would have testified that after entering the garage (1) he found Ms. Andrew kneeling by Rob Andrew's side; (2) she asked Officer Warren to help Rob Andrew; and (3) Rob Andrew had obviously already died. Ms. Andrew argues that this testimony would have "blunted a key aspect of

---

[20] Because Ms. Andrew failed to show that the OCCA unreasonably applied *Chapman*'s standard of harmlessness, she "necessarily cannot satisfy" the *Brecht* standard of actual prejudice. *Ayala*, 576 U.S. at 270.

the prosecution's case: that Brenda Andrew acted indifferently, even coldly toward her husband on the night he was killed." Opening Br. at 53.

The OCCA determined that even assuming constitutional error from precluding Officer Warren's testimony, any such error was harmless beyond a reasonable doubt:

> [Ms. Andrew] claims that exclusion of Officer Ronald Warren's testimony was error. The testimony was excluded, because of a lack of pre-trial notice. This officer made a written report, which was in the custody of the State. The report spells out his expected testimony . . . . [T]he exclusion of the testimony constituted an abuse of discretion. However, defense counsel was able, through another witness, to elicit the same evidence; evidence that [Ms. Andrew] was kneeling over obviously deceased Rob Andrew attempting to aid him, while disregarding her own gunshot injury. This excluded evidence was largely cumulative; therefore, the exclusion was harmless beyond a reasonable doubt.

*Andrew I*, 164 P.3d at 197 (paragraph number omitted).

In disputing the OCCA's harmlessness determination, Ms. Andrew concedes that Officer Ramsey (Officer Warren's partner) testified that he saw Ms. Andrew "kneeling over the top" of Rob Andrew when he arrived on the scene. Trial Vol. 15 at 83. But she argues that his testimony was "cut short" because the trial court sustained the government's objections to any testimony about Officer Ramsey's perceptions of Ms. Andrew at the scene. Opening Br. at 55.[21]

Specifically, Ms. Andrew contends that Officer Ramsey did not testify, as Officer Warren would have, that "in kneeling over the top of her husband Andrew was deeply upset and imploring the police to help her husband." Reply Br. at 24 (quotations omitted).

---

[21] The trial court sustained the objections because Ms. Andrew failed to give notice that Officer Ramsey would be testifying about her demeanor.

Ms. Andrew also alleges that Officer Warren would have testified that when he arrived in the garage Rob Andrew was obviously already dead. She believes these facts "would have cleared up a concern troubling two later-arriving emergency responders, prosecution witnesses who advanced the callous-indifference narrative by noting that Andrew did not ask about her husband's condition." *Id.* So, in her estimation, "Officer Ramsey was no substitute for Officer Warren." Opening Br. at 56. [22]

We find Ms. Andrew's arguments unavailing for three reasons. First, as the district court noted, evidence was admitted about the content of Ms. Andrew's calls with police dispatch, and an ambulance report documented that she had asked about her husband's condition. Trial Vol. 15 at 127; State's Ex. 84. So, contrary to Ms. Andrew's view of the record, the jury heard evidence about her demeanor at the crime scene and her questions about her husband's condition.

Second, Officer Ramsey testified that when he arrived on the scene, it was clear that Rob Andrew "was deceased and had been shot." Trial Vol. 15 at 88. So there was no need for Officer Warren to testify that Rob Andrew was dead when he arrived.

---

[22] Though it does not affect our decision, we note that defense counsel asked Officer Ramsey about Ms. Andrew's demeanor and Officer Ramsey, before the government could finish objecting, said that "[s]he was very distraught." Trial Vol. 15 at 85. The state trial court sustained the government's objection, but it did not order the jury to disregard the testimony. And later, when defense counsel asked Officer Ramsey about what Ms. Andrew was "trying to do" while on the phone beside Rob Andrew, Officer Ramsey answered that "[s]he was trying to get help." Trial Vol. 15 at 87. Again, the government objected, and the trial court sustained the objection without instructing the jury to disregard the testimony. So the jury did indeed hear the very "demeanor-related testimony" that Ms. Andrew insists would have made all the difference in her case.

Third, given the testimony of other witnesses on this point, as well as the overwhelming evidence of her guilt, we find it unlikely that Officer Warren's testimony would have, as Ms. Andrew puts it, "blunted" the prosecution's theory that she acted "coldly" toward her deceased husband. *E.g.*, Trial Vol. 8 at 124 (Officer Frost testified that Ms. Andrew was strangely calm at the crime scene); Trial Vol. 9 at 64 (Officer Teresa Bunn of the Oklahoma City police department testified that Ms. Andrew was "unusually calm" and that she wasn't sure if Ms. Andrew was a victim because Officer Bunn "wasn't seeing the usual signs"); Trial Vol. 10 at 113 (Detective Roland Garrett testified that when he interviewed Ms. Andrew the night of the murder, Ms. Andrew didn't seem to be grieving); *see also supra* Section II.B.

Thus, we conclude that a fairminded jurist could reasonably find that the OCCA correctly determined that any constitutional error in disallowing Officer Warren's testimony was harmless beyond a reasonable doubt. Ms. Andrew has therefore failed to meet her burden in establishing that the OCCA unreasonably applied *Chapman*.

**D.     Officer Donna Tyra**

Next, Ms. Andrew challenges the exclusion of testimony from Officer Donna Tyra, who worked as a detention officer at the county jail where Ms. Andrew was detained pending trial. Ms. Andrew alleges that Officer Tyra would have rebutted the testimony of Teresa Sullivan, who had testified that while she was jailed with Ms. Andrew, Ms. Andrew confessed to Sullivan to murdering Rob Andrew.

The OCCA held any error committed by the trial court in excluding Officer Tyra's testimony to be harmless beyond a reasonable doubt:

31

Defense counsel listed Tyra as a second stage witness who would offer testimony about [Ms. Andrew]'s good character while incarcerated at the County jail (the State did not list Tyra as a witness or have a report from her, unlike the above witnesses) [sic] However, defense counsel wished her to testify to rebut witness Teresa Sullivan's testimony regarding [Ms. Andrew]'s confession.

An offer of proof indicated that Tyra would have testified that Sullivan was a known snitch, known as the "mouth of the south;" Sullivan and [Ms. Andrew] could not have contacted each other, either verbally or through notes; and that there were newspapers available to the inmates on the pod, so that Sullivan could have learned the facts of the case through news reports. Discovery of this testimony was not presented to the State.

Defense counsel was allowed to produce the testimony of [County jail inmate] Angela Burk, who testified that Sullivan was a known snitch. She testified that she communicated to Sullivan through the cell doors, and she testified that inmates were sometimes out in the pod together. Any error in the failure to allow Tyra to testify was harmless beyond a reasonable doubt.

*Andrew I*, 164 P.3d at 197–98 (paragraph numbers omitted).

Because this claim depends on a few nuanced distinctions between Burk's testimony and Officer Tyra's proposed testimony, a more precise recounting of Burk's relevant testimony is required.

When asked about inmate communication at the County jail, Burk informed the jury that inmates could communicate with each other through letters or "hollering underneath" cell doors. Trial Vol. 15 at 172. And when asked about whether Andrew partook in those communication methods, Burk said she "never once saw Brenda [Andrew] talk to anybody." Trial Vol. 15 at 173. Burk also explained that because Ms. Andrew was in a segregated unit, whenever she was out of her unit and in the pod, she was alone. But later, Burk said that inmates were sometimes together in the pod.

Ms. Andrew contends that Burk's testimony was inadequate to replace Officer

32

Tyra's testimony. Specifically, she claims that Officer Tyra would have contradicted Burk's testimony by explaining that Ms. Andrew and Sullivan couldn't have had private, extended conversations in their segregation unit. And that testimony, Ms. Andrew argues, could have caused "at least one juror" to reasonably conclude that Sullivan fabricated Ms. Andrew's confession. Opening Br. at 58.

But as already discussed, even if Ms. Andrew persuaded us that "at least one juror" might have disregarded Sullivan's testimony had Officer Tyra testified, that wouldn't meet her AEDPA burden. She would need to show that "*every* fairminded jurist" would conclude that the OCCA's harmlessness determination was unreasonable. *Davenport*, 142 S. Ct. at 1530. And in any event, Burk's testimony, on top of defense counsel's effective cross-examination of Sullivan, accomplished the ultimate goal of the defense—to question Sullivan's motive in testifying. So that, combined with the overwhelming evidence of Ms. Andrew's guilt discussed above, leads us to conclude that Ms. Andrew has failed to establish that the OCCA unreasonably applied *Chapman* in ruling that any constitutional error in excluding Officer Tyra's testimony was harmless beyond a reasonable doubt.

### E.    Lisa Gisler and Carol Shadid

Finally, Ms. Andrew challenges the state trial court's preclusion of testimony from two of her neighbors, Lisa Gisler and Carol Shadid ("the neighbors"). Their testimony, Ms. Andrew contends, would have strengthened the evidence in support of her timeline of events on the night of the murder—that the shots were fired in rapid succession by the two masked gunmen.

The OCCA held under *Chapman* that any constitutional error in excluding the neighbors' testimony was harmless beyond a reasonable doubt:

> Next, [Ms. Andrew] cites to her attempts to present the testimony of Lisa Gisler and Carol Shadid, who were neighbors of [Ms. Andrew], regarding what they heard on the night of the murder. These witnesses heard noises, which [Ms. Andrew] describes as a "loud noise" (Gisler) or "three shotgun blasts" and a scream (Shadid). [Ms. Andrew] claims this testimony would corroborate her story of the events and rebut the staging theory espoused by the State.
>
> Defense counsel provided the State with a list of witnesses which included these two witnesses; however, no summary of their expected testimony was provided. Nevertheless, both of these witnesses provided statements to the police. Their statements were contained in police reports that were in the custody of the State. Defense counsel made an offer of proof indicating that their testimony would be consistent with their statements to police. Preclusion of this testimony, under the circumstances was too harsh a sanction, thus there was an abuse of discretion here. The trial court had at its disposal the possibility of a short continuance, if necessary, so the State could prepare for cross-examination of these two witnesses, especially considering the limited nature of their testimony. The trial court abused its discretion in using the preclusion sanction.
>
> Even though an abuse of discretion occurred, we find that the error was harmless beyond a reasonable doubt. *See Hooks v. State*, 2001 OK CR 1, ¶ 14, 19 P.3d 294, 307. Despite [Ms. Andrew]'s claim, evidence that there were three shots is consistent with the State's theory of two shots fired from a shotgun and one fired from a .22 caliber handgun. The testimony is inconsistent with [Ms. Andrew]'s story that she heard only two shots fired. Furthermore, both reconstruction experts, prosecution and defense, testified that [Ms. Andrew]'s gunshot wound was evidence of a staged event.

*Andrew I*, 164 P.3d at 197 (paragraph numbers omitted).[23]

---

[23] The parties agree that the OCCA based its harmlessness determination in part on a misstatement of the record: it stated that Ms. Andrew said she heard only two gunshots, when she has always maintained that she heard three. Ms. Andrew argues (in a single paragraph in briefing submitted before she was granted a COA on this issue), that this misstatement "removes the deference AEDPA would otherwise

(continued)

Ms. Andrew argues that "[t]he neighbors' discrepant perceptions, one hearing a single loud noise while the other detected three separate shots," suggest that the shots were fired rapidly. Reply Br. at 20. Thus, in Ms. Andrew's view, their testimony would have "challenged the arguably more expansive time required to support the State's staging theory"—that Ms. Andrew and Pavatt orchestrated her gunshot wound.[24] *Id*. Ms. Andrew also contends that the testimony "would have strengthened the defense claim that two separate shooters entered the garage, one shooting Brenda Andrew with a handgun while the other near-simultaneously fired the shotgun at Robert Andrew." Opening Br. at 65.

We see no basis for defense counsel's view that the neighbors would have testified that the firearm shots were fired in rapid succession. One claimed that she heard "a loud

---

extend to the state-court decision, forfeited because the OCCA's adjudication of the issue 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" Opening Br. at 67 (quoting 28 U.S.C. § 2254(d)(2)). Thus, she contends, we must review the claim de novo. *Id.*

Upon a review of the record, Ms. Andrew has rebutted by "clear and convincing evidence" the OCCA's determination that Ms. Andrew heard only two gunshots. *See* 28 U.S.C. § 2254(e)(1). But this isn't enough for Ms. Andrew to show an unreasonable factual determination. Rather, she must show that the OCCA's harmlessness determination about the exclusion of the neighbors' testimony was "*based on*" the unreasonable factual determination. *Byrd v. Worman*, 645 F.3d 1159, 1172 (10th Cir. 2011) (quoting 28 U.S.C. § 2254(d)(2)). Ms. Andrew has failed to meet that burden, and thus is not entitled to relief under § 2254(d)(2).

[24] Certainly, Pavatt and Ms. Andrew would have tried to complete the three shots as quickly as possible. It's not difficult to conceive Ms. Andrew firing the first two shots at Rob Andrew, and Pavatt quickly entering the garage to shoot her in the arm before retreating back through the house and across to the neighbors' house and attic. The point is simply that a shortened time interval between shots doesn't necessarily benefit Ms. Andrew.

noise." Trial Vol. 16 at 164. And the other claimed that she heard "three shots" with no description of the intervals between the shots. Trial Vol. 16 at 165. We glean little, if any, probative value from these statements.[25] And we don't believe a reasonable juror would gather from those statements that the shots were fired in rapid succession.

But even if we accept Ms. Andrew's theory that the shots were fired in rapid succession, as the OCCA noted and as Ms. Andrew fails to dispute, the reconstruction experts of both parties testified that Ms. Andrew's gunshot wound was staged. That was because (1) Ms. Andrew's wound was located where it would do the least damage, and (2) the wound, sustained from a .22 pistol shot from no more than four inches away, was unlike Rob Andrew's wounds, which were caused by two shotgun blasts from at least a few feet away. So, given the expert testimony, the "discrepant perceptions" of Ms. Andrew's neighbors would cast no doubt on the state's staging theory.

Thus, we conclude that Ms. Andrew has not met her burden to show that all reasonable jurists would agree that the OCCA's decision was unreasonable in concluding that the exclusion of the neighbors' testimony was harmless beyond a reasonable doubt. Ms. Andrew has therefore failed to show that the OCCA's harmlessness determination under *Chapman* was unreasonable. We affirm the district court's denial of Ms. Andrew's

---

[25] In her Supplemental Reply Brief, for the first and only time, Ms. Andrew notes that an appellate investigator re-interviewed Gisler. During that interview, Gisler signed an affidavit stating that she heard two shots, not one, as she stated before. But Ms. Andrew does not explain what we should make of this contradictory affidavit, or why she did not mention it in her habeas petition, Motion for COA, Motion for Expanded COA, Opening Brief, or Reply Brief. *See* Fed. Dist. Court at 79–82 (stating that "Ms. Gisler heard only one shot"). So we decline to consider it now. *See United States v. Viera*, 674 F.3d 1214, 1220 (10th Cir. 2012).

right-to-present-a-complete-defense claim for all six witnesses.

## III.  *Brady*

Ms. Andrew next alleges that the government violated its disclosure obligations

under *Brady*. Specifically, she contends that the government suppressed a "tacit

agreement" between the government and Sullivan to reduce her existing federal drug

sentence in exchange for her testimony against Ms. Andrew. Reply Br. at 35.

### A.     The OCCA's Decision

Ms. Andrew presented this claim to the OCCA in a motion for new trial based on

newly discovered evidence. The OCCA denied the motion within its opinion dismissing

Ms. Andrew's direct appeal:

> [Ms. Andrew] filed a motion for new trial with this Court on September 21, 2005. [Ms. Andrew]'s motion is brought pursuant to 22 O.S.2001, §§ 952 and 953, alleging newly discovered evidence. The State filed a response on June 21, 2006.

> "The test for whether a motion for a new trial should be granted based upon newly discovered evidence is: (1) whether the evidence is material; (2) whether the evidence could not have been discovered before trial with reasonable diligence; (3) whether the evidence is cumulative; and (4) whether the evidence creates a reasonable probability that, had it been introduced at trial, it would have changed the outcome." *Ellis v. State*, 1992 OK CR 45, ¶ 50, 867 P.2d 1289, 1303.

> The motion contains information that Teresa Sullivan, who testified against [Ms. Andrew], received a reduction of her federal sentence due to her cooperation with the Oklahoma County District Attorney's office in this case. Sullivan testified that she had twenty-two (22) months left on her sentence; however, a new sentence was given by the federal court after she testified, which basically allowed her release just five (5) months after testifying. The documents indicate that Sullivan was granted the early release because of her cooperation in this case.

> Information attached to the motion also indicates that Sullivan received a

downward departure on her federal sentence because she cooperated with the federal authorities in the investigation of her co-defendants (even though she testified that she was not a snitch). The gist of the motion is that the State knew about the potential for a benefit to Sullivan, but failed to disclose the information.

Sullivan testified that [Ms. Andrew] confessed that she and James Pavatt killed Rob Andrew. Sullivan's attorney says in a letter written to the federal prosecutor that he had to explain to her that she might receive additional consideration on her federal sentence if she were called to testify against [Ms. Andrew]. It appears that Sullivan provided information to the State (before testifying) with no understanding that she might receive a benefit. When she testified at trial, there were no guarantees that she would receive any benefit.

One document in particular states that Oklahoma City Police detectives contacted Sullivan at her place of federal confinement as part of their investigation (as well as others who where [sic] incarcerated with [Ms. Andrew] at the Oklahoma County Jail). Sullivan provided information to the detectives before contacting, William P. Earley, the federal public defender who represented her in her federal case. The documents indicate that Earley filed the motion for a reduction of sentence after Sullivan testified as any effective advocate might have done. He stated that he would have filed this motion regardless of any input from the Oklahoma County District Attorney's office.

[Ms. Andrew] has not presented a sufficient showing to be granted a new trial. Substantial additional evidence supports the conviction. We are further convinced that, were we to grant a new trial with this "newly discovered evidence" being introduced, the outcome of the trial would be the same.

Sullivan was thoroughly cross-examined regarding her motivation to testify against [Ms. Andrew], with repeated attempts to show her bias. Defense counsel also called a witness to refute the possibility that [Ms. Andrew] shared any information with Sullivan. The knowledge of the fact that Sullivan was the beneficiary of an act of grace by the federal courts would not change the outcome of this trial.

*Andrew I*, 164 P.3d at 204–05 (paragraph numbers and footnote omitted).

## B.     Clearly Established Law

The clearly established federal law governing this claim is the Supreme Court's

38

holding in *Brady*. In *Brady*, the Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. From that holding, and the line of cases that followed, we distilled three elements of a *Brady* claim "(1) the prosecutor suppressed the evidence; (2) the suppressed evidence was favorable to the accused, either because it is exculpatory or because it is impeaching; and (3) prejudice ensued because the suppressed evidence was material." *Simpson v. Carpenter*, 912 F.3d 542, 569 (10th Cir. 2018); *see also Giglio v. United States*, 405 U.S. 150, 154 (1972) (holding that impeachment evidence "falls within" *Brady*).

"[F]avorable evidence is material, and constitutional error results from its suppression by the government, 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). And the "reasonable probability" standard is met by a "showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Id.* at 435.[26]

---

[26] In an attempt to cast doubt on the OCCA's decision, Ms. Andrew notes that the OCCA failed to cite *Brady* or *Giglio*. We note that a state court need not cite Supreme Court precedents, nor "even be aware" of them, "so long as neither the reasoning nor the result of the state-court decision contradicts them." *Mitchell v. Esparza*, 540 U.S. 12, 16 (2003) (citation omitted).

### C.    Analysis

Ms. Andrew challenges the OCCA's decision as contrary to and as an unreasonable application of *Brady* under § 2254(d)(1).

The OCCA's denial of Ms. Andrew's *Brady* claim depended almost entirely on its finding that her proffered evidence was not material—that is, that she had not shown a reasonable probability that the outcome of the trial would have changed had the jury known about the inner workings of Sullivan's hypothetical, future reduction of her federal prison sentence. For three reasons, it found that the evidence of Sullivan's hypothetical future benefit for testifying was not material: (1) substantial other evidence supported Ms. Andrew's conviction; (2) Sullivan was cross-examined about bias and motivation to testify against Ms. Andrew; and (3) fellow-detainee Burk testified that Ms. Andrew couldn't have shared any information with Sullivan. *Id.* at 205. So the only real question before us now is this: has Ms. Andrew established that the OCCA's denial of her *Brady* claim on materiality grounds was contrary to or an unreasonable application of *Brady*? We conclude that she has not.

### 1.    "Contrary To"

A state-court decision is "contrary to" clearly established law under § 2254(d)(1) if it "applies a rule different from the governing law set forth in Supreme Court cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts." *Lockett*, 711 F.3d at 1231 (citation omitted). Ms. Andrew makes no attempt to identify a Supreme Court case with materially indistinguishable facts. Instead, she argues that the OCCA twice applied a rule different from *Brady*'s materiality

standard: once when it "misstated" the standard, and again when the OCCA failed to apply a "presumption of materiality." Opening Br. at 88–89 n.6. As a reminder, under *Brady*, evidence is material if there "is reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Bagley*, 473 U.S. at 682.

We begin with Ms. Andrew's argument that the OCCA misstated *Brady*'s materiality standard.[27] Ms. Andrew specifically objects to this statement from the OCCA: "We are further convinced that, were we to grant a new trial with this 'newly discovered evidence' being introduced, the outcome of the trial would be the same." *Andrew I*, 164 P.3d at 205. Ms. Andrew states that this "would-it-have-changed-the-outcome test" (as she calls it) is more demanding than the *Brady* materiality test, which requires only a showing of "a reasonable probability" of a different outcome. Opening Br. at 89 n.6.

But as Ms. Andrew herself notes, the OCCA stated the proper standard for evaluating materiality earlier in its analysis. *See Andrew I*, 164 P.3d at 204 (noting that whether a new trial is warranted depends on if "the [newly discovered] evidence creates a reasonable probability that, had it been introduced at trial, it would have changed the outcome"). That the OCCA later failed to recite the complete "reasonable probability"

---

[27] This argument is relegated to a single footnote without citation to authority. We note that while we are inclined to address its merits here because of the nature of the case, such a cursory reference to an issue is usually fatal. *See Verlo v. Martinez*, 820 F.3d 1113, 1127 (10th Cir. 2016) ("A party's offhand reference to an issue in a footnote, without citation to legal authority or reasoned argument, is insufficient to present the issue for our consideration.").

condition does little to rebut "the presumption that state courts know and follow the law." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002). And to attribute error to the OCCA's statement would be "incompatible with § 2254(d)'s highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Id.* (internal quotations and citation omitted).

Next, we address Ms. Andrew's argument that the OCCA's decision was contrary to *Brady* because it didn't apply a "presumption of materiality." Opening Br. at 88. In support of that supposed presumption, Ms. Andrew cites a footnote from *Smith v. Secretary of New Mexico Department of Corrections*, 50 F.3d 801 (10th Cir. 1995). In the footnote, we stated,

> The Supreme Court enunciated a fourth standard of materiality for the exceptional case where the undisclosed evidence would demonstrate "the prosecutor's knowing failure to disclose that testimony used to convict the defendant was false." *Bagley*, 473 U.S. at 668. In those rare situations, the evidence is presumptively material "unless failure to disclose it would be harmless beyond a reasonable doubt." *Id.* at 680.

*Id.* at 826 n.38.

Ms. Andrew claims that her case is the "exceptional case" in which the government knowingly presented false testimony from Sullivan that Ms. Andrew confessed her crime, and then falsely argued in closing that Sullivan "got no deal" for her testimony, when she in fact later received a reduction to her federal sentence. Reply Br. at 37. Thus, as we understand it, Ms. Andrew argues that the OCCA's decision was contrary to the Supreme Court's holding in *Bagley*, as interpreted by us in a footnote in *Smith*. This argument, particularly in the habeas context, fails for two primary reasons.

42

First, in *Smith*, we applied *Bagley*'s flexible standard consolidating the Court's previous three standards for materiality into one. *Smith*, 50 F.3d at 834–35.[28] Thus, as the OCCA noted, the *Brady* materiality standard applicable to this case and *all* cases, whether the government knowingly presented perjured testimony or not, is that "[t]he evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." 473 U.S. at 682. The OCCA therefore did not misapply the "presumption of materiality" test because no such test exists.

Second, Ms. Andrew hasn't explained how Sullivan's testimony was inaccurate, let alone perjurious. Ms. Andrew points to this single exchange between Sullivan and the prosecutor:

> **Q:** Have you been offered anything by the State of Oklahoma to testify against Defendant Brenda Andrew?
>
> **A:** No, ma'am.

Trial Vol. 12 at 17.

Ms. Andrew relies on these later happenings to try to establish that she had indeed "been offered anything by the State of Oklahoma to testify against Brenda Andrew": a

---

[28] We disagree with *Smith*'s statement that *Bagley* "enunciated a fourth standard of materiality" for cases involving the government's nondisclosure of perjured testimony. 50 F.3d at 826 n.38. Rather, the Supreme Court listed the *three* previously identified standards of materiality for various nondisclosure situations, the first of which "was the prosecutor's knowing use of perjured testimony." *Bagley*, 473 U.S. at 679. The Court consolidated the three existing tests into a single materiality test "sufficiently flexible to cover" all cases of nondisclosure. *Id.* at 682.

few months before Ms. Andrew's trial, Sullivan's Assistant Federal Public Defender

("AFPD") told the Assistant District Attorney ("ADA") that *he might* ask the ADA to

write a letter to the United States Attorney concerning Sullivan's testimony after the trial;

before Ms. Andrew's trial, the AFPD told Sullivan she *might* receive a benefit if she

testified against Ms. Andrew; before Ms. Andrew's trial, Sullivan's AFPD reached out to

the Assistant United States Attorney ("AUSA") who prosecuted Sullivan's federal drug

case to advise him that he would soon ask the United States to file a substantial-

assistance motion in the federal court; after Ms. Andrew was convicted, the AFPD wrote

to the ADA asking that she advise the AUSA about Sullivan's assistance; two weeks

later, the ADA wrote to the AUSA doing so; the next month, the AUSA filed a motion

asking that the federal court reduce Sullivan's sentence based on her cooperation in Ms.

Andrew's trial; and the federal district court reduced Sullivan's sentence on that basis.

Sullivan never testified that she wasn't hoping for a reduction of her federal

sentence from her testimony. Defense counsel never raised that question. But in closing,

he emphasized that all it would take was a phone call to the federal prosecutor for

Sullivan's sentence to be reduced. Now on appeal, Ms. Andrew provides nothing

showing that Sullivan was in fact *offered* or *promised* anything of value by the ADA. Ms.

Andrew therefore has failed to establish that the OCCA's decision was contrary to

*Brady*.[29]

---

[29] Ms. Andrew also contends that several findings made by the OCCA
"deviated from" the *Brady* standard. Opening Br. at 86. First, she challenges the
OCCA's statement that "[w]hen [Sullivan] testified at trial, there were no guarantees

(continued)

### 2.     "Unreasonable Application"

Next, we determine whether Ms. Andrew has shown that the OCCA's decision was an unreasonable application of *Brady*. As a reminder, a state-court decision involves an "unreasonable application" of clearly established federal law if it "identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of [the] petitioner's case." *Lockett*, 711 F.3d at 1231 (citation omitted). Whether an application of a rule was unreasonable requires consideration of the rule's specificity. *Alvarado*, 541 U.S. at 664. "The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations." *Id.* An application is unreasonable only if "*every* fairminded jurist" would "reach a different conclusion" than the OCCA. *Davenport*, 142 S. Ct. at 1530.

The disclosure rule that the Supreme Court announced in *Brady* is a general one. So in determining whether the OCCA unreasonably applied *Brady* here, the OCCA enjoys substantial deference. *See Alvarado*, 541 U.S. at 664. With that in mind, we conclude that the OCCA's materiality determination was not unreasonable, and briefly

---

that she would receive any benefit." *Andrew I*, 164 P.3d at 204. But there, the OCCA was merely stating, correctly, that the record did not reflect any promises made by the ADA to Sullivan. Second, Ms. Andrew challenges the OCCA's emphasis on the fact that Sullivan spoke with the police before contacting her FPD. *Id.* at 204. But that is a reasonable fact to emphasize, considering that it makes it more likely that Sullivan cooperated without any promise or offer from the ADA. Lastly, Ms. Andrew challenges the OCCA's characterization of her sentence reduction as "an act of grace by the federal courts." *Id.* at 205. But that is a perfectly reasonable characterization as, at the end of the day, whether Sullivan was granted a sentence reduction or not was entirely within the discretion of the federal district court. So at bottom, none of those statements "deviated" whatsoever from *Brady*.

explain why.

As discussed, the evidence of Ms. Andrew's guilt in the murder of Rob Andrew is overwhelming, even without any incremental value provided by Sullivan's testimony. *See supra* Section II.B.[30] This is doubly so because Sullivan was vigorously cross-examined with questions like these:

> **Q.** Well, Ms. Sullivan, you didn't voluntarily come forward, they found you because you're a snitch over there at the County Jail and everybody knows that you'll tell any story that they want to hear; isn't that correct, ma'am?
> . . .
> **Q.** And it's a known fact that you [sic] over at the County Jail and down at the federal prison where you are you'll do anything and say anything for law enforcement to get your sentence reduced; isn't that correct, ma'am?

Trial Vol. 12 at 17–18. Sullivan of course answered no to both questions, but the jury no doubt got the point.

Plus, fellow detainee Burk challenged Sullivan's testimony. She testified that Sullivan "was a known jailhouse snitch throughout the jail for testifying against other people"; that Sullivan had access to newspapers and the news, from which she could have learned all she needed to know about Ms. Andrew's case to testify against her; that Ms. Andrew never talked to anyone about her case; and, most importantly, that Sullivan told Burk that she was testifying so she could get some benefit. Trial Vol. 15 at 174, 176–77,

---

[30] Two weeks after Ms. Andrew was convicted, the ADA in this case sent a letter to the AUSA advising of Sullivan's cooperation. In that letter, the ADA described Sullivan's testimony as being "of a critical nature" and an "important link in the State's case." Direct Appeal, Mot. for New Trial at 65. But whatever the jury thought of Sullivan's testimony, it had overwhelming evidence of Ms. Andrew's guilt.

179.[31] In light of the foregoing, Ms. Andrew has failed to establish that every fairminded jurist would agree with her that the OCCA unreasonably applied *Brady*. Accordingly, we affirm the district court's denial of Ms. Andrew's *Brady* claim.[32]

## IV.    *Miranda*

We move next to Ms. Andrew's *Miranda* challenge. Before trial, Ms. Andrew objected to the admission at trial of her videotaped interview taken at the police station on the night of Rob Andrew's murder. She contends that she was in custody when she was interviewed, without being advised of, or waiving, her constitutional rights under *Miranda v. Arizona*, 384 U.S. 436 (1966).

### A.    Background

First, some background developed at a pretrial hearing. On the night of the murder, Ms. Andrew was taken to the hospital for medical treatment. While she was there, police gathered crime evidence, including her clothing. Officers Bunn and Frost encountered Ms. Andrew at the hospital. After asking her some initial questions, Officer

---

[31] It is instructive to compare the facts of *Bagley* with Ms. Andrew's case in determining materiality. In *Bagley*, the government failed to disclose that it had paid its two key witnesses $300 each for their testimony. 473 U.S. at 671. On remand, the Ninth Circuit concluded that the government's nondisclosure undermined confidence in the outcome of the *Bagley* defendant's trial and required reversal of his conviction. *Bagley v. Lumpkin*, 798 F.2d 1297, 1302 (9th Cir. 1986). Ms. Andrew has no such evidence of knowing nondisclosure.

[32] Ms. Andrew initially requested an evidentiary hearing on this claim. But based on the government's response, she conceded that an evidentiary hearing may be "unnecessary." Reply Br. at 36. In any event, we note that because the OCCA's resolution of Ms. Andrew's *Brady* claim was reasonable, we must deny her request for an evidentiary hearing. *See Smith v. Aldridge*, 904 F.3d 874, 886 (10th Cir. 2018).

Frost told Ms. Andrew that a detective (Detective Garrett) wanted to interview her about the murder. So after Ms. Andrew's wound was treated and all relevant evidence had been gathered, Officer Frost drove Ms. Andrew to the police department for an interview. The police videotaped her two-plus-hour interview.

Overruling Ms. Andrew's pretrial motion to suppress, the trial court admitted the videotape, concluding that Ms. Andrew was not in police custody when she was interviewed. During closing, the government pointed to Ms. Andrew's lies during the interview—including her denying that she had affairs, denying the significance of her dispute with Rob over the life-insurance policy, and suggesting that Rob was in possession of his 16-gauge shotgun.

## B.    The OCCA's Decision

On direct appeal, the OCCA affirmed the trial court's ruling:

[Ms. Andrew] argues that her statements to police were the result of custodial interrogation, thus their introduction was unconstitutional because she had not been advised of her *Miranda* rights. During the *Jackson v. Denno* hearing, [Ms. Andrew] admitted that she agreed to speak with the police because she wanted to help the police catch those responsible for shooting her husband. [Ms. Andrew] was taken to the police station to be questioned by detectives. The detective interviewing her considered her to be a witness, not a suspect. She was taken to a friend's house after the interview. She was not "arrested" at any time. She was not handcuffed, shackled or placed in any type of restraint. Eye-witnesses are routinely taken to the police station for interviews. [Ms. Andrew] was the only living eye-witness to this crime. Under the circumstances of this case, a reasonable person in the same position would not conclude that he or she was in custody. *See Berkemer v. McCarty*, 468 U.S. 420, 442, 104 S. Ct. 3138, 3151, 82 L.Ed.2d 317 (1984) (the relevant inquiry is how a reasonable man under the circumstances would understand the situation.) Warnings are not required "simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect." *Oregon v. Mathiason*, 429 U.S. 492, 495, 97 S. Ct. 711, 714, 50 L.Ed.2d 714 (1977). The trial court did not abuse its

discretion in allowing the admission of [Ms. Andrew]'s statements.

*Andrew I*, 164 P.3d at 194–95 (footnotes omitted).[33]

## C.    Clearly Established Law

*Miranda*'s holding furnishes the clearly established federal law required by

§ 2254(d)(1). In *Miranda*, the Supreme Court held that police must advise suspects in

"custodial interrogation" of certain rights, including the right to remain silent and the

right to the presence of an attorney. 384 U.S. at 444–45. Statements obtained in violation

of *Miranda* are ordinarily suppressed. *See Berkemer v. McCarty*, 468 U.S. 420, 429

(1984).

In determining whether a person is "in custody" under *Miranda*, courts employ an

objective test that requires two discrete inquiries. *Thompson v. Keohane*, 516 U.S. 99,

112 (1995). First, courts must evaluate "the circumstances surrounding the interrogation."

*Id.* Second, courts ask, "given those circumstances, would a reasonable person have felt

he or she was not at liberty to terminate the interrogation and leave." *Id.* (footnote

---

[33] As for Ms. Andrew's state of mind that evening, the government refers to the same pretrial-hearing transcript that the dissent uses to establish the officers' testimony. *See* Dissent at 15–18. The government cites supporting testimony that Ms. Andrew never stated that she did not want to go to the police station; that she could have left the hospital at any time; that she signed search waivers voluntarily because in her words, "I was trying to help"; that she was never placed under arrest or handcuffed; that she spoke to the officers because in her words, "I wanted to help [Rob Andrew] and I told them what had happened"; and that in her words she was "cooperating" with the police that night. Tr. of Mot. Hr'g Proceedings at 87, 97–98, 109, 128, 146–47, 149, 151, 155 (June 7, 2004). Further, the government relies on officers' testimony that Ms. Andrew was not kept from leaving the police station that night. *Id.* at 52–53, 67, 87, 92, 94, 98, 109, 128.

omitted).[34] Courts then apply "an objective test to resolve the ultimate inquiry: was there a formal arrest or restraint on freedom of movement of the degree associated with formal arrest." *Id.* (cleaned up). Thus, the "subjective views harbored by either the interrogating officers or the person being questioned," unless "somehow manifested," are not relevant to the inquiry. *Stansbury v. California*, 511 U.S. 318, 323–25 (1994) (per curiam).

Relevant in the AEDPA context, the Supreme Court has classified the "custody test" as a general rule. *Alvarado*, 541 U.S. at 665. Thus, when applying the rule, state courts have "more leeway . . . in reaching outcomes in case-by-case determinations." *Id.* at 664.

### D.  Analysis

Ms. Andrew argues that the OCCA's determination that she was not in custody during her interview was an unreasonable application of *Miranda* under § 2254(d)(1).[35] She points to testimony at a pretrial hearing, during which the voluntariness of her statements to the police was determined, to support her argument that the police would have required her to go to the station for the interview had she refused to go. Specifically, she points to Officer Frost's testimony that he didn't give Ms. Andrew the option of going home (the crime-scene investigation was still ongoing) after her release from the

---

[34] We note that, at least in the Fourth Amendment context, the "reasonable person test presupposes an *innocent* person." *Florida v. Bostick*, 501 U.S. 429, 438 (1991) (internal quotations omitted).

[35] Ms. Andrew also argues that she is entitled to relief because the OCCA's decision was based on an unreasonable determination of the facts under § 2254(d)(2). But because she didn't make this argument before the district court, it is waived. *See Owens v. Trammell*, 792 F.3d 1234, 1246 (10th Cir. 2015).

hospital. Rather, he told her that they "were going down to the station" so that the detective could speak with her. Tr. of Mot. Hr'g Proceedings at 113. She also emphasizes her own testimony that she felt like she had no choice but to go with the police to the station because Officer Frost "told [her that she] had to go to the police station." *Id.* at 139. And she notes that Detective Garrett testified that, before he met with Ms. Andrew, Officer Frost evidently did not allow Ms. Andrew to go home to change out of her hospital gown.

But given the *objective* circumstances of Ms. Andrew's interview, we cannot say that every fairminded jurist would conclude that the OCCA unreasonably applied *Miranda*. Those circumstances include the following:

- At the crime scene, Ms. Andrew answered questions from the police.

- At the hospital, Officer Frost informed Ms. Andrew that they would be going to the police station so that a detective (Detective Garrett) could talk to her about the murder.

- Ms. Andrew knew that she could not go home from the hospital, because the police were still processing the crime scene and searching the premises.[36]

- Ms. Andrew was told that when the investigation was complete, she could return home.

- Officer Frost transported Ms. Andrew, who was dressed in two hospital gowns (each covering a side of her body) because her clothes were taken into evidence, from the hospital to the police station for the interview.

- Ms. Andrew never objected to going to the police station for the

---

[36] Ms. Andrew signed search waivers for her home and vehicle to aid the investigation.

interview.

- Ms. Andrew wasn't arrested, handcuffed, or told that she was a suspect in the murder.

- After Ms. Andrew's two-and-a-half-hour interview was over, Officer Frost took Ms. Andrew directly to her friend's house where her children were staying.

Whether Ms. Andrew "*felt*" she couldn't refuse to go to the police station or terminate the interview and leave, or whether she felt she needed to go to avoid suspicion, does not affect our objective inquiry. Tr. of Mot. Hr'g Proceedings at 138, 142 (emphasis added). Considering only the objective circumstances before the OCCA and the leeway that the OCCA has in applying the general *Miranda* rule, not every reasonable jurist would conclude that the OCCA's custody determination was unreasonable. Thus, Ms. Andrew has failed to demonstrate that the OCCA's application of *Miranda* was objectively unreasonable. We therefore affirm the district court's denial of Ms. Andrew's *Miranda* claim.

## V.    Confrontation Clause

Next, Ms. Andrew challenges the admission of statements that Rob Andrew made to the police about the severing of his brake lines. Ms. Andrew contends that the statements' admission violated the Sixth Amendment's Confrontation Clause.

### A.    Background

Two officers testified at trial, over Ms. Andrew's objections, that Rob Andrew had told them that he suspected that Ms. Andrew and Pavatt cut his car brake lines. One officer told the jury that Rob Andrew stated that Ms. Andrew asked him about the brake-

line incident before he had told anyone other than his mechanic and police about it, suggesting her involvement. Obviously, Ms. Andrew could not cross-examine Rob Andrew about those statements because he was deceased.

### B.    The OCCA's Decision

On direct appeal, the OCCA rejected Ms. Andrew's claim, concluding that any constitutional violation from the admission of the evidence was harmless beyond a reasonable doubt:

> [Ms. Andrew] also claims that Rob's statements to the police that he believed that [Ms. Andrew] and Pavatt were responsible were testimonial in nature, and thus, in violation of *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L.Ed.2d 177 (2004). *Crawford* held that testimonial hearsay violates the confrontation clause. *Id.* at 51–52, 124 S. Ct. at 1364. Rob's belief was supported by the evidence in this case. The jury would have reached the same conclusion absent this testimony. The introduction of this testimony was harmless beyond a reasonable doubt, considering the mountain of evidence leading to the conclusion that [Ms. Andrew] was responsible, in part, for the brake line incident. *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 828, 17 L.Ed.2d 705, 710–711 (1967).

*Andrew I*, 164 P.3d at 189.

### C.    Analysis

Because the OCCA determined under *Chapman* that any constitutional error from the introduction of Rob Andrew's testimony was harmless beyond a reasonable doubt, we may decide only whether Ms. Andrew has met her burden in establishing that the OCCA's application of *Chapman* was unreasonable. *See Ayala*, 576 U.S. at 269.[37] In

---

[37] Alternatively, the OCCA found that the admission of Rob Andrew's testimony didn't require reversal because the testimony was admitted for purposes other than establishing the truth of the matter asserted. *Andrew I*, 164 P.3d at 189.

(continued)

reviewing the OCCA's harmlessness decision, we must consider factors such as "the importance" of the unconfronted testimony in the government's case; "whether the testimony was cumulative"; whether other evidence corroborated or contradicted the testimony; the extent of cross-examination permitted; and "the overall strength" of the government's case. *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986).

With the *Van Arsdall* factors in mind, we cannot say that the OCCA unreasonably applied *Chapman*. Ms. Andrew's argument relies exclusively on the first *Van Arsdall* factor—the importance of Rob Andrew's testimony. She argues that his testimony was clearly important to the government's case because the testimony was repeatedly "accentuated" by the government during closing argument. Opening Br. at 105.

We don't doubt that Rob Andrew's statements were important to the government's case. But the other *Van Arsdall* factors—whether the testimony was cumulative, whether other evidence corroborated or contradicted the testimony, and the overall strength of the government's case—support a finding of harmlessness beyond a reasonable doubt.

The OCCA generally referenced a "mountain of evidence" apart from Rob Andrew's statements to the police implicating Ms. Andrew in the brake-line incident. This includes the evidence that Ms. Andrew asked Pavatt to kill Rob Andrew in late October 2001 (the brake-line incident occurred on October 26, 2001) and the eighty-two calls between her and Pavatt on the day of the brake-line incident. Ms. Andrew offers no

---

But because we can resolve Ms. Andrew's claim by ascertaining whether the OCCA's harmlessness determination was reasonable, we need not consider whether its alternative holding was reasonable.

compelling reason why the jury could not have credited this corroborating evidence, or why the corroborating evidence did not render Rob Andrew's testimony cumulative. And, as we've discussed, the government submitted overwhelming evidence of Ms. Andrew's guilt in the murder. *See supra* Section II.B.

For these reasons, the OCCA's harmlessness determination was not "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Ayala*, 576 U.S. at 269–70 (citation omitted). Ms. Andrew has failed to establish that the OCCA unreasonably applied *Chapman*. We therefore affirm the district court's denial of Ms. Andrew's Confrontation Clause claim.

## VI.    Penalty-Phase Prosecutorial Misconduct

Next, Ms. Andrew claims that four alleged instances of government misconduct during the penalty phase violated the Eighth and Fourteenth Amendments, rendering her sentence unreliable.

### A.    Background

We begin by summarizing each instance of alleged misconduct. The first involves the prosecutor's comments about the testimony of 13-year-old Tricity Andrew, the daughter of Rob Andrew and Ms. Andrew. During the penalty phase, the defense called Tricity to testify. The defense expected Tricity to read several letters she wrote to Ms. Andrew, and the defense attorney planned to ask Tricity whether she wanted Ms. Andrew to receive the death penalty. But when Tricity took the stand, she was overcome with emotion and was unable to read her letters. She was never asked about the appropriate

punishment for Ms. Andrew. Even so, the prosecutor argued in closing that "[a]nd another thing I'm sure you noticed from the witness stand, Tricity didn't beg for her mother's life." Trial Vol. 19 at 321. Ms. Andrew did not object.

The second instance relates to the prosecutor's comment on the defense's decision to call Ms. Andrew's 15-year-old niece, Jennifer Bowlin, to testify. During the penalty phase, Jennifer tearfully read a prepared statement asking the jury to spare Ms. Andrew's life. In her closing arguments, the prosecutor asked the jury, "Would you put your 15-year-old niece on the stand to do that?" Trial Vol. 19 at 328. Answering for herself, the prosecutor said she would not. *Id.* Ms. Andrew again did not object.

The third instance involves a comment about one of the defense's proposed mitigating circumstances: that Ms. Andrew had relatives who would visit her in prison if they could. In response, the prosecutor said that "Rob Andrew's parents would like to visit him in prison. They'd like to visit him anywhere, but they can't. They have been deprived of that. The only place they get to visit is his grave." Trial Vol. 19 at 239. Ms. Andrew again did not object.

The fourth and final instance relates to the prosecutor's comment on the victim-impact evidence. In closing, the defense noted that "no one from the Andrew family asked you to impose the death penalty, if you even get there, and if no one from the Andrew family asked for that do you think that Rob Andrew, Brenda's husband would ask for that?" Trial Vol. 19 at 311. In response, the prosecutor said, "[defense counsel] said twice . . . you didn't hear the victim's family ask for the death penalty. They're prohibited by the law from asking for a specific punishment. Did they have to say it?

56

Wasn't it conveyed? Wasn't their message conveyed to you what punishment they want?" Trial Vol. 19 at 326–27. Ms. Andrew again did not object.

## B.    The OCCA's Decision

On direct appeal, given Ms. Andrew's failure to object to any of the alleged misconduct, the OCCA reviewed each instance for plain error. It concluded that none of them rose to the level of plain error:

> [Ms. Andrew] alleges several instances of what she calls prosecutorial misconduct. We first note that no trial will be reversed on the allegations of prosecutorial misconduct unless the cumulative effect was such to deprive [Ms. Andrew] of a fair trial. *Garrison v. State*, 2004 OK CR 35, ¶ 128, 103 P.3d 590, 612. Many of the allegations here were not preserved at trial with contemporaneous objections, thus we review for plain error. We will not find plain error unless the error is plain on the record and the error goes to the foundation of the case, or takes from a defendant a right essential to his defense. *Simpson*, 1994 OK CR 40, ¶ 23, 876 P.2d at 698.
>
> [Ms. Andrew] first claims that the prosecutor intentionally misled the jury by pointing out to them that Tricity Andrew did not beg for her mother's life. Defense counsel had planned and had informed the Court that he intended to ask Tricity if she wanted her mother to get the death penalty, but the question was never asked, possibly due to Tricity's emotional state on the witness stand. [Ms. Andrew] also claims that the prosecution attacked defense counsel's choice to use [Ms. Andrew]'s fifteen-year-old niece to ask to spare [Ms. Andrew]'s life by asking the jury, "would you put your 15–year–old niece on the stand to do that? I wouldn't." There was no objection to either of these comments.
>
> While these comments were "low blows" and may have constituted improper argument and casting aspersions on defense counsel, we can confidently say that they did not rise to the level of plain error.
>
> . . .
>
> [Ms. Andrew], next points us to the prosecutors comment that, "Rob Andrew's parents would like to visit him in prison.... The only place they get to visit is his grave." The prosecutor used this comment to rebut mitigating evidence that [Ms. Andrew] "has many relatives who would visit her in

prison if given the opportunity." Again, no objection was lodged. This comment is similar to the ones condemned in *Duckett v. State*, 1995 OK CR 61, ¶ 46, 919 P.2d 7, 19. However, as in *Duckett*, we find that the comment did not rise to the level of plain error.

. . .

[Ms. Andrew] claims that the prosecutor misstated the evidence by inferring that the victim impact witnesses wanted the death penalty through their testimony, even though Rob's father testified that "all of our family will do everything in our power to assist for convictions and punishment for all of those who are involved in this and responsible for the murder of my son and that they will never ever walk free again." These arguments were in direct response to the defense argument that the victim impact witnesses didn't ask for the death penalty. The prosecutor informed the jury that, by law, the victim impact witnesses could not ask for a specific punishment during their victim impact testimony. There was no objection and the comments do not rise to the level of plain error.

. . .

[Ms. Andrew] has failed to show either that her trial was so infected by misconduct as to violate due process, or that her death sentence was improperly or unconstitutionally obtained. *DeRosa*, 2004 OK CR 19, ¶ 70, 89 P.3d at 1149. [Ms. Andrew] was convicted and sentenced to death based upon the facts and circumstances of this case, rather than any improper remarks by the prosecutor. *Id.*

*Andrew I*, 164 P.3d at 202–04.

### C.    Clearly Established Law

The standard of review for a prosecutorial-misconduct claim at the habeas stage is "the narrow one of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 642 (1974).

In *Darden v. Wainwright*, 477 U.S. 168 (1986), the Supreme Court explained that "[i]t is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Id.* at 181 (citation omitted). "The relevant question is whether the prosecutors' improper comments 'so infected the trial with unfairness as to make the

58

resulting conviction a denial of due process.'" *Id.* (quoting *Donnelly*, 416 U.S. at 643). In answering this question, we may consider factors such as whether the comments were "invited by" or "responsive" to defense arguments; whether curative instructions were given to the jury; and the weight of the evidence. *See id.* at 182. And critical to our analysis, the Supreme Court later noted that "the *Darden* standard is a very general one, leaving courts 'more leeway . . . in reaching outcomes in case-by-case determinations.'" *Parker*, 567 U.S. at 48 (quoting *Alvarado*, 541 U.S. at 664).[38]

### D.    Analysis

Ms. Andrew's briefing on this claim consists mostly of a long description of the prosecutor's comments as borderline "inhumane" and contrary to "prosecutorial norms." Opening Br. at 111. After noting her agreement with the dissenting member of the OCCA, Ms. Andrew spends one cursory paragraph arguing that the prosecutor's comments denied her due process.

In that paragraph, she never mentions the applicable, deferential AEDPA standard. Rather, she summarily states that "[t]he prosecution's remarks at closing argument befouled the sentencing process and its outcome, subverting the heightened standards of reliability required by the Constitution in capital cases." Opening Br. at 113. And she concludes, vaguely, that "[t]he state-court decision excusing the remarks was unreasonable, particularly in conjunction with other errors undermining the fairness of

---

[38] Although the OCCA reviewed Ms. Andrew's claim for plain error, Oklahoma's plain-error test and the federal due-process test are the same. *Thornburg v. Mullin*, 422 F.3d 1113, 1125 (10th Cir. 2005). So we defer to the OCCA's ruling unless it unreasonably applied that test. *Id*.

the trial." *Id.* at 114.

We disagree. Despite pointing to some troublesome comments, Ms. Andrew hasn't established that "*every* fairminded jurist" would "reach a different conclusion" than the OCCA. *Davenport*, 142 S. Ct. at 1530. First, though the trial court didn't provide the jury with curative instructions, it had no occasion to do so given that defense counsel failed to object to any of the statements they now claim warrant reversal. Second, as noted by the OCCA and the district court, at least two of the comments responded to defense arguments. And third, as discussed, the evidence of Ms. Andrew's guilt was overwhelming. *See supra* Section II.B. That evidence, both of her guilt and in support of aggravating factors, "reduced the likelihood that the jury's decision was influenced by argument." *Darden*, 477 U.S. at 182. So, particularly because we must substantially defer to the OCCA in applying the general *Darden* rule, we cannot say that the OCCA's decision was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Ayala*, 576 U.S. at 269–70.

The Supreme Court's own refusal to grant relief in *Darden* also supports this conclusion. There, the prosecutor's closing argument during the guilt phase contained many "undoubtedly. . . improper" comments. 477 U.S. at 180. For example, he implied that the death penalty was necessary to protect the public; he called the defendant an "animal"; and he made comments reflecting his emotional reaction to the case, including expressing his desire to see the defendant "blown away by a shotgun." *Id.* at 179, 180 n.12. The Supreme Court held that while the prosecutor's comments deserved

60

"condemnation," *id.* at 179, they didn't deprive the petitioner of a fair trial, *id.* at 181. We view the prosecutor's comments here, individually and collectively, to be less problematic than those made by the prosecutor in *Darden*. So we have "no warrant to set aside the [OCCA]'s conclusion." *Parker*, 567 U.S. at 48 (reversing the Sixth Circuit's grant of habeas relief based on the petitioner's prosecutorial misconduct claim and noting that the more inflammatory comments from the prosecutor in *Darden* did not warrant relief).

We conclude that Ms. Andrew has failed to demonstrate that all fairminded jurists would agree that the OCCA's resolution of Ms. Andrew's prosecutorial-misconduct claim was incorrect. Thus, we cannot say that the OCCA unreasonably applied *Darden*. We therefore affirm the district court's denial of relief on Ms. Andrew's prosecutorial-misconduct claim.

## VII.    Ineffective Assistance of Counsel: DNA Evidence

Ms. Andrew next argues that her trial counsel provided ineffective assistance by not submitting a bloodstain ("Pattern 5") found on Ms. Andrew's jeans for DNA testing before trial. She contends that had Pattern 5 been tested before trial, the government couldn't have argued that Pattern 5 contained Rob Andrew's blood and tied that to Ms. Andrew being the shooter.

### A.    Background

At trial, Ms. Andrew's expert witness, Ross Gardner, testified that he believed Pattern 5 to be blood spatter from the second gunshot wound Rob Andrew suffered—not blood from Ms. Andrew's arm wound. He could not determine whether the stain was

61

forward or back spatter.[39] But he acknowledged that if it was back spatter, it would be reasonable to conclude that Ms. Andrew was the shooter.

During guilt-stage closing arguments, the government argued that Pattern 5 was definitively back spatter. That evidence, the government contended, demonstrated that Ms. Andrew shot Rob Andrew. The government later repeated that assertion, stating that when Rob Andrew "turn[ed] to look at her one last time . . . . [T]he blood spatter shows you, [that] he saw her face over the barrel of a shotgun." Trial Vol. 17 at 274. The government made clear, however, that even if Pavatt had shot Rob Andrew, it wouldn't matter—under Oklahoma law, Ms. Andrew was guilty "as long as she was aiding, abetting, advising, or encouraging" Pavatt. *Id.* at 19.

During penalty-stage closing arguments, the government again highlighted the Pattern 5 evidence. It noted that Pattern 5 consisted of blood spatter on the front of Ms. Andrew's jeans and that Rob Andrew had been lying on the garage floor when shot, supporting the theory that Ms. Andrew was the shooter. And it told the jury that there was no need to test the blood: "You know whose it is. It's Rob Andrew's blood. And [the defense's] own witness is the one who said that." Trial Vol. 19 at 326.

On direct appeal, Ms. Andrew argued that her trial counsel was ineffective for failing to submit Pattern 5 for DNA testing and that she was entitled to an evidentiary hearing. In support of that claim, she submitted an affidavit from a forensic scientist who

---

[39] A spray of blood projected from a gunshot victim's wound can be forward spatter or back spatter. Forward spatter comes from a bullet exit wound, traveling in the same direction as the bullet. Back spatter comes from a bullet entrance wound, traveling in the opposite direction of the bullet.

performed post-trial DNA testing on Pattern 5, as well as the other stains found on the jeans. The affidavit states as follows:

> There is no evidence from which I can identify Robert Andrew as having contributed to any of these stains. While [Pattern 5] shows an additional allele of a Y at the amelogenin (sex marker) locus, the data do not allow me to attribute that Y to any person. As I received the jeans in an unsealed condition from the District Attorney's Office, I cannot exclude any male who may have had contact with those jeans as having contributed that Y.
>
> Certain other possible alleles at various loci which fell below the laboratory's call standard were indicated in the tabular results on page 3 of the Supplemental Report with asterisks. Reviewing these possible other alleles, it is my opinion that every one of them (with the exception of the Y in [Pattern 5]) is more than likely stutter from an allele contributed by Ms. Andrew.
>
> Accordingly, I have no evidence from the DNA analysis from which I could identify Robert Andrew, or any specific other person than Brenda Andrew, as having contributed to the identified blood stains.

Direct Appeal, App. for Evidentiary Hr'g at 28–29 (paragraph numbers omitted).

From this, Ms. Andrew argued that had Pattern 5 been tested pretrial, as it was posttrial, the government couldn't have argued that Pattern 5 consisted of Rob Andrew's blood. Thus, Ms. Andrew reasoned, the government could have never claimed that Ms. Andrew shot him.

### B.     The OCCA's Decision

After a detailed explanation of the standard for ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 687 (1984), the OCCA rejected her claim:

> The blood pattern evidence deals with the defense expert who testified that [Ms. Andrew] had high velocity blood spatter on her jeans. In closing the prosecution turned this evidence against [Ms. Andrew] by arguing that she received this spatter by firing the second shot and getting blow back blood spatter from Rob. However, this blood spatter had never been tested to

63

determine its source. Now, during the pendency of this Appeal, [Ms. Andrew] provides DNA analysis which she argues shows that the blood stains were from her alone. The State's response points out that the blood is a mixture: the major component from [Ms. Andrew] and the minor component being from an unknown male (arguably the victim because the tester cannot exclude the victim as the source of the blood). [Ms. Andrew] claims that utilizing a defense expert without first determining the source of these stains led to the theory that she fired the second shot, making her more culpable and allowing the jury to more easily give her the death penalty. The prosecutor could have made this argument by stating that the unknown (minor component) blood spatter came from the victim, forming the basis for the same argument.

This evidence does not show by clear and convincing evidence that the outcome would have been different; consequently, no evidentiary hearing is necessary.

*Andrew I*, 164 P.3d at 198–99 (paragraph numbers and footnote omitted).

### C.     Analysis

In her petition to the district court, Ms. Andrew argued that the OCCA didn't adjudicate this claim on the merits, which would free her from the need to overcome AEDPA deference. In the alternative, she argued that even if AEDPA deference applied, relief would be warranted under 28 U.S.C. § 2254(d)(1) because the OCCA's decision was contrary to or involved an unreasonable application of *Strickland*. The district court rejected both arguments and denied relief.

On appeal, Ms. Andrew doesn't challenge the district court's order. Rather, her sole argument is a new one: that she is entitled to relief under 28 U.S.C. § 2254(d)(2) because the OCCA's resolution of her claim was "based upon an unreasonable determination of the facts." Opening Br. at 126. Specifically, she contends that the OCCA "incorrectly interpreted the [forensic scientist's] affidavit and the specific, actual

argument the prosecutors presented to the jury." *Id.* at 125–26.

Ms. Andrew's change in tactics—to seek relief under § 2254(d)(2) when she altogether failed to do so before the district court—presents a clear-cut waiver issue.[40] Ms. Andrew acknowledges that this issue might "trouble[]" us. Reply Br. at 59. Yet she encourages us to exercise our discretion to review her claim on grounds that her overarching argument has remained largely the same. But we have held that if an argument wasn't presented to the district court, it is waived on appeal—even in situations "where a litigant changes to a new theory on appeal that falls under the same general category as an argument presented below." *Owens*, 792 F.3d at 1246 (brackets and citation omitted).[41] Thus, we conclude that Ms. Andrew's § 2254(d)(2) argument is waived.

We briefly note, however, that the OCCA's resolution of this claim was in no way

---

[40] In moving for a certificate of appealability on this claim, Ms. Andrew did briefly argue that the OCCA unreasonably interpreted the affidavit. But at bottom, as shown by her concluding paragraph, her argument was that she'd satisfied her burden "by showing that the OCCA unreasonably applied the prejudice test erected by *Strickland*." Mot. for COA at 78–79.

[41] Ms. Andrew argues that in *Jackson v. Warrior*, 805 F.3d 940 (10th Cir. 2015), we confronted "the same problem" and still exercised our discretion to review a claim that the petitioner failed to raise to the district court. Reply Br. at 58. But *Jackson* is distinguishable. There, we found the petitioner's new claim to be "closely intertwined with his prior position" and to "involve[] pure matters of law." *Jackson*, 805 F.3d at 947 n.2. Ms. Andrew's new position is fundamentally different from the one she took before the district court, and it involves matters of factual interpretation.

based on an unreasonable determination of the facts.[42] The OCCA stated that the DNA analysis revealed that Pattern 5 consisted of a mixture of blood—most from Ms. Andrew, but some from an unidentified male. Ms. Andrew does not dispute that factual finding.

What she does dispute is the OCCA's interpretation of this statement from the affidavit: "[t]here is no evidence from which I can identify Robert Andrew as having contributed to any of these stains." Direct Appeal, App. for Evidentiary Hr'g at 28. Reading this statement in the context of the rest of the affidavit, the OCCA concluded that the unidentified male DNA could "arguably" have been Rob Andrew's because the test couldn't "exclude" Rob Andrew as the source. *Andrew I*, 164 P.3d at 199.

Ms. Andrew disagrees, positing that "the only reasonable interpretation" of that statement is that the forensic scientist explicitly *excluded* Rob Andrew as the contributor of the male DNA. Opening Br. at 123. So, in Ms. Andrew's estimation, Pattern 5's male DNA source must've been "*another* male, mostly likely left there by careless handling of the jeans." *Id.*

Ms. Andrew's interpretation of the affidavit is wholly unsupported. In the sentence following the statement that Ms. Andrew disputes, the forensic scientist states that "the

---

[42] The parties are at odds as to whether the plain-error doctrine applies in the AEDPA context. This question and the related question of whether to treat unpreserved issues as forfeited or waived have been sources of debate and inconsistency in our precedents. *See Harmon v. Sharp*, 936 F.3d 1044, 1085–91 (10th Cir. 2019) (Holmes, J., concurring) (discussing that inconsistency and why "the waiver doctrine—not the forfeiture/plain-error rubric—should be applied to arguments that habeas petitioners proceeding under AEDPA seek to advance for the first time on appeal"). But because Ms. Andrew did not urge plain error here and because her argument, as discussed, is invalid, we need not wade into the parties' arguments.

data do not allow me to attribute that [male chromosome] to *any* person." Direct Appeal, App. for Evidentiary Hr'g at 28 (emphasis added). Later, she states that she has "no evidence from the DNA analysis from which I could identify Robert Andrew, *or any specific other person* than Brenda Andrew, as having contributed to the identified blood stains." *Id.* at 29 (emphasis added). Given that context, contrary to Ms. Andrew's view, the only reasonable interpretation of the affidavit is that the forensic scientist couldn't identify *or exclude* any male individual from the data she possessed—including Rob Andrew.

Ms. Andrew also objects to the OCCA's conclusion that the government could have argued that Ms. Andrew was the shooter even if the DNA testing had been done before trial "by stating that the unknown (minor component) blood spatter came from the victim." *Andrew I*, 164 P.3d at 199. Ms. Andrew contends that had the DNA been tested pretrial, its argument that Ms. Andrew was the shooter "would have been sapped of its potency." Opening Br. at 125.

To us, this is not a true § 2254(d)(2) challenge to a "factual determination" of the OCCA. Rather, Ms. Andrew attempts to renew her argument that the OCCA unreasonably applied *Strickland*'s prejudice prong under § 2254(d)(1)—an argument she abandoned on appeal. But regardless, the OCCA never equated the strength of the government's argument that Ms. Andrew was the shooter pre-DNA testing and the hypothetical strength of the same argument post-DNA testing. It merely stated that with or without the testing, "*the basis*" of the argument remained the same. *Andrew I*, 164 P.3d at 199 (emphasis added). That was a reasonable determination.

Thus, we affirm the district court's denial of relief on Ms. Andrew's first ineffective-assistance-of-counsel claim. We also deny her request for an evidentiary hearing. *See Smith*, 904 F.3d at 886.

## VIII.  Ineffective Assistance of Counsel: Extradition Treaty

Ms. Andrew also contends that her trial counsel was ineffective for failing to advise her (1) about a provision within a treaty between the United States and Mexico ("Extradition Treaty") and (2) to turn herself in to Mexican authorities.

### A.    Background

On November 20, 2001, Rob Andrew was murdered. Five days later, before Rob Andrew's funeral, Ms. Andrew crossed the Mexico border with Pavatt and her children. On November 29, 2001, after she entered Mexico, she was charged with first-degree murder. Three months later, on February 28, 2002, Ms. Andrew and Pavatt were arrested at the border as they attempted to return to the United States. On the day of those arrests, Ms. Andrew's trial counsel entered his appearance on behalf of Ms. Andrew in the criminal case against her (he had previously represented her in the divorce proceedings). She allegedly had many phone calls with him while she was in Mexico.

In her application for post-conviction relief to the OCCA, Ms. Andrew argued that her trial counsel had failed to advise her of the following provision of the Extradition Treaty:

> When the offense for which extradition is requested is punishable by death under the laws of the requesting Party and the laws of the requested Party do not permit such punishment for that offense, extradition may be refused unless the requesting Party furnishes such assurances as the requested Party considers sufficient that the death penalty shall not be imposed, or, if

68

imposed, shall not be executed.

Extradition Treaty Between the United States of America and the United Mexican States, Mex.-U.S., May 4, 1978, 31 U.S.T. 5059.

Because Mexico doesn't approve of death or life-without-parole sentences, Ms. Andrew contends that she could have turned herself in to Mexican authorities under the Extradition Treaty and avoided extradition absent Oklahoma's agreeing to forgo those penalties. She also argues that her appellate counsel was ineffective for failing to raise the issue on direct appeal.

## B.    The OCCA's Decision

After reciting the *Strickland* standard, the OCCA rejected Ms. Andrew's claim for ineffective assistance of counsel. In adjudicating it on the merits, the court stated as follows:

> [Ms. Andrew] makes two assumptions which are necessary to her argument. Her first assumption is that Mexico would have invoked the provisions of the treaty had Oklahoma authorities refused to agree to not seek the death penalty. In reading this treaty we find that the language of the treaty is not mandatory. The language contains the discretionary phrase "may be refused." Mexico is under no obligation to refuse extradition, and without any specific statement from the Mexican authorities saying they would have refused to extradite [Ms. Andrew], *she cannot show a prejudicial result which is necessary to any ineffective assistance of counsel claim.*
>
> Her second assumption is that Oklahoma would have sought extradition and would have agreed to the terms of the treaty before extraditing Andrew to Oklahoma. However, Oklahoma authorities could have simply remained patient and not sought extradition, planning instead on some other means of rendition.[FN3]
>
> > [FN3] For example, Oklahoma could have simply waited on Andrew and Pavatt to run out of money and attempt to return to the United States, where their families resided. It is

> interesting to note that this is exactly what happened and the pair were apprehended by United States border agents when they tried to enter the United States.

> Had Andrew surrendered to Mexican authorities, there is no guarantee that Oklahoma would have sought extradition, because of the possible agreement they would have to make with Mexico. The result would be that she would both be released from Mexican custody and be faced with the possibility of life on the lamb [sic] in Mexico, or the Mexican authorities could simply deport her to the United States as an illegal alien. With deportation, there is no triggering of the extradition treaty. Again, her speculation does not provide evidence that she suffered a prejudicial result from counsel's conduct.

> What Andrew is asking this Court to do is to give murder defendants *carte blanch* [sic] authority to flee to Mexico, turn themselves over to the Mexican authorities, and claim immunity from the penalties of death and life without parole. Public policy aside, the discretionary language of the treaty would allow Mexico to curtail this type of behavior by extraditing those seeking to avoid justice. Andrew has neither made a compelling argument nor provided sufficient evidence that she would have escaped the death penalty had her attorney advised her to turn herself in to the Mexican authorities. Therefore, regardless of counsel's knowledge of the treaty, *Andrew cannot show that she was prejudiced by counsel's conduct*.

*Andrew II*, No. PCD-2005-176 at 3–5 (emphasis added).[43]

Because her ineffective-assistance-of-trial-counsel claim lacked merit, the OCCA also concluded that her appellate counsel wasn't ineffective in failing to raise it on direct appeal. *Id.* at 5 n.4.

### C.　Clearly Established Law

"It is past question that the rule set forth in *Strickland* qualifies as 'clearly established Federal law, as determined by the Supreme Court of the United States.'"

---

[43] The dissent focuses on the extradition issue and does not address the other bases in the above OCCA determination—a possible deportation as well as Oklahoma's option to patiently await her cash-strapped return to the United States.

*Terry Williams*, 529 U.S. at 391. *Strickland* involves a two-part test. First, the petitioner must demonstrate that her counsel performed deficiently. 466 U.S. at 687–88. Second, the petitioner must show that her counsel's performance prejudiced her. *Id.* at 693. To establish prejudice, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[44] *Id.* at 694.

"The standards created by *Strickland* and § 2254(d) are both highly deferential, and when the two apply in tandem, review is doubly so." *Richter*, 562 U.S. at 105 (internal quotations and citations omitted). That is because "[t]he *Strickland* standard is a general one, so the range of reasonable applications is substantial." *Id.* (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)).

**D.    Analysis**

**1.    The Right to Counsel**

We begin by noting that the OCCA did not adjudicate the merits of whether Ms. Andrew had a Sixth Amendment right to counsel while she was on the run in Mexico. That means the State of Oklahoma doesn't get § 2254(d)(1) deference on that issue. Addressing this preliminary question of whether *Strickland* even applies here, the district court ruled de novo that Ms. Andrew had no such right while in Mexico. That, of course,

---

[44] Ms. Andrew's ineffective-assistance-of-counsel claim differs from those in *Strickland* and other cases by alleging deficient performance concerning advice about an extradition treaty with a foreign country, a matter outside of the trial proceedings themselves. We assume for this appeal, but do not decide, that *Strickland* could provide clearly established law in this context.

is significant because without a Sixth Amendment right to counsel, Ms. Andrew "cannot claim constitutionally ineffective assistance of counsel." *Coleman v. Thompson*, 501 U.S. 722, 752 (1991) (citing *Wainwright v. Torna*, 455 U.S. 586 (1982)).

Ms. Andrew argues that the district court erred in this analysis. She says that her Sixth Amendment right to effective counsel attached on the filing of her state charges on November 29, 2001, before she received the alleged ineffective assistance of counsel. In contrast, the government says that the district court correctly ruled that Ms. Andrew's Sixth Amendment right first attached at her appearance before a judicial officer, which followed her arrest after entering the United States on February 28, 2002.

Even assuming Ms. Andrew's right to counsel attached on the filing of charges, we would question whether she had a right to counsel when she was in Mexico. That's because even after the Sixth Amendment attaches, it guarantees criminal defendants the right to counsel only during *critical stages* of the prosecution. *See Montejo v. Louisiana,* 556 U.S. 778, 786 (2009); *Rothgery v. Gillespie County*, 554 U.S. 191, 211–12 (2008) (noting that it is "an analytical mistake" to "assume that attachment necessarily requires the occurrence or imminence of a critical stage" because "the attachment question" and the "critical stage question" are distinct (cleaned up)). The parties haven't briefed whether Ms. Andrew's time in Mexico qualifies as a critical stage.

But we need not decide whether Ms. Andrew had a Sixth Amendment right to effective counsel when she was on the run in Mexico because, even if she did, she wouldn't be entitled to any habeas relief on this claim.

### 2.     The Merits

Ms. Andrew argues under § 2254(d)(1) that the OCCA unreasonably applied

*Strickland*'s prejudice prong. Specifically, she contends that the affidavits of five

attorneys—filed with her petition to the OCCA for an evidentiary hearing—establish that

"(1) it is common knowledge among defense attorneys . . . that Mexico refuses to

extradite capital defendants to the United States; and (2) failure to advise a client facing

capital charges to surrender to the Mexican authorities would be an unacceptable failure

to advise a client to take advantage of available protection from the risk of capital

punishment." Suppl. Reply Br. at 2–3. In her view, those affidavits, combined with "the

historical context of the treaty" and "the history of the extradition practices establish the

high probability that Mexico would have initiated formal extradition proceedings and

would not have handed [Ms.] Andrew over to Oklahoma without a waiver of capital

sentence."[45] *Id.* at 3–4.

But these arguments fail to acknowledge the stringent standard of review imposed

by § 2254(d)(1) for claims that a state court adjudicated on the merits. To show that the

OCCA's adjudication of her ineffective-assistance-of-counsel claim was unreasonable,

Ms. Andrew needs to show that "*every* fairminded jurist" would "reach a different

conclusion" than the OCCA did. *Davenport*, 142 S. Ct. at 1530. Yet Ms. Andrew doesn't

---

[45] Based on its own research, the dissent treats Mexico's forced extradition of
Ms. Andrew as more akin to an impossibility than just a low probability as Ms.
Andrew had maintained. Dissent at 45–47. Ms. Andrew provided none of these
academic sources to the OCCA, the federal district court, or us.

even contend that she can meet that standard.[46] We conclude that Ms. Andrew cannot make such a showing, so we affirm the district court's denial of Ms. Andrew's ineffective-assistance-of-counsel claim.[47]

Apart from this, Ms. Andrews makes a mere perfunctory assertion—without any legal analysis—that she is entitled to a federal evidentiary hearing on this extradition-based claim of ineffective assistance of counsel. But her inability to overcome § 2254(d)(1)'s deference on that claim also bears on her request for evidentiary hearing. In *Michael Williams v. Taylor*, the Court examined the availability of a federal evidentiary hearing over the prisoner's claim (among others) that the government had "failed to disclose an informal plea agreement with [a testifying co-defendant]." 529 U.S. 420, 427, 444 (2000). Because the federal court of appeals had rejected this claim on the merits under § 2254(d)(1), the Supreme Court ruled that "it is unnecessary to reach the question whether § 2254(e)(2) would permit a hearing on the claim." *Id.* at 444. Thus, in that circumstance, it didn't matter whether the prisoner had failed to develop the factual record in state court.

---

[46] Nor does the dissent acknowledge this standard, let alone explain how Ms. Andrew has met its demanding terms.

[47] We interpret Ms. Andrew's argument broadly to challenge—under § 2254(d)(1)—the OCCA's rejection of her extradition-related claim for ineffective assistance of counsel. After making that argument, she switches gears by asserting that "[a]ny *remaining questions* on prejudice should have been resolved in a hearing." Suppl. Reply Br. at 5 (emphasis added). Though Ms. Andrew disagrees with the OCCA's decision not to grant an evidentiary hearing after reviewing her submitted affidavits, she makes no legal argument challenging the OCCA's decision under the federal habeas law.

On a related point, in *Cullen v. Pinholster*, the Court reviewed a Ninth Circuit decision using evidence collected at a federal evidentiary hearing in determining that the prisoner had overcome the deference due under § 2254(d)(1) to the state court's merits adjudication of an ineffective-assistance-of-counsel claim. 563 U.S. 170, 174 (2011). The Supreme Court agreed with the government that "review is limited to the record that was before the state court that adjudicated the claim on the merits." *Id.* at 180. The Court held "that evidence later introduced in federal court is irrelevant to § 2254(d)(1) review." *Id.* at 184. Otherwise stated, the Court held "that evidence introduced in federal court has no bearing on § 2254(d)(1) review." *Id.* at 185. Emphasizing the importance of § 2254(d)(1) in determining the availability of a federal evidentiary hearing, the Court noted that "[s]ection 2254(e)(2) continues to have force where § 2254(d)(1) does not bar federal habeas relief." *Id.*; *see also Shoop v. Twyford*, 142 S. Ct. 2037, 2043–44 (2022) (relying on *Cullen v. Pinholster* for the rule that "review of legal claims under § 2254(d)(1) is also 'limited to the record that was before the state court'" (citation omitted)).

In view of these pronouncements, we cannot see how Ms. Andrew could obtain a federal evidentiary hearing on her extradition-related claim for ineffective assistance of counsel when the OCCA had adjudicated that claim on the merits and we upheld its ruling under § 2254(d)(1) review. Ms. Andrew could not use any evidence collected in that hearing in the review under § 2254(d)(1). Though that should end Ms. Andrew's request that we order the district court to conduct an evidentiary hearing, we note that her request fails on other bases too.

Even if Ms. Andrew could ignore § 2254(d)(1)'s effect on her request, she would

still need to face § 2254(e)(2). She fails even to cite that statute, let alone argue that she

has not "failed to develop the factual basis of a claim in State court proceedings," which

would render § 2254(e)(2) inapposite. Instead, she merely mentions her request to the

OCCA that it order an evidentiary hearing on the extradition issue.

Further, if Ms. Andrew could somehow avoid § 2254(d)(1) and (e)(2), her demand

for a federal evidentiary hearing would still fail. Even "[i]n cases where an applicant for

federal habeas relief is not barred from obtaining an evidentiary hearing by 28 U.S.C.

§ 2254(e)(2), the decision to grant such a hearing rests in the discretion of the district

court." *Schriro*, 550 U.S. at 468. And here we cannot conclude that the district court

abused its discretion in denying the evidentiary hearing. In the end, Ms. Andrew has not

made a threshold showing that an evidentiary hearing would have revealed a "fact" that

would entitle her to habeas relief. No matter what, the questions that the OCCA identified

would have remained. Though Ms. Andrew now says that she would have surrendered

for Mexican detention, that is nothing more than a self-serving attestation. By her own

account, she learned in Mexico that Pavatt was one of the two shooters (he would never

name the other) and claimed to have shot her in the arm (with the experts saying from

within inches). Would she have left her young children in his custody and volunteered for

Mexican detention?[48] And even if so, would the Mexican government still have declined

---

[48] As the dissent notes, one of Ms. Andrew's expert attorneys, who had represented the Mexican government in extradition cases, stated that on surrendering to the Mexican authorities Ms. Andrew "would have been detained in a Mexican penal institution pending extradition to Oklahoma." Dissent at 45.

to extradite or deport her? And if Mexico would have refused to extradite or deport, would the State of Oklahoma have chosen to reduce its penalties rather than bide its time?[49] As mentioned, the state had already come close to nabbing Ms. Andrew as she and Pavatt retrieved cash sent by his daughter, who unknown to them was working with the FBI. In these circumstances, the district court did not abuse its discretion by declining to order a federal evidentiary hearing. *See Tharpe v. Sellers*, 138 S. Ct. 545 (2018) (in evaluating a fact determination under § 2254(d)(1) review, the Court noted that "even if we might have made a different call, abuse-of-discretion review means we cannot 'substitute [our] judgment for that of the district court.'" (quoting *Horne v. Flores*, 557 U.S. 433, 493 (2009) (Breyer, J., dissenting))).

## IX.    HAC Aggravating Circumstance: Sufficiency of the Evidence

Ms. Andrew next challenges the sufficiency of the evidence supporting the HAC aggravator found by the jury at the end of the penalty phase.

### A.    *Pavatt I* and *Pavatt II*

Ms. Andrew requested, and was ultimately granted, a COA on this claim before we vacated the panel decision in *Pavatt I*. She argues under the Eighth and Fourteenth Amendments that the evidence presented in support of the HAC aggravator was insufficient. And she encourages us to endorse that argument and reverse and remand for resentencing, as we did with Pavatt's identical claim in *Pavatt I*. 894 F.3d at 1133 (holding that the HAC aggravator could not "constitutionally be applied" in Pavatt's

---

[49] We note that Pavatt and Ms. Andrew had only had a few American coins and some cans of tuna fish when they were apprehended returning to the United States.

case). She contends that "[a]ny other outcome would be arbitrary and capricious, to say nothing of cruel and unusual" and that a "HAC aggravator should apply equally to two codefendants charged, convicted, and sentenced for the same murder." Andrew Suppl. Br. on HAC at 11.

But after the briefing was completed on this claim, we vacated our decision in *Pavatt I* and set a rehearing en banc. And our ensuing en banc decision in *Pavatt II* demands denial of Ms. Andrew's claim here. To explain why, it helps to provide some background on Pavatt's sufficiency-of-the-evidence claim relating to the HAC aggravator claim and an explanation of our resolution of that claim in *Pavatt II*.

At the end of the penalty phase of Pavatt's trial, the jury, as it did in Ms. Andrew's case, concluded that the government had proved the HAC aggravator beyond a reasonable doubt. On direct appeal, Pavatt challenged the sufficiency of the evidence supporting the HAC aggravator. The OCCA rejected the claim, concluding under Oklahoma state law that a rational juror could have found the existence of the HAC aggravator beyond a reasonable doubt. *Pavatt v. State*, 159 P.3d 272, 295 (Okla. Crim. App. 2007).

In his federal habeas petition, Pavatt challenged this sufficiency-of-the-evidence determination. In reviewing the claim, we first considered whether the OCCA's decision was an unreasonable application of the Supreme Court's holding in *Jackson v. Virginia*, 443 U.S. 307 (1979). *See Pavatt II*, 928 F.3d at 920. In *Jackson*, the Supreme Court established that "the fundamental protection of due process of law" requires that the evidence presented at a criminal trial, viewed in the light most favorable to the

prosecution, be sufficient to allow "*any* rational trier of fact to have found the essential elements of the crime beyond a reasonable doubt." 443 U.S. at 319. That same due-process requirement applies to aggravating factors argued to the jury in a capital case. *See Pavatt II*, 928 F.3d at 917.

After a detailed review of the evidence—which was substantially the same evidence as presented in Ms. Andrew's case—we concluded that Pavatt had "failed to establish that the OCCA's determination that the evidence was sufficient to support the HAC aggravator was contrary to, or involved an unreasonable application of, clearly established law" and denied relief. *Id.* at 922.

Next, we considered Pavatt's attempted as-applied challenge to the HAC aggravator. Pavatt argued that the OCCA had "unreasonably failed to follow its own precedent that had adopted a constitutionally narrow construction of the HAC aggravator, compounded its historically inconsistent approach to what Oklahoma requires to support the HAC aggravator, and, ultimately, applied an unconstitutionally overbroad definition of the HAC aggravator in affirming his death sentence." *Id.* (internal quotations omitted).

We ultimately concluded that this challenge failed at the threshold. We explained that a prerequisite to seeking habeas relief is exhaustion of state-court remedies. *Id.* at 923 (citing 28 U.S.C. § 2254(b)(1)(A)). "A claim is exhausted only after it has been fairly presented to the state court." *Id.* (quoting *Simpson*, 912 F.3d at 564). And "[f]air representation requires that the substance of the federal claim was raised in state court." *Id.* (citation omitted).

On direct appeal, Pavatt asserted only a *Jackson* due-process challenge. It wasn't

79

until his second application for state post-conviction relief that he challenged the HAC

aggravator as "facially vague" and violative of the Eighth and Fourteenth Amendments.

Citing other OCCA cases applying the HAC aggravator, he contrasted the lack of

gratuitous violence in Rob Andrew's murder. The OCCA concluded that the claim was

procedurally barred because he failed to raise it in prior proceedings.

After reviewing those state court pleadings, we were unpersuaded that Pavatt had

fairly presented to the OCCA his as-applied challenge and found it subject to an

anticipatory procedural bar:

> To begin with, we reject the notion that the *Jackson* challenge that Pavatt
> asserted in his direct appeal necessarily incorporated an as-applied challenge
> to the HAC aggravator.[FN6] Indeed, Pavatt's *Jackson* claim could not have
> incorporated the as-applied arguments that he now attempts to make in this
> federal habeas appeal because his as-applied arguments challenge only the
> manner in which the OCCA, in disposing of his *Jackson* challenge on direct
> appeal, construed the HAC aggravator. We further conclude that Pavatt's
> second application for post-conviction relief plainly asserted a facial
> vagueness challenge to the HAC aggravator, but, at best, only hinted at an
> as-applied challenge to the HAC aggravator. Consequently, we conclude that
> the as-applied arguments Pavatt now presents in his federal appellate brief
> were not fairly presented to the OCCA and are thus unexhausted and, in turn,
> subject to an anticipatory procedural bar. *See Moore v. Schoeman*, 288 F.3d
> 1231, 1233 n.3 (10th Cir. 2002).
>
>> [FN6] A *Jackson* challenge to a jury's finding of the HAC
>> aggravator, which relies on the Due Process Clause of the
>> Fourteenth Amendment, is a separate and distinct legal claim
>> from an Eighth Amendment challenge to the HAC aggravator.
>> That said, we do not foreclose the possibility that a petitioner
>> may, depending on the circumstances, assert a *Jackson* claim
>> and an Eighth Amendment claim in the same proceeding. We
>> hold only that the Eighth Amendment as-applied claim that
>> Pavatt now seeks to assert was not, and could not have been,
>> asserted in his direct appeal because it focuses on the manner
>> in which the OCCA applied the HAC aggravator in rejecting
>> Pavatt's *Jackson* claim on direct appeal.

*Id.* at 924 & n.6 (other footnote omitted).

Thus, for that reason, along with others irrelevant here, we concluded that Pavatt's as-applied challenge to the HAC aggravator wasn't properly before us and could not serve as a basis for habeas relief. *Id.* at 926.

## B.    Anticipatory Procedural Bar

Pavatt's and Ms. Andrew's as-applied challenges rest on nearly identical substantive claims and procedural history, so it is no surprise that Ms. Andrew's claim is similarly barred. Like Pavatt, Ms. Andrew asserted only a *Jackson* challenge on direct appeal.[50] She did not and *could not have*, contrary to her assertions, incorporated an as-applied challenge within her *Jackson* challenge because an as-applied challenge "focuses on the manner in which the OCCA applied the HAC aggravator in rejecting [Ms. Andrew]'s *Jackson* claim on direct appeal." *Pavatt II*, 928 F.3d at 924 n.6. In addition, unlike Pavatt, Ms. Andrew failed even to try to assert an as-applied challenge in her application for post-conviction relief. So it is even clearer here than in Pavatt's case that Ms. Andrew failed to fairly present her as-applied challenge to the OCCA. Thus, the claim is unexhausted.[51]

---

[50] On appeal before us, Ms. Andrew does not challenge the OCCA's finding of sufficient evidence under the *Jackson* due-process standard.

[51] Though *Pavatt II* considered whether the government had waived its exhaustion argument, no such questions exist here. In its response to Ms. Andrew's petition for habeas corpus, the government argued in depth that Ms. Andrew had failed to exhaust her as-applied challenge in state court. Ms. Andrew failed to respond to the government's failure-to-exhaust argument. We also note that the district court failed altogether to address the government's argument in its order denying Ms. Andrew relief.

Further, if Ms. Andrew were to return to the OCCA and present her as-applied challenge now, the OCCA would find it procedurally barred. *See Davis v. Sharp*, 943 F.3d 1290, 1296 (10th Cir. 2019). That is so because she could have brought the challenge in her application for post-conviction relief. *See id.*; *see also* Okla. Stat. Ann. tit. 22, § 1086 (requiring a petitioner to present "[a]ll grounds for relief available . . . in his original, supplemental or amended application" for post-conviction relief and stating that "[a]ny ground . . . not so raised . . . may not be the basis for a subsequent application"); *id.* § 1089(D)(2) (providing that in capital cases, any available "grounds for relief" that are "not included in a timely [post-conviction] application shall be deemed waived"). Ms. Andrew's as-applied challenge is therefore subject to an anticipatory procedural bar.

### C.    Exceptions

A petitioner may overcome an anticipatory procedural bar by showing (1) "cause for the default and actual prejudice as a result of the alleged violation of federal law," or (2) "that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750. On appeal, Ms. Andrew argues—for the first time— that both cause and prejudice, as well as the risk of a fundamental miscarriage of justice, excuse any potential default. But she failed to make that argument before the district court. In fact, she failed to respond at all to the government's argument in response to her petition that she had failed to exhaust her as-applied challenge before the OCCA. Thus, she has waived consideration of her arguments about any excuse she may have to sidestep the procedural bar against this challenge. *See Cuesta-Rodriguez v. Carpenter*,

916 F.3d 885, 905 (10th Cir. 2019) (declining to review the petitioner's argument on the

miscarriage-of-justice exception because he failed to preserve it for appellate review).

We therefore affirm the district court's denial of relief on Ms. Andrew's

sufficiency-of-the-evidence claim.

## X.     Cumulative Error

Finally, Ms. Andrew raises a claim of cumulative error. She argues that even if

each individual constitutional error identified might be viewed separately as harmless

beyond a reasonable doubt, when taken together, the errors violated her right to due

process during both the guilt and penalty phases.

On direct appeal, the OCCA rejected Ms. Andrew's cumulative-error claim:

> [Ms. Andrew] urges this Court to view the alleged errors in a cumulative
> fashion, should we hold that no individual error rises to the level of reversible
> error. We have reviewed the case to determine the effect, if any, of [Ms.
> Andrew]'s alleged accumulation of error. We find, even viewed in a
> cumulative fashion, the errors we identified do not require relief. *Stouffer v.
> State*, 2006 OK CR 46, ¶ 205–06, 147 P.3d 245, 280.

> We found error, although harmless, in the admission of some State's
> evidence and exclusion of some defense evidence. We also found error in the
> failure to include an instruction on "other crimes" evidence. We find that
> even viewed in a cumulative fashion, these errors do not require relief.
> Furthermore, these errors combined with alleged and unpreserved error
> which did not rise to the level of plain error did not cause [Ms. Andrew] to
> receive an unfair trial.

*Andrew I*, 164 P.3d at 205 (paragraph numbers omitted).

"In *Darks v. Mullin*, 327 F.3d 1001 (10th Cir. 2003), we announced that when a

habeas petitioner raises a cumulative error argument under due process principles the

argument is reviewable because 'Supreme Court authority clearly establishes the right to

a fair trial and due process.'" *Hanson v. Sherrod*, 797 F.3d 810, 852 n.16 (10th Cir. 2015) (quoting *Darks*, 317 F.3d at 1017).[52] Under our precedent, petitioners are entitled to "relief under cumulative error doctrine only when the constitutional errors committed in the state court trial so fatally infected the trial that they violated the trial's fundamental fairness." *Littlejohn v. Trammell*, 704 F.3d 817, 868 (10th Cir. 2013) (internal quotation marks and citation omitted).[53]

Here, the OCCA considered the merits of Ms. Andrew's cumulative-error claim, and we did not find any constitutional errors beyond those that the OCCA identified. So its decision is owed deference under AEDPA. *See Hanson*, 797 F.3d at 852. Our task then is to determine whether the OCCA's cumulative-error decision was an unreasonable application of the rule that a defendant has a right to a trial that is fundamentally fair. Because that rule is a general one, the OCCA is granted "more leeway." *Alvarado*, 541 U.S. at 664.

Having reviewed the state court record and the constitutional errors alleged by Ms.

---

[52] In *Darks*, we listed three examples of Supreme Court cases that, in our view, emphasize that rule: *Van Arsdall*, 475 U.S. at 681 ("[T]he Constitution entitles [a criminal] defendant to a fair trial, not a perfect one[.]"); *Taylor v. Kentucky*, 436 U.S. 478, 487–88 & n.15 (1978) ("[T]he cumulative effect of potentially damaging circumstances violated [the] due process guarantee of fundamental fairness . . . ."); and *DeChristoforo*, 416 U.S. at 643 (concluding that when viewed in the context of the entire trial, a prosecutor's improper remark did not "so infect[] the trial with unfairness as to make the resulting conviction a denial of due process").

[53] The government argues, "for preservation purposes," that no clearly established federal law entitles habeas petitioners to relief on cumulative-error claims. Response Br. at 112. We, like the panel in *Bush v. Carpenter*, 926 F.3d 644, 686 n.16 (10th Cir. 2019), acknowledge that "we are bound by Tenth Circuit precedent on this issue."

Andrew in her habeas petition, it is evident that Ms. Andrew's trial was not perfect. But it is just as evident that her trial was fundamentally fair, and that is all she was entitled to. *Van Arsdall*, 475 U.S. at 681. We are confident that the alleged federal constitutional violations did not have the requisite "synergistic effect" we've observed in the rare cumulative-error claim we have granted relief on. *Black v. Workman*, 682 F.3d 880, 914 (10th Cir. 2012) (quoting *Cargle*, 317 F.3d at 1221).[54] Particularly because, as the district court noted, each of the constitutional errors identified had minor significance when viewed against the backdrop of the entire proceeding and the overwhelming evidence supporting Ms. Andrew's guilt and conviction. *See supra* Section II.B.

We briefly address the dissent's cumulative-error analysis. The dissent goes beyond Ms. Andrew's argument by including its self-found *Miranda* violation in its cumulative-error analysis.[55] It does so despite acknowledging that the OCCA adjudicated the merits of the *Miranda* issue and that the district court's affirmance under § 2254(d)(1) was correct. Dissent at 5–7.

---

[54] Ms. Andrew argues that this "synergistic effect" can be found when combining two of the harmless errors recognized by the OCCA: the admission of some of the "bad acts" evidence and the exclusion of four of the defense witnesses. Opening Br. at 127–28. But the admission of the "bad acts" evidence, as discussed, did not constitute federal constitutional error. Thus, we may not consider that error in our cumulative-error analysis. *See Young v. Sirmons*, 551 F.3d 942, 972 (10th Cir. 2008) ("[I]n the federal habeas context, cumulative error analysis applies only to cumulative constitutional errors.").

[55] Notably, Ms. Andrew acknowledges that the *Miranda* issue isn't part of the cumulative-error analysis unless this court finds a *Miranda* violation, Reply Br. at 65. We could do so only under the limits of § 2254(d)(1) review.

85

The dissent begins correctly by stating that "[f]or cumulative error, two or more individually *harmless* errors can cumulate to create prejudice, justifying habeas relief." *Id.* at 5 (emphasis added) (citing *Bush*, 926 F.3d at 686). Consistently, it later states that "[b]ecause the right involves a fair trial, we aggregate 'all errors found to be *harmless*.'" *Id.* at 21 (emphasis added) (quoting *Cargle*, 317 F.3d at 1206). But it then drifts from those pronouncements by unilaterally finding *Miranda* error, deeming it harmless, and adding the incremental prejudice to its own cumulative-error mix. In other words, the dissent claims for itself a right to redetermine the *Miranda* issue while ignoring the OCCA's determination or our affirmance under the deferential § 2254(d) review. The dissent points to no clearly established law from the Supreme Court approving its approach.[56] Instead, the dissent relies on two of our cases. But neither *Bush* nor *Cargle* authorizes the dissent's move. Those cases confine themselves to aggregating the harm from (1) constitutional violations found by the state court and deemed harmless and (2) constitutional violations we have found after § 2254(d) review and then deemed harmless. Neither case authorizes the dissent's approach of disregarding the state court's adjudication on the merits and our affirmance under § 2254(d).

The OCCA rejected Ms. Andrew's *Miranda* claim after concluding that she had not been in custody during her videotaped interview. As noted, it did not find a *Miranda*

---

[56] It says that "[w]e've never said that when considering a distinct constitutional claim of the denial of a fair trial, we can consider errors only if they would individually overcome the AEDPA." Dissent at 23. Even if the dissent's unprecedented approach were justified by a Supreme Court holding, we would still rule that the overwhelming evidence of Ms. Andrew's guilt would outweigh any harm from the dissent's combined constitutional violations.

violation and then deem it harmless. And as seen above, we have determined under

§ 2254(d)(1) review that the OCCA's determination was neither contrary to, nor an

unreasonable application of, a Supreme Court holding. So the *Miranda* issue has no place

in the cumulative-error analysis.

The dissent cannot determine for itself the *Miranda* issue despite the OCCA's

having already adjudicated that issue on the merits.[57] That approach would enable this

court to treat any constitutional issue already rejected by a state court and affirmed by us

under § 2254(d)(1) as fair game for inclusion in a cumulative-error analysis.[58] And that

would cut § 2254(d)(1) deference to a stump. The dissent's cited cases, *see* Dissent at 22,

do not provide support for such a result.[59]

---

[57] The dissent contends that "[b]ecause the [OCCA] did not consider the effect of the *Miranda* violation, we must engage in de novo review." Dissent at 22 (citing *Bush*, 926 F.3d at 686). But this assumes that the OCCA had to agree with the dissent about a *Miranda* violation and then "consider the effect." It ignores that the OCCA *did* adjudicate the merits of the *Miranda* issue and found no violation. That the dissent would resolve that issue differently if it were the OCCA doesn't justify de novo review.

[58] Indeed, if the dissent's approach is permissible, we are unsure why it has not decided for itself all the other constitutional issues cursorily mentioned in Ms. Andrew's cumulative-error argument and assessed for itself any additional harm from them. Those alleged errors include "the *Crawford* error, . . . the illegitimate comments at closing argument, the constitutionally significant mistakes of defense counsel, and a breach of the *Brady* rule." Opening Br. at 129.

[59] *See Bush*, 926 F.3d at 666–67 (reviewing de novo the OCCA's cumulative-error decision, because the OCCA's approval of victim-impact statements was contrary to Supreme Court precedent, thus requiring consideration of the harmlessness issue); *Cargle*, 317 F.3d at 1224 (same but rejecting the OCCA's standard used to measure ineffective assistance of counsel); *Lockett*, 711 F.3d at 1245 (same but rejecting the OCCA's approval of victim-impact testimony and exclusion

(continued)

Next, the dissent says that "[a]s with the other claims, the State argues that any error was harmless." Dissent at 20. But that misses the point. In fact, the government has always argued that no *Miranda* violation occurred, reasoning that Ms. Andrew was not in custody during the police interrogation. Resp. Br. at 82–87. And applying § 2254(d) (which the dissent fails to do), the government has further argued that "[t]his court should deny relief because the OCCA's decision on this issue was neither contrary to, nor an unreasonable application of, clearly established federal law." *Id.* at 78. The government raised the possibility of harmless-error review solely as a backup argument if this court upended the OCCA's *Miranda* ruling on review under § 2254(d)(1). *Id.* at 87–88. Because that didn't happen, the hypothetical question of any harmlessness of a *Miranda* violation never came into play.

Thus, we are confident that, especially given the leeway the OCCA was afforded in ruling on the cumulative-error claim, Ms. Andrew has failed to establish that the OCCA's application of clearly established federal law in denying her cumulative-error claim was objectively unreasonable under § 2254(d)(1). We thus affirm the district court's denial of relief on Ms. Andrew's cumulative-error claim.

## CONCLUSION

For these reasons, we affirm the district court's denial of Ms. Andrew's petition for relief under 28 U.S.C. § 2254.

---

of mitigating testimony). Unlike in these three cases, the OCCA's *Miranda* ruling in Ms. Andrew's case withstood § 2254(d)(1) review, so harmlessness never became an issue.

*Brenda Evers Andrew v. Tamika White, Acting Warden, Mabel Bassett Correctional Center*, No. 15-6190
**BACHARACH**, J., dissenting.

An Oklahoma jury found Ms. Brenda Andrew guilty of murdering and conspiring to murder her estranged husband, Mr. Rob Andrew. After finding guilt, the jury decided on the death penalty for the murder count[1] and 10 years' imprisonment for the conspiracy count. The trial court entered judgment accordingly.

After unsuccessful challenges in state court, Ms. Andrew petitioned for federal habeas relief. The district court denied relief. *Andrew v. Moham*, No. CIV-08-832-R, 2015 WL 5254525, at *58 (W.D. Okla. Sept. 9, 2015). In my view, we should vacate the judgment and remand for issuance of habeas relief on both convictions and the death sentence.

The jury found guilt only after the trial court had committed a slew of errors—many of which were recognized by the state's appellate court—that combined to deprive Ms. Andrew of her constitutional right to fundamental fairness.

But even if Ms. Andrew had obtained a fair trial at the guilt stage, we should at least reverse the denial of habeas relief on the death sentence.

---

[1]    Before deciding on the death penalty for the murder count, the jury also found two aggravating circumstances:

1.    The murder had been committed for remuneration.

2.    The murder had been especially heinous, atrocious, or cruel.

Ms. Andrew challenges the death sentence based on the legal advice given to her when she learned of the criminal charges. At the time, Ms. Andrew was vacationing in Mexico, which could have conditioned her extradition on the State's willingness to drop its request for the death penalty. But Ms. Andrew's attorney allegedly failed to tell her of the chance to avoid the death penalty by requiring extradition from Mexico. That failure could constitute ineffective assistance of counsel.

Granted, the merits of this claim turns on multiple factual disputes; so Ms. Andrew asked the federal district court for an evidentiary hearing. But the district court denied Ms. Andrew's request. In my view, the district court should have provided Ms. Andrew with an evidentiary hearing.

## I.     The State's Case Against Ms. Andrew

Mr. Andrew was fatally shot on a November evening. At the time, the couple was separated and Ms. Andrew was having an affair with Mr. James Pavatt. Mr. Pavatt later admitted committing the murder without any involvement by Ms. Andrew. But the police suspected that Ms. Andrew had helped arrange the shooting, and the district attorney's office charged her with murder and conspiracy to commit murder.

### A.     The Murder and the Aftermath

On the night of the shooting, Mr. Andrew came to Ms. Andrew's house to pick up their children for Thanksgiving. When he arrived, Ms. Andrew asked him to come into the garage to help light a burned-out

2

pilot light on the furnace. Mr. Andrew was soon killed by two shotgun blasts, and Ms. Andrew was shot in her arm.

Ms. Andrew called 911, which led to the quick arrival of police officers and emergency medical technicians. But Mr. Andrew was already dead. The medical technicians took Ms. Andrew to a hospital, where she obtained treatment for the gunshot wound. After getting this treatment, Ms. Andrew was taken to the police station, where officers interrogated her for over two hours.

The police not only interrogated Ms. Andrew but also searched her garage, finding a 16-gauge shotgun shell on the ground and a .22-caliber bullet lodged in a doorway. The shell matched a 16-gauge shotgun that Ms. Andrew had kept when the couple separated.

Another 16-gauge shotgun shell was found in a neighbor's house, along with three .22-caliber bullets. Ms. Andrew had a key to that house, and there were no signs of forced entry. Still another .22-caliber bullet was found in a car belonging to Janna Larson, Mr. Pavatt's daughter. That bullet matched a revolver that Mr. Pavatt had bought six days before the murder.

**B.     The Changes to Mr. Andrew's Life Insurance Policy**

Before the murder, Mr. Andrew tried to remove Ms. Andrew as a beneficiary. In response, Ms. Andrew presented a document—purportedly bearing Mr. Andrew's signature—that gave her ownership of the policy.

3

Stripped of ownership, Mr. Andrew couldn't change the beneficiary. But the police suspected that Ms. Andrew had forged the change in ownership.

At roughly the same time, someone cut the hydraulic brake lines on Mr. Andrew's car. After discovering the cut, Mr. Andrew received two telephone calls telling him to pick up Ms. Andrew at a local hospital. At least one of the calls came from Mr. Pavatt's daughter. After getting the calls, Mr. Andrew rented a car and drove to the hospital. When he arrived, he learned that Ms. Andrew wasn't there.

## C.    The Trip to Mexico

Five days after the murder, Mr. Pavatt, Ms. Andrew, and her two children went to Mexico. Shortly after their entry into Mexico, Oklahoma authorities charged Ms. Andrew and Mr. Pavatt with murder.

While in Mexico, Ms. Andrew repeatedly consulted her attorney, who tried to negotiate a surrender in exchange for a reduction in charges. The negotiations faltered; and Mr. Pavatt and Ms. Andrew returned to the United States, where they were arrested.

## II.    Standard for Habeas Relief

When the state's highest court rejects a constitutional claim on the merits, the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) limits eligibility for habeas relief to three circumstances:

Two appear in [28 U.S.C.] § 2254(d)(1), which provides that a state prisoner can qualify for habeas relief by showing a state court decision was (1) "contrary to" or (2) "involved an unreasonable application of" federal law that was clearly established by the Supreme Court. The third way, in § 2254(d)(2), requires a state prisoner to show that a state court decision was based on an unreasonable factual determination . . . . "Each of AEDPA's three prongs . . . presents an independent inquiry."

*Murphy v. Royal*, 875 F.3d 896, 913 (10th Cir. 2017) (citations and alteration omitted) (quoting 28 U.S.C. § 2254(d) and *Budder v. Addison*, 851 F.3d 1047, 1051 (10th Cir. 2017)), *aff'd sub nom. Sharp v. Murphy*, 140 S. Ct. 2412 (2020) (per curiam).

## III.    Ms. Andrew's Challenge to the Convictions

Ms. Andrew challenges her convictions based in part on three arguments:

1.    deprivation of due process based on the erroneous admission of evidence about her sex life,

2.    deprivation of due process from the exclusion of witnesses, and

3.    use of statements elicited in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966).

Besides these three arguments, Ms. Andrew claims cumulative error. For cumulative error, two or more individually harmless errors can cumulate to create prejudice, justifying habeas relief. *Bush v. Carpenter*,

5

926 F.3d 644, 686 (10th Cir. 2019); *Workman v. Mullin*, 342 F.3d 1100, 1116 (10th Cir. 2003).[2]

The Oklahoma Court of Criminal Appeals acknowledged that the trial court had erred in

- allowing the introduction of evidence of Ms. Andrew's sex life, which was far more unfairly prejudicial than probative, and

- excluding defense witnesses.

In my view, the trial court also erred by allowing the State to present evidence of Ms. Andrew's incriminating statements elicited without *Miranda* warnings.

The majority properly applies the AEDPA to each of these individual claims. But Ms. Andrew has raised not only these individual claims but also a distinct constitutional claim of cumulative error. And we've held that the accumulation of errors can result in a denial of due process. *Darks v. Mullin*, 327 F.3d 1001, 1017 (10th Cir. 2003).

---

[2]     Ms. Andrew also alleged

- violation of the Confrontation Clause and

- failure to conduct an evidentiary hearing on claims involving withholding of exculpatory evidence and ineffective assistance of counsel for failing to get blood tests on Ms. Andrew's jeans.

For the sake of argument, I assume that the district court properly rejected these allegations.

6

The Oklahoma Court of Criminal Appeals recognized the existence of multiple evidentiary errors and combined them to consider the fairness of the trial. But the Oklahoma Court of Criminal Appeals never considered the impact of the *Miranda* violation on the other trial errors. Our precedents thus require de novo review of Ms. Andrew's distinct claim involving the denial of a fair trial through cumulative errors. Conducting that review, I would find a denial of fundamental fairness at the guilt stage.

**A.    The trial court committed three categories of errors.**

Ms. Andrew has established three categories of errors that combined to prevent a fair trial: (1) the introduction of evidence about Ms. Andrew's sex life, (2) the exclusion of defense witnesses, and (3) the introduction of testimony about statements obtained in violation of *Miranda v. Arizona*. We may assume, for the sake of argument, that each category of errors would individually have been harmless.

**1.    The trial court erred in introducing evidence about Ms. Andrew's sex life.**

Ms. Andrew argues that the trial court allowed the introduction of inadmissible evidence about her sex life. I agree.

The prosecution presented nine categories of evidence relating to Ms. Andrew's sexual conduct:

1.    testimony from James Higgins about the details of his past affair with Ms. Andrew,

7

2.    testimony about Rick Nunley's past affair with Ms. Andrew,

3.    testimony that Ms. Andrew had dyed her hair red because she heard that a friend of her husband liked redheads,

4.    testimony that Ms. Andrew had worn revealing clothing to a restaurant and a customer had called her a "hoochie,"

5.    testimony that Ms. Andrew had trained her children to be discreet about men visiting her at home,

6.    testimony that Ms. Andrew had flirted with Mr. Higgins's college-aged sons when they were working at her house,

7.    testimony that Mr. Andrew would find new lingerie that he never saw Ms. Andrew wear,[3]

8.    evidence that Ms. Andrew had taken sexy underwear when accompanying Mr. Pavatt on a trip to Mexico, and

9.    excerpts from Mr. Andrew's journal describing Ms. Andrew's infidelity during their engagement.[4]

---

[3]    The State argues that in her direct appeal, Ms. Andrew did not challenge the use of this evidence. This argument is incorrect. In the direct appeal, Ms. Andrew argued: "Lott [a prosecution witness] also told the jury that [Mr. Andrew] claimed not to have had sex in years and was upset that [Ms. Andrew] would never wear for him the lingerie he found in her bedroom." Direct Appeal, Brief of Appellant at 29.

[4]    The State argues that when Ms. Andrew appealed, she did not challenge the use of this evidence. But "not every new piece of evidence makes a claim a new one." *Fairchild v. Workman*, 579 F.3d 1134, 1148 (10th Cir. 2009). For example, the claim isn't new when the evidence

- just "'add[s] color'" to a claim presented in state court and

- does not "so change[] the legal landscape that the state court's prior analysis no longer addresses the substance of the petitioner's claim."

8

The Oklahoma Court of Criminal Appeals acknowledged that the trial court had erred in allowing the introduction of evidence involving Ms. Andrew's sexual advances to Mr. Higgins's sons, Ms. Andrew's provocative clothing at a dinner, and her decision to dye her hair red after learning that her husband's friend liked redheads. *Andrew v. State*, 164 P.3d 176, 192 (Okla. Crim. App. 2007). For all of this evidence, the court "struggl[ed] to find any relevance" except as to Ms. Andrew's character. *Id*. In this appeal, the State doesn't try to defend the admissibility of any of this evidence.

I agree with the Oklahoma Court of Criminal Appeals that the trial court erred in introducing this evidence. The evidence not only lacked relevance but also cast Ms. Andrew as a woman fixated on seducing nearby men. In my view, the state appellate court correctly condemned the State's broadside on Ms. Andrew's sex life.

---

*Id*. at 1149 (quoting *Gardner v. Galetka*, 568 F.3d 862, 881 (10th Cir. 2009)).

Though Ms. Andrew did not discuss the journal entries about infidelity during their engagement, her direct-appeal brief did challenge other entries from Mr. Andrew's journal; and the entries involving the engagement do not change the claim that Ms. Andrew had presented in the direct appeal.

9

**2.     The trial court erred in excluding three defense witnesses.**

Ms. Andrew's second argument is that the trial court erred by excluding three defense witnesses as a sanction for discovery violations. In my view, the Oklahoma Court of Criminal Appeals correctly found that the trial court had erred in excluding these witnesses.

**a.     The Oklahoma Court of Criminal Appeals concluded that the trial court had erred.**

The trial court excluded testimony by Ronald Warren, Carol Shadid, and Lisa Gisler. Ms. Andrew's proffer explained what these witnesses would have said:

1.     A police officer, Officer Ronald Warren, would have testified that Ms. Andrew had asked the officers to help Mr. Andrew after he was shot.

2.     A neighbor, Carol Shadid, would have testified that she had heard three shots.

3.     Another neighbor, Lisa Gisler, would have testified that she had heard only a single loud noise.

The trial court disallowed the use of these witnesses, concluding that the defense had failed to provide notice of their testimony.

The Oklahoma Court of Criminal Appeals found an abuse of discretion in the trial court's exclusion of these witnesses, viewing the sanction as excessive. *Id.* at 197. But the Oklahoma Court of Criminal Appeals regarded the erroneous exclusions as harmless. *Id.*

10

**b.    The excluded testimony could have cast doubt on the State's theories.**

Ms. Andrew proffered the testimony to challenge two of the State's theories.

First, to counter Mr. Pavatt's insistence that he had acted alone, the State tried to show that Ms. Andrew had reacted coldly to her husband after the shooting. For example, the State presented testimony by Officer Frost that Ms. Andrew

- had stayed away from Mr. Andrew in the garage and

- had never asked about his condition after the shooting.

To counter that testimony, Ms. Andrew proffered testimony by Officer Warren. He would have testified that when he arrived at the scene, Ms. Andrew was kneeling at Mr. Andrew's side and pleading for someone "to help her husband." Trial Trans. vol. 16, at 3779.

Second, the State argued that Ms. Andrew had tried to divert suspicion by arranging for Mr. Pavatt to shoot her in the arm. The State's argument, however, would have required spacing between the gunshots: After shooting Mr. Andrew, Mr. Pavatt would have needed to race toward Ms. Andrew and then hold her arm to shoot her carefully enough to avoid permanent damage.

In response, Ms. Andrew argued that the gunman had fired so rapidly that the shooting couldn't have been staged. For this argument,

11

Ms. Andrew relied on the testimony of two neighbors: Carol Shadid and Lisa Gisler. Ms. Shadid had heard three shots; Ms. Gisler had heard only a single loud noise.

The combination of their testimony could have cast doubt on the State's theory of the gunshot wound to Ms. Andrew's arm. If there were three shots (as Ms. Shadid heard) and only a single loud noise (as Ms. Gisler heard), the jury could reasonably conclude that the shots had been fired in quick succession, leaving too little time to stage the shot to Ms. Andrew's arm.

### c.    We are bound by the Oklahoma Court of Criminal Appeals' conclusion that the trial court had erred.

The Oklahoma Court of Criminal Appeals concluded that the trial court had erred in excluding the testimony by Officer Warren, Ms. Shadid and Ms. Gisler. And the State does not defend the trial court's exclusion of any of these witnesses. *See* Answer Br. at 56–58 (arguing that Officer Warren's exclusion was harmless); Supplemental Br. of Respondent/Appellee, filed June 1, 2017, at 5–7 (arguing that exclusion of Ms. Gisler and Ms. Shadid's testimony about the timing of the gunshots was harmless).

In characterizing the rulings as erroneous, the Oklahoma Court of Criminal Appeals was acting as the final arbiter of Oklahoma law on the consequences of a failure to adequately disclose the subject-matter of

12

expected testimony. So we are bound by the Oklahoma Court of Criminal Appeals' conclusion that these exclusions were erroneous. *See Fultz v. Embry*, 158 F.3d 1101, 1103 (10th Cir. 1998). Because of that binding conclusion, I'd recognize errors when the trial court excluded testimony by Officer Warren, Ms. Shadid, and Ms. Gisler.

> **3.** **The trial court erred by allowing the use of Ms. Andrew's statements obtained without *Miranda* warnings.**

But there was still another error: the use of incriminating statements elicited in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). This error bears on Ms. Andrew's distinct constitutional claim of cumulative error.

Under *Miranda*, warnings are required before a "custodial interrogation." *Miranda*, 384 U.S. at 478–79. An interrogation is custodial "when an individual is taken into custody or otherwise deprived of [her] freedom by the authorities in any significant way and is subjected to questioning." *Id.* at 444, 478.

The police questioned Ms. Andrew after the murder, and the State showed the jury a videotape of the interrogation, using excerpts to argue that Ms. Andrew had lied. But no one had ever advised Ms. Andrew of her *Miranda* rights. Without this advisement, the trial court should have excluded her statements.

13

**a.    Ms. Andrew was in custody during the interrogation.**

The *Miranda* issue turns on whether Ms. Andrew had been in "custody" when questioned at the police station. If she had been, the State needed to supply *Miranda* warnings; if she had not been in custody, warnings would have been unnecessary. *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam).

To determine whether Ms. Andrew was in custody, we focus on whether a reasonable person would have felt "at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). "The ultimate inquiry" is whether there was "'a formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." *California v. Beheler*, 463 U.S. 1121, 1125 (1983) (per curiam) (quoting *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) (per curiam)).

The trial court and the Oklahoma Court of Criminal Appeals concluded that Ms. Andrew had not been in custody during the questioning at the police station. This conclusion involves a mixed question of law and fact. *Thompson*, 516 U.S. at 102.

In reviewing this conclusion, we consider three non-exhaustive factors:

1.    whether the police informed Ms. Andrew that she could refuse to answer questions or end the interview,

2.    whether the questioning was long and accusatory or coercive, and

14

3.    whether the circumstances showed a police-dominated atmosphere.

*See United States v. Revels*, 510 F.3d 1269, 1275 (10th Cir. 2007). Under these factors, Ms. Andrew was in custody.

The first factor supports a finding of custody because the police admitted that they had never told Ms. Andrew that she could leave.

The second factor also supports a finding of custody. The questioning took over two hours, suggesting that Ms. Andrew was in custody. *See Yarborough v. Alvarado*, 541 U.S. 652, 665 (2004) (treating the two-hour duration of questioning as support for a conclusion that the individual was in custody); *Tankleff v. Senkowski*, 135 F.3d 235, 244 (2d Cir. 1998) (concluding that the defendant was in custody when he had been "subjected to increasingly hostile questioning at the police station" for two hours and had been "accused . . . of showing insufficient grief"); *Moore v. Ballone*, 658 F.2d 218, 226 (4th Cir. 1981) (concluding that the defendant was in custody when he had been subjected to "almost an hour of repetitive leading questions"). In addition, many of the questions were accusatory, like these five examples:

1.    Roughly 30 minutes into the interview, the police detective asked Ms. Andrew what had been going on with Mr. Andrew, why he had moved out, and what they had fought about.

2.    The detective left the room for roughly 20 minutes. When he returned, he asked Ms. Andrew if she had loved or hated

15

her husband, expressing a belief that she seemed to lack emotion: "Did you hate him that much that you don't show any emotion about it?" He followed up with: "How do you feel about the fact that he's dead now?"

3.    The detective also pressed Ms. Andrew on her affairs, her relationship with Mr. Pavatt, and the increases in Mr. Andrew's life insurance policy.

4.    The detective then quizzed Ms. Andrew about the incident with her husband's brake lines, asking if Mr. Andrew had suspected her.

5.    Near the end of the interview, the detective questioned Ms. Andrew about her promiscuity: "How many guys did [Mr. Andrew] accuse you of having affairs with?" The detective then asked Ms. Andrew if she was currently having an affair.

The third factor also suggests Ms. Andrew was in custody. The interview took place at the police station, where psychological compulsion or intimidation "is most apt to exist." *Steigler v. Anderson*, 496 F.2d 793, 799 (3d Cir. 1974). This was "the paradigmatic *Miranda* situation": "a person arrested . . . and whisked to a police station for questioning." *Howes v. Fields*, 565 U.S. 499, 511 (2012). The coercion arises in this "paradigmatic *Miranda* situation" because the individual is "'cut off from [her] normal life and companions,' and abruptly transported . . . into a 'police-dominated atmosphere.'" *Id.* (quoting *Maryland v. Shatzer*, 559 U.S. 98, 106 (2010), and *Miranda v. Arizona*, 384 U.S. 436, 456 (1966)).

The State suggests that the statements were voluntary because Ms. Andrew wanted to help the police, but there's nothing to suggest that

16

she agreed to go to the police station. Ms. Andrew was being treated at the hospital when Officer Frost told her that she would be taken to the police station. Officer Frost confirmed that Ms. Andrew had no choice about going:

> Q. Did you give her a choice of whether she could go home or she could go to the station?
>
> A. No.
>
> Q. She had no choice on that, did she?
>
> A. I told her we were going down to the station, Detective Garrett wanted to talk to her some more.
>
> Q. And so she did not have any choice on that, did she, Officer Frost?
>
> A. No.

Tr. of Mtn. Hr'g Proceedings at 113 (June 7, 2004). Ms. Andrew confirmed that the police officers had told her that she needed to accompany them to the police station. *Id.* at 138. And as the questioning grew increasingly accusatory, Ms. Andrew repeatedly told the officers that she needed to leave. These statements triggered more questions rather than permission to leave.

The State relies on testimony by Detective Garrett. According to the State, Detective Garrett testified that Ms. Andrew could have left at any time. His actual testimony was different:

> Q. She certainly wasn't allowed to go home, check on her children, was she?

17

A.    No.

*Id.* at 59. Detective Garrett also confirmed Ms. Andrew's inability to leave:

Q.    She was required to come [from] the hospital in an . . . open-backed hospital smock and not allowed to go home . . . ?

A.    Correct. She didn't go back home.

*Id.*

The recording of the interrogation shows that the police forced Ms. Andrew to stay even after she had told the officers that she needed to leave to see her kids. The first example occurred about one hour and twenty minutes into the interview. At that time, Ms. Andrew asked: "Can I go see my kids?"[5] The detective acknowledged this question, but continued to press: "I have to ask you another question . . . ." About 40 minutes later, Ms. Andrew repeatedly insisted that she needed to leave to see her kids. The detective again refused to let her leave, telling her that she could see her kids only after they had finished.[6] The interrogation continued.

---

[5]    These statements are audible on the videotape, which was introduced as State's Exhibit 204a.

[6]    The State argues that Ms. Andrew couldn't return home because it was a crime scene. But she said that she needed to see her kids, not go home.

Though the police admittedly forced Ms. Andrew to stay, the Oklahoma Court of Criminal Appeals found that Ms. Andrew had voluntarily participated in the questioning. Applying the "reasonable person" standard, the court concluded that "a reasonable person in the same position [as Ms. Andrew] would not conclude that he or she was in custody." *Andrew v. State*, 164 P.3d 176, 195 (Okla. Crim. App. 2007). Ms. Andrew challenges this conclusion.

A reasonable person in Ms. Andrew's position would not have felt free to leave. The police officers admitted under oath that Ms. Andrew couldn't leave, and they ordered her to stay after she had repeatedly asked to leave.

Not only did the police admit that Ms. Andrew couldn't leave, but the prosecutor also capitalized on Ms. Andrew's repeated requests to leave:

> And you know what? She did ask to go home. Think about this. At the end of that tape, and she doesn't like the questions this detective . . . is starting to ask her, and she's not a stupid lady. She's starting to realize he's asking her about insurance, he's asking her about boyfriends, he's asking about shotguns, he's asking about child custody. Oh my God, she's thinking to herself. I want to leave.

Trial Trans. vol. 17, at 4071.

The Oklahoma Court of Criminal Appeals thus stood alone in regarding Ms. Andrew as free to leave. Everyone else—the prosecutor, the police officers, and Ms. Andrew herself—agreed that she had been forced to remain at the police station for further questioning after stating that she

19

needed to leave. In my view, Ms. Andrew was in custody when subjected to the two-hour interrogation at the police station.

\* \* \*

The evidence shows that Ms. Andrew was in custody when she made the incriminating statements during the interview. Because she was not advised of her *Miranda* rights, the trial court erred in allowing the introduction of her statements elicited in the interrogation.

As with the other claims, the State argues that any error was harmless. For the sake of argument, we may assume that a *Miranda* violation alone would be harmless. Even with that assumption, however, we must consider the combined effect of

- the *Miranda* violation and

- the other errors—acknowledged by the Oklahoma Court of Criminal Appeals—in excluding three defense witnesses and allowing the introduction of irrelevant and unfairly prejudicial evidence about Ms. Andrew's sex life.

These errors bear on Ms. Andrew's distinct constitutional claim of cumulative error.

### B.    The existence of cumulative errors resulted in a denial of due process.

Apart from the prejudice caused by each individual violation, a petitioner may bring a separate claim of cumulative error. *See Hanson v. Sherrod*, 797 F.3d 810, 852 & n.16 (10th Cir. 2015). The availability of a distinct claim of cumulative error reflects every criminal defendant's right

20

to a fair trial. *Darks v. Mullin*, 327 F.3d 1001, 1017 (10th Cir. 2003). That right may be violated not only by individual trial errors but also by a combination of rulings that result in a denial of due process. *Hancock v. Trammell*, 798 F.3d 1002, 1025 (10th Cir. 2015); *see also Collins v. Sec'y of Penn. Dep't of Corrs.*, 742 F.3d 528, 542 (3d Cir. 2014) ("The cumulative error doctrine allows a petitioner to present a standalone claim asserting the cumulative effect of errors at trial so undermined the verdict as to constitute a denial of his constitutional right to due process.").

**1.    We consider the combined impact of the trial court's errors.**

Because the right involves a fair trial, we aggregate "all errors found to be harmless." *Cargle v. Mullin*, 317 F.3d 1196, 1206 (10th Cir. 2003) (quoting *United States v. Toles*, 297 F.3d 959, 972 (10th Cir. 2002)). So we consider errors even when they wouldn't individually warrant habeas relief. *Id.* at 1207.

In considering whether cumulative errors denied a fair trial to Ms. Andrew, we'd ordinarily apply the AEDPA, which restricts our review when the state appeals court rejects a claim on the merits. *See* Part II, above. And the Oklahoma Court of Criminal Appeals rejected the claim of cumulative error on the merits. In rejecting this claim, the court considered the cumulative effect of the trial court's errors in

- introducing evidence involving Ms. Andrew's sexual advances to Mr. Higgins's sons, her sexy clothing at a dinner, and her dying her hair red to attract a friend of her husband's and

21

- excluding testimony by Officer Warren, Ms. Shadid, and Ms. Gisler.

*Andrew v. State*, 164 P.3d 176, 188–92, 196–98, 205 (Okla. Crim. App. 2007).

But the state appeals court did not find error, as I would, in the introduction of the statements that Ms. Andrew had made after a *Miranda* violation. Because the Oklahoma Court of Criminal Appeals did not consider the effect of the *Miranda* violation, we must engage in de novo review. *See Bush v. Carpenter*, 926 F.3d 644, 686 (10th Cir. 2019) (conducting de novo review of a claim of cumulative error because the appellate court had not recognized errors that we later recognized); *Cargle v. Mullin*, 317 F.3d 1196, 1224 (10th Cir. 2003) (stating that because the Oklahoma Court of Criminal Appeals had not recognized certain errors, we would conduct de novo review of the claim of cumulative error); *see also Lockett v. Trammel*, 711 F.3d 1218, 1245 (10th Cir. 2013) ("AEDPA deference does not apply because the [Oklahoma Court of Criminal Appeals] failed to consider all of the constitutional errors present in the case.").

The majority acknowledges that we should consider all of the errors that the Oklahoma Court of Criminal Appeals recognized. But the majority disagrees with my assessment of Ms. Andrew's *Miranda* claim. In the

22

majority's view, we shouldn't combine the effect of a *Miranda* violation if it wouldn't individually merit habeas relief under the AEDPA.

The majority's approach overlooks the separate existence of a constitutional claim involving the denial of a fair trial through cumulative error. As we've previously recognized, the Supreme Court has clearly established a distinct constitutional claim of cumulative error. *See Hanson v. Sherrod*, 797 F.3d 810, 852 n.16 (10th Cir. 2015) (concluding that the Supreme Court has clearly established a "separate constitutional violation" involving the denial of a fair trial and due process through cumulative error); *see also Darks v. Mullin*, 327 F.3d 1001, 1017 (10th Cir. 2003) (stating that the claim of cumulative error involves a clearly established constitutional right "under due process principles").

The majority errs by conflating the distinct constitutional claims involving cumulative error and *Miranda*. For the *Miranda* claim itself, we'd need to apply the AEDPA. *See* Part II, above. But here Ms. Andrew isn't asserting a separate *Miranda* claim; she's instead claiming that the *Miranda* violation combined with the other errors to prevent a fundamentally fair trial. That claim requires an "unqualified reference to *all* errors." *Cargle v. Mullin*, 317 F.3d 1196, 1207 (10th Cir. 2003) (emphasis in original). We've never said that when considering a distinct constitutional claim of the denial of a fair trial, we can consider errors only if they would individually overcome the AEDPA.

23

Because we must consider "all errors," we've acknowledged the need to accumulate constitutional claims even when they might not individually represent constitutional violations due to an inadequate showing of prejudice. *See Cargle v. Mullin*, 317 F.3d 1196, 1207 (10th Cir. 2003) ("[T]o deny cumulative-error consideration of claims unless they have first satisfied their individual substantive standards for actionable prejudice 'would render the cumulative error inquiry meaningless, since it [would] . . . be predicated only upon individual error already requiring reversal.'" (quoting *Willingham v. Mullin*, 296 F.3d 917, 935 (10th Cir. 2002))). So we've accumulated constitutional claims even after concluding that they haven't surpassed the AEDPA hurdle.

An example is *Bush v. Carpenter*, 926 F.3d 644 (10th Cir. 2019). There we relied on the AEDPA to reject a constitutional claim of ineffective assistance of appellate counsel, concluding that the petitioner had failed to show an unreasonable application of Supreme Court precedent. *Id.* at 682–86. Even though this claim didn't individually surpass the AEDPA hurdle, we included this claim when considering the petitioner's distinct claim involving the denial of a fair trial through cumulative error. *Id.* at 686–87.

We did the same in *Cargle v. Mullin*, 317 F.3d 1196 (10th Cir. 2003). There we regarded the Oklahoma Court of Criminal Appeals' decision on a claim of prosecutorial misconduct as "suspect" under controlling federal

24

law, but we didn't suggest that the state court had committed an error that would have surpassed the AEDPA hurdle. *Id.* at 1218–20. Although we could say only that the decision was "suspect," we included the claim of prosecutorial misconduct when considering the distinct constitutional claim of cumulative error. *Id.* at 1220.

Despite the teachings in *Bush* and *Cargle*, the majority conflates the distinct constitutional claims being pressed individually and collectively. Here we're considering a distinct constitutional claim involving the denial of a fair trial. Under the AEDPA, we would consider whether the state court reasonably applied Supreme Court precedent on the distinct constitutional right to a fair trial. Though a *Miranda* violation might not alone surpass the AEDPA hurdle—like the claims of ineffective assistance of appellate counsel in *Bush* and prosecutorial misconduct in *Cargle*—we must consider the *Miranda* violation when determining whether the accumulation of errors resulted in the denial of a fair trial.

> ### 2. We need not decide whether to defer to the Oklahoma Court of Criminal Appeals' assessment of the accumulated errors.

Because the Oklahoma Court of Criminal Appeals didn't consider the *Miranda* violation when assessing the claim of cumulative error, we must conduct de novo review on that claim. *See* p. 22, above. But we must also consider whether to defer to the Oklahoma Court of Criminal Appeals' assessment of the impact from the other errors.

25

Our case law is not entirely consistent on whether to accord deference to the state appeals court's characterization of some errors as harmless. For example, we held in *Bush v. Carpenter* that when we conduct de novo review on a habeas claim of cumulative error, we "afford no deference to the [Oklahoma Court of Criminal Appeals'] decisions." 926 F.3d 644, 686 (10th Cir. 2019).

But we had earlier said in *Le v. Mullin* that when we conduct de novo review of a claim of cumulative error, "we give some deference to the Court of Criminal Appeals' cumulative error analysis as far as it went." 311 F.3d 1002, 1023 (10th Cir. 2002) (per curiam). *Le* thus required the habeas court to consider whether the other errors (overlooked by the state appeals court) would have tipped the scales toward the defendant. *See id.* (stating that when we consider cumulative error de novo, "we focus on whether the . . . errors not addressed by the Oklahoma courts . . . would tip the scales in light of the Court of Criminal Appeals' ruling on the cumulative impact of the other errors").

I wouldn't resolve the difference in approaches[7] because I'd regard Ms. Andrew's trial as unfair either with or without deference to the state appeals court's consideration of some errors as harmless.[8]

### 3.    The cumulative errors rendered the trial unfair.

In conducting de novo review of a decision on cumulative error, we consider whether the errors affected the petitioner's substantial rights. *Simpson v. Carpenter*, 912 F.3d 542, 602 (10th Cir. 2018). A petitioner's substantial rights are affected when they "had a substantial and injurious effect or influence in determining the jury's verdict." *Hanson v. Sherrod*, 797 F.3d 810, 852 (10th Cir. 2015) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). In considering the effect of the errors, we can consider them together whether or not they have "an inherent synergistic effect." *Grant v. Trammell*, 727 F.3d 1006, 1026 (10th Cir. 2013)

---

[7]    When our precedents conflict, we typically adhere to the earlier one. *Haynes v. Williams*, 88 F.3d 898, 900 n.4 (10th Cir. 1996). But the two opinions might be reconcilable based on a change in the law. When we issued *Le v. Mullin*, we hadn't decided whether cumulative errors could impinge on a clearly established right to due process. *See Hooks v. Workman*, 689 F.3d 1148, 1194 n.24 (10th Cir. 2012) ("[W]e have never expressly held in other contexts that cumulative-error analysis is clearly established federal law."). But we recognized such a right by the time that we decided *Bush v. Carpenter*. *See Hanson v. Sherrod*, 797 F.3d 810, 852 n.16 (10th Cir. 2015).

[8]    The majority argues that consideration of the *Miranda* violation would reduce AEDPA deference "to a stump." Maj. Op. at 87. But we're bound by our precedents in *Bush* and *Le* regardless of their impact on AEDPA deference.

(Gorsuch, J.) (quoting *Cargle v. Mullin*, 317 F.3d 1196, 1221 (10th Cir. 2003)).[9]

In Ms. Andrew's trial, the evidence of guilt was undoubtedly sufficient for a conviction; but the sufficiency of the evidence doesn't mean that the trial was fair or the errors harmless. *See United States v. Lane*, 474 U.S. 438, 450 n.13 (1986) (stating that the inquiries for harmlessness and sufficiency of the evidence are distinct and "the threshold of overwhelming evidence is far higher than mere sufficiency to uphold conviction"). Cumulative errors are considered prejudicial if they

---

[9]    In *Grant v. Trammell*, then-Judge Gorsuch explained why errors need not be synergistic to accumulate:

> The reason why becomes clear if we understand prejudice in terms of probabilities. One might "accumulate" probabilities by adding them together, taking into account the disjunctive probabilities of each error. One might also "accumulate" probabilities by multiplying them and finding reversible error only in the space where all errors are conjunctively appearing all at once. If the cumulative error doctrine means anything, it must be that prejudice can be accumulated disjunctively—that all a defendant needs to show is a strong likelihood that the several errors in his case, when considered additively, prejudiced him. If it were otherwise, the cumulative error doctrine would be a nullity. A finding that one error wasn't prejudicial would necessarily preclude a finding that all of the errors were prejudicial. So while one error may make another error in the same direction more egregious, a defendant can still show cumulative error by accumulating unrelated errors if their probabilistic sum sufficiently undermines confidence in the outcome of the trial.

*Id*. (citation and emphasis omitted).

"had substantial influence" on the jury or leave us in "grave doubt" about their impact. *Kotteakos v. United States*, 328 U.S. 750, 765 (1946). Grave doubt exists when the impact of the error leaves us in "equipoise" about the effect. *Bland v. Sirmons*, 459 F.3d 999, 1009–10 (10th Cir. 2006) (quoting *O'Neal v. McAninch*, 513 U.S. 432, 435 (1995)).

I am in equipoise about the combined effect of the trial errors involving the State's focus on Ms. Andrew's sex life, the introduction of statements elicited after a *Miranda* violation, and the trial court's exclusion of defense witnesses. Given the combined effect of these trial errors, I would reverse the district court's denial of habeas relief on the convictions.

**Evidence about Ms. Andrew's sex life.** From the outset of the trial, the State lasered in on Ms. Andrew's sex life. For example, soon after beginning her opening statement, the prosecutor promised to "present evidence that throughout the marriage [Ms. Andrew] had a boyfriend on the side." Trial Trans. vol. 1, at 13.

Ms. Andrew's babysitter testified on the second day of the trial, recounting a suspicion that Ms. Andrew was cheating on Mr. Andrew. Most of the other sexualizing evidence also came early in the trial. For example, on the second day of the trial, Mr. David Ostrowe testified about a dinner with Mr. Andrew and Ms. Andrew. The dinner itself had nothing to do with the case except for one observer's comment that Ms. Andrew's dress had

29

been "very tight" and "very short," exposing "a lot of cleavage." Trial

Trans. vol. 2, at 323. The clothing led another individual to call

Ms. Andrew a "hoochie," a slur referring to a promiscuous woman. *Id.*

The third day of trial continued with more tales of Ms. Andrew's

promiscuity. Ronald Stump testified that

- his wife had told Ms. Andrew that he liked red hair on women and

- the next time he saw Ms. Andrew, she had dyed her hair red.

The opening of the trial with this evidence surely left an imprint on

the jurors, who generally give great weight to information they learn early

in a trial. *See* Lawrence S. Wrightsman, *The Place of Primacy in

Persuading Jurors: Timing of Judges' Instructions and Impact of Opening

Statements*, 8 U. Bridgeport L. Rev. 431, 432–36 (1987). At the beginning

of a trial, jurors are "anxious, curious, receptive, and looking for someone

to trust." Michael Frost, *Ethos, Pathos & Legal Audience*, 99 Dick. L. Rev.

85, 111 (1994).

The State not only opened the trial with the evidence of

Ms. Andrew's sex life but harped on that evidence when finishing the

closing arguments. Before the judge sent the jury to deliberate, the

prosecutor read from Mr. Andrew's journal about Ms. Andrew's infidelity

during their engagement. This evidence of infidelity closed the loop,

creating "an outsized effect due to [its] temporal proximity to jury

30

deliberations." *United States v. Starks*, 34 F.4th 1142, 1165 n.7 (10th Cir. 2022).

The State focused from start to finish on Ms. Andrew's sex life. This focus portrayed Ms. Andrew as a scarlet woman, a modern Jezebel, sparking distrust based on her loose morals. The drumbeat on Ms. Andrew's sex life continued in closing argument, plucking away any realistic chance that the jury would seriously consider her version of events.

***Miranda* violation**. With this relentless attack on Ms. Andrew's morals, the State pounced in closing argument on what she'd told the police during her custodial interrogation.[10] In closing argument, defense counsel argued that Mr. Pavatt had admitted acting without Ms. Andrew's involvement. In response, the State pointed to what Ms. Andrew had told the police when denying affairs, admitting anger toward Mr. Andrew, and acknowledging clashes over his life insurance policy:

- "And you know what else you can't change? She lies to [Detective] Garrett, and you know that . . . . She lies about her boyfriends." Trial Tr. vol. 17, at 4064.

---

[10]   Given its reliance on the AEDPA, the majority doesn't address

- whether the state trial court had violated *Miranda* by allowing the testimony about Ms. Andrew's statements during the interrogation or

- whether the introduction of that testimony resulted in prejudice to Ms. Andrew.

- "[Detective Garrett] asked her . . . ['][Mr. Andrew] have any enemies? Anybody looking out for [Mr. Andrew]? Anybody interested in harming [Mr. Andrew]?['] And her answers were no. But then he realizes . . . there's a police report . . . where [Mr. Andrew] is saying I think Jim Pavatt and my wife are trying to kill me." *Id.* at 4064–65.

- "So he goes in and he says, '[I]s there anybody that's been angry with [Mr. Andrew]?['] You know what she says? She says no." *Id.* at 4065.

- "She tells the police officers that this man that she is now building her hopes back on, just been gunned down, and . . . I can't think of anybody that's been upset with him lately. She lies. Why? You know why." *Id.* at 4065–66.

- "[Detective Garrett] asks her specifically because he's got the information now[:] [']Is there something going on with the life insurance policy?' And you know what she says? . . . . [']Well yeah we talked about it but it's not a big deal.['] That's what she says." *Id.* at 4066.

- "And yet at this point she has just witnessed horror upon horrors exactly what she was afraid of, that [Mr. Andrew] might have something happen to him, and I'm not going to be able to provide for my children and myself and so when the detective, assuming that she's innocent of all this, says tell me what's going on with the policy, she sits there with her leg up and says well it was no big deal. She lied. She lied. Why did she lie? Because it was a big deal. It was a big deal. It's a motive for murder." *Id.* at 4067.

The State also pointed to Ms. Andrew's statements that it had been

too dark to see the gunmen:

She tells [Detective Garrett] she can't give him any leads on these two unidentified gunmen because it was dark. She says it over and over again on that video. It was dark. Dark mask, dark shirt. It was dark. Dark pants. I didn't see their shoes. It was dark.

32

> Well folks, the light's on in the garage, isn't it? The lights are on outside. How dark is it? What's your common sense tell you about this?

*See id.* at 4071–72.

Given the defense's theory that Mr. Pavatt had acted without any involvement by Ms. Andrew, her statements played a critical role for the prosecution by showing a motive for the murder and consciousness of guilt. *See Al-Adahi v. Obama*, 613 F.3d 1102, 1107 (D.C. Cir. 2010) ("[It is a] well-settled principle that false exculpatory statements are evidence—often strong evidence—of guilt."). The prosecution's closing argument crystallized the effect of the statements elicited in violation of *Miranda*.

**Exclusion of defense witnesses.** In opposing a death sentence, Ms. Andrew had to confront evidence of her icy indifference to Mr. Andrew even after he'd been shot. This evidence led the prosecutor to argue that Ms. Andrew hadn't approached her husband after the shooting or asked about his condition, proving that she was "a coldblooded killer." Trial Trans. vol. 17, at 4098. The jury never got to hear Officer Warren explain that Ms. Andrew had sat at her husband's side, pleading for someone to help him even though he was obviously dead. The state appeals court admitted that the trial judge had erred in excluding this testimony. *See* p. 10, above.

With Ms. Andrew unable to counter the State's portrayal of indifference to the killing, the prosecution also capitalized on her inability

33

to counter the State's theory of the shooting itself. Everyone agreed that there were three gunshots: two came from a shotgun and struck Mr. Andrew; one came from a .22-caliber handgun and struck Ms. Andrew's arm.

The State's theory was that (1) either Ms. Andrew or Mr. Pavatt had shot Mr. Andrew and (2) the shot to Ms. Andrew's arm had been staged. This theory was feasible only if Mr. Pavatt had enough time to get close enough to Ms. Andrew to shoot her arm at close range. So the State argued in closing that Ms. Andrew "had to stand still long enough for Pavatt to shoot her and to be sure that she wasn't seriously wounded." Trial Trans. vol. 17, at 3895.

One neighbor (Ms. Shadid) heard three shots, and another neighbor (Ms. Gisler) heard only a single loud noise. Ms. Shadid was right according to the prosecution: There were three distinct shots. Why, then, did Ms. Gisler hear only a single loud noise? One possibility was that the three shots had come so quickly that they sounded like only a single loud noise. But the jury never got to hear this explanation because the trial court had disallowed testimony by Ms. Shadid and Ms. Gisler. The Oklahoma Court of Criminal Appeals acknowledged that the trial court had erred in excluding this testimony. *See* p. 10, above.

Would the jury have rejected Ms. Andrew's explanation even if the trial court had allowed Ms. Shadid and Ms. Gisler to testify? Perhaps. But

we have no way of knowing because the trial court didn't allow Ms. Andrew to counter the State's theory with the testimony of Ms. Shadid or Ms. Gisler.

* * *

The combination of trial errors rendered the trial fundamentally unfair from the start to the end. So I would reverse the denial of habeas relief on Ms. Andrew's separate claim of cumulative error. With this reversal, I would instruct the district court to grant habeas relief on Ms. Andrew's convictions.

## IV.    Ms. Andrew's Challenge to the Death Sentence

Even if the convictions were to remain, we should at least reverse the denial of habeas relief on Ms. Andrew's death sentence. In challenging the sentence, Ms. Andrew claimed ineffective assistance of counsel and requested an evidentiary hearing based on a plethora of factual disputes. The district court erroneously refused Ms. Andrew's request.

### A.    Ms. Andrew claimed ineffective assistance of counsel.

In claiming ineffective assistance, Ms. Andrew points out that she was in Mexico when the State filed the charges. Ms. Andrew knew about these charges, so she could have either turned herself in to Mexican authorities or returned to the United States.

Returning to the United States left Ms. Andrew exposed to the death penalty. On the other hand, turning herself in to the Mexican authorities

35

might have enabled Ms. Andrew to avoid the possibility of a death sentence. Mexico could still extradite her, but it could have conditioned extradition on Oklahoma's agreement to forgo the death penalty. Extradition Treaty, Mex.-U.S., art. 8, May 4, 1978; *see also* Bruce Zagaris & Julia Padierna Peralta, *Mexico-United States Extradition and Alternatives: From Fugitive Slaves to Drug Traffickers—150 years & Beyond from the Rio Grande's Winding Courses*, 12 Am. U. J. Int'l L. & Policy 519, 539 (1997) ("In cases of extradition, Mexico's Law on International Extradition states a preference for severe incarceration rather than the death penalty, when feasible.").

In Ms. Andrew's view, her attorney was ineffective by failing to advise her about the option to turn herself in to the Mexican authorities. If she had turned herself in while in Mexico, she could have avoided extradition as long as Oklahoma pursued the death penalty.

Ms. Andrew requested an evidentiary hearing on this claim in both the state appeals court and in federal district court. Both courts refused. In my view, the federal district court should have allowed an evidentiary hearing before resolving Ms. Andrew's claim of ineffective assistance.

**B.    Ms. Andrew's Sixth Amendment right to counsel had attached.**

The Oklahoma Court of Criminal Appeals rejected the ineffective-assistance claim on the ground that Ms. Andrew had not shown prejudice.

36

Opinion Denying Petitioner's Original Application for Post-Conviction

Relief and Denying Petitioner's Application for Discovery and for an

Evidentiary Hearing at 3–5 (Okla. Crim. App. June 17, 2008). One judge

concurred, concluding that Ms. Andrew's right to counsel had not yet

attached. *Id.* (Lumpkin, P.J., concurring in result) at 1. The dissenting

judge regarded this issue as unresolved and concluded that it should be

considered in an evidentiary hearing. *Id.* (Chapel, J., dissenting).

The federal district court agreed with the concurring state judge,

rejecting Ms. Andrew's ineffective-assistance claim on the ground that her

"Sixth Amendment right to effective counsel had not yet attached" when

she was in Mexico. *Andrew v. Moham*, No. CIV-08-832-R, 2015 WL

5254525, at *30 (W.D. Okla. Sept. 9, 2015). Unless the Sixth Amendment

had attached, Ms. Andrew could not base her claim of ineffective

assistance on the attorney's error. *See Coleman v. Thompson*, 501 U.S. 722,

752 (1991). In my view, the district court erred in concluding that the

Sixth Amendment right had not attached when Ms. Andrew was in

Mexico.[11]

The Sixth Amendment right to counsel attaches "only at or after the

time that adversary judicial proceedings have been initiated against" a

---

[11]    The majority in the state appellate court did not decide whether the Sixth Amendment right had attached. So we conduct de novo review of the district court's decision. *See Hooks v. Workman*, 606 F.3d 715, 728 (10th Cir. 2010).

defendant. *Kirby v. Illinois*, 406 U.S. 682, 688 (1972) (plurality opinion); *see United States v. Gouveia*, 467 U.S. 180, 189 (1984). Under *Kirby v. Illinois*, the initiation of "adversary judicial criminal proceedings" can be manifested through a "formal charge, preliminary hearing, indictment, information, or arraignment." 406 U.S. at 689; *see Moran v. Burbine*, 475 U.S. 412, 431 (1986) (noting that the Sixth Amendment right to counsel attaches at "the initiation of formal charges," such as an indictment).

*Kirby* settles the issue because Oklahoma filed an information charging Ms. Andrew with the murder before the allegedly deficient performance by her attorney. The filing of the information marked the start of "adversary judicial proceedings," triggering the right to counsel.

In response, the State relies on *Rothgery v. Gillespie County*, 554 U.S. 191 (2008). One sentence in *Rothgery* states that "a criminal defendant's initial appearance before a judicial officer . . . marks the start of adversary judicial proceedings." 554 U.S. at 213. The State used that sentence from *Rothgery* to argue that Ms. Andrew's right had not attached because she did not appear before a judicial officer until returning to the United States.

But the State misreads *Rothgery*. That opinion did not

- say that the initial appearance is the *only* way to mark the start of adversary judicial proceedings or

- overrule *Kirby*.

38

Instead, *Rothgery* tracks *Kirby* and repeatedly relies on it.

The sentence appears in *Rothgery* because the defendant had not faced a formal charge, indictment, information, or arraignment before his first appearance in front of a judicial officer. *Id.* at 195. The police had taken Mr. Rothgery to a magistrate judge on a charge involving unlawful possession of a firearm. *Id*. The *Rothgery* Court had no reason to mention the other ways to initiate adversary proceedings because the defendant's appearance before the magistrate judge had triggered the Sixth Amendment. Indeed, the Court noted that the right attaches "whether the machinery of prosecution was turned on by the local police or the state attorney general." *Id*. at 208. In *Rothgery*, the "machinery of prosecution" had started when authorities brought the defendant to a magistrate judge.

For Ms. Andrew, the machinery of prosecution started when Oklahoma prosecutors filed the information; this filing triggered her Sixth Amendment right to effective assistance of counsel. *See United States v. Williston*, 862 F.3d 1023, 1033–34 (10th Cir. 2017) (stating that the Sixth Amendment's right to counsel attaches upon the start of adversarial proceedings, which is itself "triggered by a formal charging event, such as an . . . information").[12]

---

[12]    The majority also suggests that the Sixth Amendment might not have applied because the prosecution had not developed to a critical stage. Maj. Op. at 72. But the State doesn't make this argument on appeal, and I would

39

### C. The Oklahoma Court of Criminal Appeals unreasonably applied *Strickland*.

The state appellate court rejected Ms. Andrew's claim of ineffective assistance of counsel based on a lack of prejudice. Opinion Denying Petitioner's Original Application for Post-Convention Relief and Denying Petitioner's Application for Discovery and for an Evidentiary Hearing at 3–5 (Okla. Crim. App. June 17, 2008). In rejecting the claim, the court regarded two of Ms. Andrew's assumptions as debatable:

1.  that Mexican officials would have refused to extradite Ms. Andrew unless Oklahoma prosecutors declined to seek the death penalty and

2.  that Oklahoma prosecutors would have agreed to forgo the death penalty.

The Oklahoma Court of Criminal Appeals pointed out that the language in an existing extradition treaty had allowed discretion:

> [The treaty] contains the discretionary phrase "may be refused." Mexico is under no obligation to refuse extradition, and without any specific statement from the Mexican authorities saying they would have refused to extradite Andrew, she cannot show a

---

address only the arguments that the State presents. *See United States v. Woodard*, 5 F.4th 1148, 1154–55 (10th Cir. 2021) (declining to sua sponte consider an argument for affirmance because we rely on the parties to frame the issues); *United States v. Chavez*, 976 F.3d 1178, 1203 n.17 (10th Cir. 2020) (stating that we don't typically "craft[] arguments for affirmance completely *sua sponte* and, more specifically, without the benefit of the parties' adversarial exchange").

prejudicial result which is necessary to any ineffective assistance of counsel claim.[13]

*Id.* at 4.

Ms. Andrew argues that the state appellate court unreasonably applied Supreme Court precedent by rejecting Ms. Andrew's two assumptions. To assess this argument, we must confine ourselves to the state-court record. *See Cullen v Pinholster*, 563 U.S. 170, 181–82 (2011); *Milton v. Miller*, 744 F.3d 660, 673 (10th Cir. 2011).

We consider not only the record but also the AEDPA, which bars habeas relief unless the state appellate court unreasonably applied Supreme Court precedent. *See* Part II, above. The applicable precedent here is *Strickland v. Washington*, where the Supreme Court held that the Sixth Amendment is violated when an attorney creates prejudice to a defendant through deficient legal representation. 466 U.S. 668, 687–96 (1984).

---

[13]   At the time, a U.S.-Mexican treaty provided:

> When the offense for which extradition is punishable by death under the laws of the requesting Party and the laws of the requested Party do not permit such punishment for that offense, extradition may be refused unless the requesting Party furnishes such assurances as the requested Party considers sufficient that the death penalty shall not be imposed, or, if imposed, shall not be executed.

Extradition Treaty, Mex.-U.S., art. 8, May 4, 1978.

Under *Strickland*, legal representation is deficient when an attorney's performance falls below an "objective standard of reasonableness." *Id.* at 688. The deficiency is prejudicial if a reasonable probability exists that the outcome was affected by the deficiency. *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* But "[t]he result of a proceeding can be rendered unreliable . . . even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." *Id.*

In the Oklahoma Court of Criminal Appeals, Ms. Andrew argued that

- she would have turned herself in to authorities in Mexico to avoid a possible death sentence,

- Mexico had the right to refuse extradition when the requesting jurisdiction intended to pursue the death penalty, and

- Mexico would have exercised this right.

In response, the State pointed to "uncertainties attendant to the extradition process." Response to Petitioner's Original Application for Post-Conviction Relief at 13.

The State's reliance on uncertainties entailed an unreasonable misapplication of *Strickland*'s standard of a reasonable probability. A reasonable probability doesn't require the elimination of contrary possibilities. *See Mosley v. Atchison*, 689 F.3d 838, 852 (7th Cir. 2012) (concluding that "[a] theoretical possibility d[id] not defeat [the

42

petitioner's] showing of prejudice under *Strickland"*). So Ms. Andrew could show prejudice without disproving every possibility theorized by the State.

Relying on uncertainty without any evidentiary basis, the state appellate court surmised that Mexico might have extradited Ms. Andrew without requiring Oklahoma to forgo the death penalty. The state court unreasonably relied on this surmise in the face of Ms. Andrew's undisputed evidence of Mexican policy on extradition in capital cases. *See Allen v. Stephan*, 42 F.4th 223, 249–52 (4th Cir. 2022) (concluding that the state court acted unreasonably under the AEDPA by disregarding the petitioner's affidavit and the lack of any contrary evidence), *cert. pet. filed* (U.S. Nov. 23, 2022) (No. 22-490). Mexico's policy was based on judicial and statutory prohibitions against extradition of an individual facing a possible death sentence.

The judicial prohibition had emerged weeks before Ms. Andrew went to Mexico, when the Mexican Supreme Court had "issued a ruling that declared unconstitutional the extradition of an accused into the United States for any capital offense." Speedy Rice & Renée Luke, *U.S. Courts, the Death Penalty, and the Doctrine of Specialty: Enforcement in the Heart of Darkness*, 42 Santa Clara L. Rev. 1061, 1095 (2002); *see* Pleno de la Suprema Corte de Justicia de la Nacion, Semanario Judicial de la Federación y su Gaceta, Novena Epoca, tomo, XIV, Octubre de 2001, Tesis

43

P./J 125/2001 at 227. This ruling prevented Mexican authorities from allowing any extradition of U.S. citizens, like Ms. Andrew, who faced the possibility of the death penalty. *See* Richard J. Wilson, *International Law Issues in Death Penalty Defense*, 31 Hofstra L. Rev. 1195, 1201 (2003) ("Mexico not only refuses persons facing the death penalty extradition to the U.S., but also any accused facing a potential life sentence.").

For capital defendants, extradition was prohibited not only by the Mexican Supreme Court's decision but also under a Mexican law that required the requesting state to forgo the death penalty: "In dealing with an extradition request, the Mexican state shall require the requesting state, whenever the suspect's crime is punishable by death or any of the punishments enumerated in Article 22 of the Mexican constitution, to commute a prison sentence or substitute a punishment that is less severe." Francisco J. Ortega, *De Facto Life Imprisonment in Mexico and the United States–Mexico Extradition Treaty of 1978*, 24 Wis. Int'l L. J. 1017, 1036 n.104 (2007) (translating Ley de Extradición Internacional, as amended, Artículo 10 § 5, Diario Oficial de la Federación [D.O.], 18 de Mayo de 1999 (Mex.), available at http://www.diputados.gob.mx/LeyesBiblio/pdf/36.pdf [http://web.archive.org/web/20170622021847/http://www.diputados.gob.mx/LeyesBiblio/pdf/36.pdf]).

Given these judicial and statutory restrictions, Mexico could not and did not extradite anyone to the United States in 2002 for capital prosecutions. Ms. Andrew proved this fact in an affidavit from an attorney who had represented the Mexican government in extradition cases:

> The Government of Mexico will not extradite a person, regardless of their citizenship, to the United States, either to a state government or the federal government, if that person could then be sentenced to death and executed. In numerous cases, the Government of Mexico has successfully persuaded a prosecuting authority in the United States to drop death penalty attempts . . . .

> Had Brenda Andrew been arrested by Mexican authorities in Mexico, or turned herself in to Mexican authorities at any time during her ninety-five day stay in Mexico, she would have been detained in a Mexican penal institution pending extradition to Oklahoma. Ms. Andrew would not have been extradited to Oklahoma unless competent state authorities removed the possibility of capital punishment if and when she was convicted of the crimes for which extradition was sought.

> This has been the policy of the Mexican government for many years. It was the policy when Robert Andrew was killed; it was the policy when Brenda Andrew entered Mexico on or about November 26, 2001; and it was the policy when Brenda Andrew returned to the United States in February 2002.

State Post-Conviction, Petitioner's Application for Post-Conviction Relief-Death Penalty at 48.

Scholars made the same point in 2002, when Ms. Andrew had the chance to turn herself in to Mexican authorities:

> The Mexican Constitution states that every individual is capable of rehabilitation. Hence, no defendant extradited from Mexico to the United States can receive a sentence greater than forty years (sixty years for extreme cases), and certainly no death penalty.

45

> In just two months, the ruling "has stopped the extradition of more than 70 high-profile defendants." The consequence of this ruling is that prosecutors in the United States are forced to either reduce the sentences extradited defendants receive, or not prosecute the defendants at all.

Speedy Rice & Renee Luke, *U.S. Courts, the Death Penalty, and the Doctrine of Specialty: Enforcement in the Heart of Darkness*, 42 Santa Clara L. Rev. 1061, 1095 (2002) (quoting Tim Weiner, Extraditions Are Limited by a Ruling In Mexico, N.Y. Times, Jan. 20, 2002, at A9)) (footnotes omitted); *see* Mex. Const. art. 22, *translated in* William Schabas, *The Abolition of the Death Penalty in International Law* 250 n.4 (1993) (quoting the Mexican Constitution's limit on the death penalty). The Oklahoma Court of Criminal Appeals didn't address the *impossibility* of extraditing Ms. Andrew in the face of the judicial and statutory prohibitions against extradition of U.S. citizens facing capital charges.

The State contests these prohibitions with two examples of Mexico returning suspects to the United States without extraditing them. These two examples come from a Louisiana case (*State v. Sanders*, 648 So. 2d 1272 (La. 1994)) and press releases regarding Mexico's return of a suspect to Texas. Response to Petitioner's Original Application for Post-Conviction Relief at 10–13. But neither example casts doubt on Ms. Andrew's evidence. Her evidence had come from an attorney who represented the Mexican government. This attorney attested to Mexico's policy on extradition in early 2002, when Ms. Andrew had been in Mexico. In

46

contrast, the State's examples addressed two isolated incidents at other times.

In the State's first example, the defendant had been charged in Louisiana in 1990—more than a decade before the Mexican Supreme Court had banned extradition for capital crimes. *Sanders*, 648 So. 2d at 1276, 1283. The treatment of the *Sanders* defendant doesn't address Mexico's policy during the pertinent period.

The State's second example involved a deportation, not an extradition. When a U.S. citizen violates Mexico's immigration law, the individual can be deported to the United States without the need for extradition. *See* Yvonne M. Dutton, *U.S.-Mexico Extradition & Cross-Border Prosecution* 6 (Trans-Border Inst. 2004) ("[T]he United States may seek deportation only of non-nationals of Mexico and those who have otherwise violated some immigration law of Mexico.").

These circumstances existed for the State's second example. In that example, Mexico was able to deport a U.S. citizen because he had been arrested for violating Mexican laws involving possession of firearms, ammunition, and narcotics. Response to Petitioner's Original Application for Post-Conviction Relief, Exh. B. This example tells us little. Mexico could deport Ms. Andrew only on specific grounds. *See The Immigration Law of Mexico: Statute Regulations and Procedures Manual* III-10 (Nov.

47

2003). And no one has suggested the existence of grounds to deport Ms. Andrew.[14]

The State's two isolated examples not only failed to address Ms. Andrew's undisputed evidence of Mexican policy but also lacked admissible evidence. For the first example, the State relied on the facts of a Louisiana case. That court based its decision on the record there. Our record is different and contains no mention of the incident from the Louisiana case. And the Oklahoma Court of Criminal Appeals couldn't and didn't take judicial notice of the facts summarized in another case. *See McIvor v. Credit Control Servs., Inc.*, 773 F.3d 909, 914 (8th Cir. 2014) ("Judicial notice of another court's opinion takes notice of the 'existence of the opinion, which is not subject to reasonable dispute over its authenticity,' but not of the facts summarized in the opinion." (quoting *Lee v. City of Los Angeles*, 250 F.3d 668, 690 (9th Cir. 2001))).

The State's second example came from a press release and newspaper article, which constituted inadmissible hearsay. *See Turner v. State*, 505 P.2d 516, 518 (Okla. Crim. App. 1973) (Bliss, P.J., specially concurring) (concluding that a newspaper article was "pure hearsay" and therefore

---

[14] The majority mistakenly says that I have overlooked the state appellate court's reliance on the possibility of deportation. Maj. Op. at 70 n.43. To the contrary, neither the state appellate court nor the majority has explained how Mexico could have deported Ms. Andrew without any grounds under Mexican immigration law.

48

"incompetent"); *Martinez v. State*, 992 P.2d 426, 431 (Okla. Crim. App. 1999) (disallowing the use of hearsay in post-conviction proceedings).

The state court thus had undisputed evidence that Mexico's policy in 2002, consistent with the decision of the Mexican Supreme Court, prohibited extradition unless Oklahoma were to forgo the death penalty.

The majority questions Ms. Andrew's willingness to turn herself in to Mexican authorities. In state court, Ms. Andrew said in an affidavit that she would have surrendered to Mexican officials if she had been advised of a chance to avoid a death sentence:

> Had I been advised by [my attorney] to surrender to Mexican law enforcement officials or other Mexican government authorities and not cross back into the United States, and that by doing so I would be able to prevent the State of Oklahoma from seeking a death sentence against me, of course I would have done so.

*Id.* at 53.

The majority questions the credibility of Ms. Andrew's affidavit, calling it "nothing more than a self-serving attestation." Maj. Op. at 76. But affidavits don't become inherently incredible just because they're "self-serving." *See Martin v. United States*, 889 F.3d 827, 833 (6th Cir. 2018) (stating that when a district court considers whether to grant an evidentiary hearing, the court shouldn't regard "a 'self-serving' affidavit" as "inherently incredible"); *Sawyer v. United States*, 874 F.3d 276, 279 (7th Cir. 2017) (stating that when considering whether to grant an evidentiary hearing, district courts may not discount a petitioner's

49

declarations simply because they may be "self-serving"). In my view, the majority's skepticism of Ms. Andrew's affidavit—without any contrary evidence—shouldn't prevent an evidentiary hearing.

Even if we could decide the credibility of Ms. Andrew's affidavit, why is it difficult to believe that she would have turned herself in to avoid a possible death sentence? Everyone agrees that Ms. Andrew knew that Oklahoma had charged her with first-degree murder. Under Oklahoma law, first-degree murder required either imprisonment or the death penalty. Okla. Stat. tit. 21 § 701.9(A). The Mexican Supreme Court had just prohibited extradition when the prosecuting state sought the death penalty, and Mexican law forbade extradition to jurisdictions seeking the death penalty. *See* pp. 43–46, above. So if Ms. Andrew had turned herself in to Mexican authorities, she could have avoided extradition to Oklahoma unless it were to drop the death penalty.

Her only other option was to return to the United States, where she knew that she would be arrested and face the possibility of a death sentence or life imprisonment.[15] Given Ms. Andrew's obvious benefit from

---

[15] The majority responds that Oklahoma could have waited for Ms. Andrew to run out of cash and return to the United States. Maj. Op. at 70 n.43. The State doesn't make this argument here, and the majority's response is based on a misunderstanding of Ms. Andrew's claim. She claims that she should have turned herself in to Mexican authorities, not remain on the lam in Mexico. Ms. Andrew couldn't run out of cash and return to the United States if she had turned herself in to Mexican

turning herself in to Mexican authorities, I wouldn't so readily assume—as the majority does—that she would have bypassed that benefit and returned to face the possibility of a death sentence. At a minimum, Ms. Andrew's uncontested affidavit should have entitled her to an evidentiary hearing.[16]

The Oklahoma Court of Criminal Appeals nonetheless rejected Ms. Andrew's claim, reasoning that it had been based on debatable assumptions on what Mexico and Ms. Andrew would have done. But Ms. Andrew based her contentions on undisputed evidence. Given the lack of any contrary evidence, I would regard the state appeals court's application of *Strickland* as unsupportable and unreasonable. *See Mosley v. Atchison*, 689 F.3d 838, 848 (7th Cir. 2012) (concluding that the state court's rejection of a claim of ineffective assistance of counsel entailed an unreasonable application of *Strickland* because the court had disregarded the petitioner's uncontroverted affidavits); *Gray v. Zook*, 806 F.3d 783, 791 (4th Cir. 2015) ("When a state court apparently ignores a petitioner's

---

authorities. As the majority points out elsewhere, Ms. Andrew would have been detained in Mexico to await extradition. Maj. Op. at 76 n.48; *see* State Post-Conviction, Petitioner's Application for Post-Conviction Relief-Death Penalty at 48; *see also* p. 45, above (quoting an affidavit by an attorney who had represented the Mexican government in extradition cases).

[16]    The majority also questions whether Ms. Andrew would have left her children with Mr. Pavatt. Maj. Op. at 76. But the State has never argued that Ms. Andrew would have declined to turn herself in to Mexican authorities to avoid leaving her children with Mr. Pavatt.

properly presented evidence, its fact-finding process may lead to unreasonable determinations of fact.").

### D.    Ms. Andrew is entitled to an evidentiary hearing.

In the Oklahoma Court of Criminal Appeals and in federal district court, Ms. Andrew sought an evidentiary hearing on her claim of ineffective assistance of counsel. Both courts denied the requests. The Oklahoma court concluded that Ms. Andrew couldn't establish prejudice, and the federal district court concluded that her right to counsel hadn't attached when she was in Mexico. *See* Rec. vol. 1, at 1191–94, 1239–40.

We'd ordinarily review that decision for an abuse of discretion. *See* Maj. Op. at 76. But the court exercised its discretion based on a legal error, which would necessarily constitute an abuse of discretion. *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990) ("A district court would necessarily abuse its discretion if it based its ruling on an erroneous view of the law.").

The district court's legal error prevented examination of Ms. Andrew's allegations of ineffective assistance of counsel. In my view, those allegations merited an evidentiary hearing.

Under federal law, an evidentiary hearing is available only when the petitioner sought to "develop the factual basis of a claim in State court proceedings." 28 U.S.C. § 2254(e)(2). We thus consider whether Ms. Andrew

52

- showed diligence "in developing the factual basis for [her] claim of ineffective assistance in state court" and

- asserted a factual basis that, "if true, would entitle [her] to habeas relief."

*Boyle v. McKune*, 544 F.3d 1132, 1135 (10th Cir. 2008).

The first requirement is satisfied by Ms. Andrew's unsuccessful request for an evidentiary hearing in state court. *See id.* at 1136 ("The petitioner can prove [her] diligence by showing [she] 'could reasonably have believed' [her] request for an evidentiary hearing in state court met the requirements for such a hearing under then-existing state law." (quoting *Barkell v. Crouse*, 468 F.3d 684, 695 (10th Cir. 2006))).

The second requirement is satisfied by the evidence presented in state court. The State has questioned Ms. Andrew's account with factual arguments, but a court could resolve the factual issues only after allowing both sides to present their evidence. Ms. Andrew has not had that opportunity; and we have unresolved factual issues about what Ms. Andrew would have done, what her attorneys knew or should have known about Mexico's extradition treaty, what Mexico would or wouldn't have done if Ms. Andrew had surrendered to the Mexican authorities, and what Oklahoma would have done if Mexico had refused to extradite Ms. Andrew to face the death penalty.

If the evidentiary hearing would yield findings favoring Ms. Andrew, she could obtain habeas relief for ineffective assistance of counsel. For

53

example, her attorney's failure to advise her of the advantages of surrendering to the Mexican authorities could constitute deficient performance if the attorney should have known of these advantages and the value of presenting these options to Ms. Andrew. *See Harrington v. Richter*, 562 U.S. 86, 104 (2011). That deficiency could have proved prejudicial if Ms. Andrew would have stayed in Mexican custody or otherwise avoided extradition until Oklahoma prosecutors agreed to forgo the death penalty. Ms. Andrew's undisputed evidence entitled her to an evidentiary hearing on these factual questions.

\* \* \*

In summary, I would remand the claim of ineffective assistance of counsel for the district court to conduct an evidentiary hearing. At an evidentiary hearing, the parties should be able to present evidence on (1) whether defense counsel had advised Ms. Andrew of her right to turn herself in to Mexican authorities and (2) whether Ms. Andrew could have avoided the death penalty by turning herself in to Mexican authorities. We lack enough information to resolve these factual questions. So the district court should reconsider this claim after conducting an evidentiary hearing.

## V.    Conclusion

I would reverse the denial of habeas relief on the convictions. In my view, the combination of errors deprived Ms. Andrew of a fundamentally fair trial.

54

Even if the trial had been fair, however, I would reverse as to the death sentence. Many unresolved factual issues bear on the reasonableness and impact of defense counsel's failure to advise Ms. Andrew about the potential opportunity to avoid a death sentence. The district court resolved these factual issues without allowing an evidentiary hearing. In my view, the denial of an evidentiary hearing compels reversal as to the death sentence.